## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| LIST INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | )      **Court No. 21-00521** |
| | ) |
| ZHEJIANG XINGYI METAL | ) |
| PRODUCTS CO., LTD. / XINGYI | ) |
| METALWORKING TECHNOLOGY | ) |
| (ZHEIJIANG) CO., LTD., | ) |
| | ) |
| HANGZHOU XLINE MACHINERY & | ) |
| EQUIPMENT, | ) |
| | ) |
| WEC MANUFACTURING, LLC., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

## PLAINTIFF'S BRIEF IN SUPPORT OF RULE 56.2
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Kathleen W. Cannon
R. Alan Luberda
Elizabeth C. Johnson

**KELLEY DRYE & WARREN LLP**
**3050 K Street N.W., Suite 400**
**Washington, D.C. 20007**
**(202) 342-8400**

**Counsel to Plaintiff List Industries,**
**Inc.**

Dated:  February 22, 2022

## Table of Contents

Page

RULE 56.2 STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................... 12

STANDARD OF REVIEW ..................................................................................... 14

ARGUMENT ........................................................................................................... 16

I. COMMERCE'S FINDINGS THAT GRUPO CARSO DOES NOT PRODUCE COMPARABLE MERCHANDISE WHILE AYES DOES WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WERE CONTRARY TO LAW .............................................................. 16

II. COMMERCE'S DETERMINATION THAT AYES HAD A SUITABLE FINANCIAL STATEMENT FROM WHICH TO CALCULATE SURROGATE FINANCIAL RATIOS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW ................ 21

  A. Commerce's Treatment of "Other Real Operating Income" Is Not Supported By the Record and is Contrary to Law ................... 23

  B. Commerce's Treatment of "Income from Investing Activities" Is Not Supported By the Record and is Contrary to Law .......................... 26

III. COMMERCE'S SELECTION OF TURKEY OVER MEXICO AS A SURROGATE COUNTRY WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW ................ 29

  A. Commerce Failed to Compare the Quality of Turkish and Mexican Surrogate Value Data ........................................................... 30

  B. The Record Shows Mexican Surrogate Value Data is Superior to Turkish Data……………………….............................................. 34

CONCLUSION........................................................................................................ 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Canadian Solar Int'l Ltd. v. United States,
    378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) ....................................................21, 29

Carbon Activated Tianjin Co. v. United States,
    503 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ................................................. *passim*

DAK Ams. LLC v. United States,
    456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...........................................................23

Diamond Sawblades Mfrs. Coal. v. United States,
    219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017) ...........................................................36

Evonik Rexim (Nanning) Pharmaceutical v. United States,
    253 F. Supp. 3d 1364 (Ct. Int'l Trade 2017) ....................................................17, 19

Husteel Co. v. United States,
    491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007) ...........................................................15

Hyundai Heavy Indus., Co. v. United States,
    332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ....................................................15, 20

Hyundai Heavy Indus., Co. v. United States,
    393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ...........................................................19

Jacobi Carbons AB v. United States,
    222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) ....................................................14, 33

Jacobi Carbons AB v. United States,
    365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ....................................................15, 37

Jiaxing Bro. Fastener Co. v. United States,
    961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014) ..................................................... 33-34

Jiaxing Bro. Fastener Co. v. United States,
    822 F.3d 1289 (Fed. Cir. 2016)................................................................................30

Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,
    463 U.S. 29 (1983)................................................................................................ 14-15

NMB Singapore Ltd. v. United States,
    557 F3d. 1316 (Fed. Cir. 2009)...............................................................................15

Pakfood Public Co. v. United States,
  724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ............................................................ 20-21, 27

Qingdao Qihang Tyre Co. v. United States,
  308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ........................................................................36

Shakeproof Assembly Components Div. of Illinois Tool Works, Inc.
  v. United States,
  30 C.I.T. 1173 (2006), aff'd, 228 Fed. Appx. 1001 (Fed. Cir. July 16, 2007)
  (per curiam)..........................................................................................................................34

Shanghai Foreign Trade Enterprises Co. v. United States,
  318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ............................................................ 16-17, 19

SKF USA Inc. v. United States,
  263 F.3d 1369 (Fed. Cir. 2001)...............................................................................15, 23, 25

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
  716 F.3d 1370 (Fed. Cir. 2013)...........................................................................................37

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(A) ...........................................................................................................15

19 U.S.C. § 1516a(b)(1)(B)(i).........................................................................................................14

19 U.S.C. § 1677b(c)(1)...................................................................................................................16

19 U.S.C. § 1677b(c)(1)(B) .............................................................................................................34

19 C.F.R. § 351.301(c)(4)................................................................................................................31

## Administrative Determinations

Certain Metal Lockers and Parts Thereof From the People's Republic of China:
  Antidumping and Countervailing Duty Orders, 86 Fed. Reg. 46,826
  (Dep't Commerce Aug. 20, 2021) ("Orders") (P.R. 368)..............................................1, 20, 38

Certain Metal Lockers and Parts Thereof From the People's Republic of China:
  Final Affirmative Determination of Sales at Less Than Fair Value,
  86 Fed. Reg. 35,737 (Dep't Commerce July 7, 2021)
  ("Final Determination") (P.R. 363) ..................................................................... passim

Certain Metal Lockers and Parts Thereof From the People's Republic of China:
  Initiation of Less-Than-Fair Value Investigation, 85 Fed. Reg. 151
  (Dep't Commerce Aug. 5, 2020) (P.R. 23)................................................................2

Certain Metal Lockers and Parts Thereof from the People's Republic of China:
  Preliminary Affirmative Determination of Sales at Less Than Fair Value,
  Postponement of Final Determination and Extension of Provisional Measures,
  86 Fed. Reg. 9051 (Dep't Commerce Feb. 11, 2021)
  ("Preliminary Determination") (P.R. 301)...................................................... *passim*

Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:
  Issues and Decision Memorandum for the Final Results of the 2009-2010
  Administrative Review of the Antidumping Duty Order
  (Dep't Commerce Mar. 5, 2012) ("CNPO Tires from China IDM"),
  referenced in, 77 Fed. Reg. 14,495 (Mar. 12, 2012) (final results) .................................22, 26

Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from
  the People's Republic of China: Final Determination of Sales at Less Than
  Fair Value and Critical Circumstances, in Part, 75 Fed. Reg. 57,449 (Sept. 21,
  2010) (final determination)........................................................................31

Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-
  Value Investigation of Certain Metal Lockers and Parts Thereof from the
  People's Republic of China (Feb. 4, 2021) ("PDM").......................................... *passim*

Decision Memorandum for the Preliminary Results of Antidumping Duty
  Administrative Review: Certain New Pneumatic Off-the-Road Tires from the
  People's Republic of China (Dep't Commerce Sept. 30, 2015), referenced in
  80 Fed. Reg. 61,166 (Oct. 9, 2015) (prelim. results), unchanged in
  81 Fed. Reg. 23,272 (Dep't Commerce Apr. 20, 2016) (final results) ...................................31

Issues and Decision Memorandum for the Final Affirmative Determination in the
  Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts
  Thereof from the People's Republic of China (June 28, 2021)
  ("IDM") (P.R. 348) ......................................................................... *passim*

Issues and Decision Memorandum for the Final Affirmative Determination in the
  Less-Than-Fair-Value Investigation of Methionine from Japan
  (Dep't Commerce July 19, 2021), referenced in 86 Fed. Reg. 38,983
  (July 23, 2021) (final determination)................................................... 24-25

Issues and Decision Memorandum for the Final Determination of the Less-Than-
  Fair-Value Investigation of Certain Polyethylene Terephthalate (PET) Resin
  from India (Dep't Commerce Mar. 4, 2016), referenced in
  81 Fed. Reg. 13,327 (Mar. 14, 2016) (final determination).............................. 24-25

Issues and Decision Memorandum for the Final Results of the 2008-2010
    Antidumping Duty Administrative Review of Citric Acid and Certain Citrate
    Salts from the People's Republic of China (Dep't Commerce Dec. 7, 2011),
    referenced in 76 Fed. Reg. 77,772 (Dec. 14, 2011) (final results)...................................26, 27

Issues and Decision Memorandum for the Final Results of the 2006-2007
    Administrative Review of Pure Magnesium from the People's Republic of
    China (Dep't Commerce Dec. 8, 2008), referenced in 73 Fed. Reg. 76,336
    (Dec. 16, 2008) (final results), remanded in part, on other grounds,
    Tianjin Magnesium Int'l Co. v. United States,
    722 F. Supp. 2d 1322 (Ct. Int'l Trade 2010) .........................................................................26

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade and the Court's December 21, 2021 Scheduling Order (ECF No. 31), Plaintiff List Industries, Inc. ("List") files this memorandum in support of its motion for judgment on the administrative record.

## RULE 56.2 STATEMENT

1.     The administrative determination under review is <u>Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 86 Fed. Reg. 35,737 (Dep't Commerce July 7, 2021) (hereinafter, "<u>Final Determination</u>") (P.R. 363),[1] and the United States Department of Commerce's ("Commerce") accompanying issues and decision memorandum, <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China</u> (June 28, 2021) (hereinafter, "<u>IDM</u>") (P.R. 348) and order, <u>Certain Metal Lockers and Parts Thereof From the People's Republic of China: Antidumping and Countervailing Duty Orders</u>, 86 Fed. Reg. 46,826 (Aug. 20, 2021) ("Order") (P.R. 368).

2.     The issues presented for the Court's determination are:

a.     Whether Commerce's determination that Grupo Carso S.A.B. de C.V. ("Grupo Carso") is not a producer of merchandise comparable to the subject metal lockers, and Commerce's subsequent rejection of Grupo Carso's financial statements for determining surrogate financial ratios, was unsupported by substantial evidence and contrary to law.

---

[1]     Documents in the administrative record are cited by their confidential and/or public record number (<u>i.e.</u>, "(CR__)" and "(PR__)") provided in the Index to the Administrative Record filed with the Court on November 23, 2021 (ECF No. 28).

1

b.       Whether Commerce's calculation of Ayes Celikhasir VE CT ("Ayes")'s surrogate financial ratios, and Commerce's determination that Ayes was a profitable company, was unsupported by substantial evidence and not in accordance with law; and

c.       Whether Commerce's selection of Turkey over Mexico as the primary surrogate country was unsupported by substantial evidence and contrary to law.

## STATEMENT OF FACTS

### A.       Initial Investigation and Selection of Surrogate Country and Values

List Industries is a United States manufacturer and producer of the domestic product that is like the subject metal lockers from China.  List, along with several other petitioners, filed antidumping duty ("AD") and countervailing duty petitions on July 9, 2020, concerning imports of metal lockers from China.  Commerce initiated the AD investigation on August 5, 2020 (see Certain Metal Lockers and Parts Thereof From the People's Republic of China: Initiation of Less-Than-Fair Value Investigation, 85 Fed. Reg. 151 (Dep't Commerce Aug. 5, 2020) (P.R. 23), and selected Hangzhou Xline Machinery & Equipment Co., Ltd. ("Hangzhou Xline"), and, Zhejiang Xingyi Metal Products Co., Ltd. ("Zhejiang Xingyi"), as mandatory respondents.  See Memorandum Re: "Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China: Respondent Selection" (Aug. 19, 2020) (P.R. 74).

Because Commerce considers China "to be a non-market economy country in the context of antidumping duty proceedings," Commerce requested interested parties to submit comments on Commerce's selection of a surrogate country and surrogate values in the investigation.  See Memorandum Re: "Certain Metal Lockers and Parts Thereof from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (Sep. 16, 2020) (P.R. 142).  Commerce provided a non-exhaustive list of six countries that are at the same level of economic development as China, based on per capita gross

2

net income:  Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.  Id. at Attachment 1.

Commerce then requested the parties to:

> {S}ubmit information regarding the selection of a surrogate country by providing the following information regarding that country:
>
> (1) Information on whether the country is a significant producer of merchandise comparable to the merchandise subject to this investigation;
>
> (2) Information regarding data availability and quality of the data available within that single country for the major factors of production used to produce the merchandise subject to this investigation; and
>
> (3) Information regarding data availability and quality of financial statements available within that country for producers of merchandise identical or comparable to the merchandise subject to this investigation.

Id. at 1-2.  Commerce further requested interested parties to submit "publicly-available

information to value the factors of production in its preliminary determination," (i.e., surrogate

values).  Id. at 2.

Petitioners submitted surrogate country and value comments for two countries that were

at a level of economic development comparable to that of China and substantial producers of

comparable merchandise, including Mexico.  See Letter from Kelley Drye & Warren to Dep't of

Commerce Re: "Certain Metal Lockers and Parts Thereof from the People's Republic of China –

Petitioners' Comments on Surrogate Country Selection and Submission of Surrogate Values"

(Nov. 17, 2020) ("Pet. SV/SC Cmts.") (P.R. 227).[2]  As part of their submission, petitioners

submitted financial statements and surrogate financial ratios for Mexican producer Grupo Carso.

---

[2]    Petitioners requested, and received, a one-day extension of time to submit comments on Commerce's selection of a surrogate country and surrogate values.  See Memorandum from Dep't of Commerce Re: "Extension of Deadline to File Comments on Surrogate Countries and Surrogate Values and Treatment of Production Component Names" (Nov. 17, 2020) (P.R. 226).

Id. at Exh. Mexico-1, Mexico-9 (P.R. 228-230). Grupo Carso produces a number of comparable metal products to metal lockers including: pressure vessels; large containers; steel tubing; metallic structures for bridges, buildings and mining branches; heat exchangers; distillation towers; air coolers; surface capacitors; cables; and high pressure feed water heaters. Id. at Exh. Mexico-9 (P.R. 230).

Respondent Zhejiang Xingyi, by contrast, submitted surrogate country and surrogate value comments for Turkey. See Letter from Morris, Manning & Martin, LLP to Dep't of Commerce, Re: "Antidumping Duty Investigation for Certain Metal Lockers and Parts Thereof from China, Case No. A-570-133: Surrogate Value and Surrogate Country Comments" (Nov. 16, 2020) ("Zhejiang Xingyi SV/SC Cmts.") (P.R. 213). Zhejiang Xingyi's submission did not include financial statements for any Turkish company for Commerce's calculation of surrogate financial ratios. See id.

On December 11, 2020, Zhejiang Xingyi submitted a rebuttal to petitioners' surrogate value comments, in which Zhejiang Xingyi argued petitioners had submitted incorrect HTS codes for "certain of {Zhejiang Xingyi's} factors of production." See Letter from Morris, Manning & Martin, LLP to Dep't of Commerce, Re: "Certain Metal Lockers And Parts Thereof From the People's Republic of China, Case No. A-570-133: Rebuttal Surrogate Value and Surrogate Country Comments" (Dec. 11, 2020) ("Zhejiang Xingyi SV/SC Rebuttal Cmts.") (P.R. 262). A week later, Zhejiang Xingyi submitted surrogate financial ratios for Ayes – the first time Zhejiang Xingyi had submitted financial statements for any Turkish company in the investigation. See Letter from Morris, Manning & Martin, LLP to Dep't of Commerce, Re: "Certain Metal Lockers And Parts Thereof From the People's Republic of China, Case No. A-570-133: Submission of Surrogate Financial Ratios" (Dec. 18, 2020) ("Zhejiang Xingyi

Surrogate Ratio Submission") (P.R. 269).  Ayes produces wire mesh products, like mesh fencing and panels, as well as wire rod, cold drawn steel bars, construction iron, and certain machines (drawing machines, cutting machines, butt welding machines, and wire mesh bending machines). Id. at Exh. 3.  Zhejiang Xingyi argued that Ayes's production processes for its wire mesh products were similar to the production of metal lockers, but did not argue that Ayes's wire mesh products were physically similar, or had similar end uses, to subject lockers.  Id. at 2, Exh. 4. Zhejiang Xingyi also provided no information about the production processes for Ayes's machinery products.  Id.

### B.  Department's Preliminary Determination

In its Preliminary Determination, Commerce found that the only two complete audited financial statements on the record were for Grupo Carso (Mexico) and Ayes (Turkey).  See Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures, 86 Fed. Reg. 9051 (Dep't Commerce Feb. 11, 2021) (P.R. 301) ("Preliminary Determination") and accompanying Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China (Feb. 4, 2021) ("PDM") at 13 (P.R. 285).  However, Commerce rejected Grupo Carso as a producer of comparable merchandise to the subject lockers, stating:

> An examination of Grupo Carso's audited financial statements
> reveals that Grupo Carso is a diversified conglomerate with
> commercial, industrial, infrastructure, construction, and energy
> sectors, which do not produce comparable merchandise.  Ayes
> produces mesh fences, steel mesh, ribbed iron, and certain
> machines (drawing machine, cutting machines butt welding
> machines, wire mesh bending machines).  As a result, because
> Ayes produces merchandise comparable to the subject

> merchandise, its audited financial statements constitute the only information on the record suitable for the determination of surrogate financial ratios.

Id. at 13 (P.R. 285) (internal citations omitted).  Commerce noted in a footnote that Grupo Carso produced products like pressure vessels and large containers, but did not analyze whether these products were similar to lockers.  Id.  Nor did Commerce provide any reasoning as to why Ayes's mesh products and machines were comparable to subject lockers.  See generally id.

Based on Commerce's preliminary decision that Ayes was the only producer of comparable merchandise with complete audited financial statements on the record, Commerce further found it had "complete {surrogate value, or "SV"} information on the record only for Turkey."  Id.  Commerce thus concluded:

> {W}e preliminarily determine that, pursuant to section 773(c)(4) of the Act, it is appropriate to use Turkey as the primary surrogate country.  Turkey is: (1) at the same level of economic development of China; (2) a significant producer of merchandise comparable to the subject merchandise; and (3) offers the best available data for valuing {factors of production, or "FOPs"}.

Id.

In calculating Ayes's selling, general and administrative ("SG&A") ratios from Ayes's financial statements, Commerce preliminarily excluded most line items categorized as "Other Real Operating Income" because Ayes's "financial statements neither describe nor discuss how this income is associated with the general operations of the company."  Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary Surrogate Value Memorandum (Feb 4, 2021) ("Prelim SV Mem.") at 6 (P.R. 295). These "Other Real Operating Income" line items included deferred finance income, incentive income, shipping revenues, provisions no longer required, exchange difference income, price difference, and other income and profits.  Id. at Attach. 3.  Commerce also preliminarily

excluded line items categorized as "Income from Investing Activities" listed as securities value increase profits and rental income.  Id. at 6.

C.     Petitioners' Arguments to Commerce

In their case brief to Commerce, petitioners challenged Commerce's reliance on Ayes's financial statements and ultimate selection of Turkey as the surrogate country.  See Certain Metal Lockers and Parts Thereof From People's Republic of China: Petitioners' Case Brief (May 12, 2021) ("Pet. Case Br.") (P.R. 341; C.R. 296).  First, petitioners explained that Grupo Carso's products included a "wide range of industrial products (e.g., metal containers and structures for construction)" involving similar materials and production processes to lockers, making Grupo Carso an appropriate source of financial ratios for the calculation of surrogate values.  Id. at 4. This issue is important because Commerce's rejection of Mexico as an appropriate surrogate country relied heavily on Commerce's determination that no Mexican producer of merchandise comparable to subject metal lockers had financial statements on the record.

Second, petitioners argued that surrogate data from Mexico was superior to that of Turkey, because (1) Mexico produced greater volumes of comparable merchandise than Turkey; (2) the Turkish data for several factors of production were not contemporaneous – i.e., not specific to the period of investigation; and (3) the Grupo Carso financial statements were superior to those of Ayes.  Id. at 4-7.

In particular, petitioners explained that the pre-tax profit that is reflected in Ayes's 2019 consolidated financial statements occurred only due to amounts listed as "other income" and investment activities not related to normal production operations.  Id. at 10-11.  Specifically, petitioners identified six line items of "Other Real Operating Income" (Deferred Finance Income, Incentive Income, Shipping Revenues, Provisions No Longer Required, Price

Difference, and Other Income and Profits) and three line items of "Income from Investing Activities" (Interest Income, Securities Value Increase Profits, and Rental Income) which totaled Turkish Lira ("TL") -5,587,695.  Id. at 11 (income items were expressed as negative numbers while costs and expenses were expressed as positive numbers).  Petitioners explained that because Commerce had properly excluded these line items from its calculation of Ayes's financial results in its preliminary determination, Commerce should have also removed these line items from Ayes's profit for the same reason – because Ayes's financial statements neither described nor discussed how this income is associated with the general operations of the company.  Id. at 11-12.  Ayes's entire pre-tax profit in 2019 was only TL 1,984,287.  Id.  Thus, once the "Other Real Operating Income" and "Income from Investing Activities" line items were removed, Ayes's financial statements show Ayes is *unprofitable*, and therefore should not have been used for Commerce's surrogate financial ratio analysis under Commerce's established practice of only using the financial statements of profitable companies.  Id. at 12.  Moreover, the financial statements of Ayes were far less detailed than the financial statements of Grupo Carso, and Ayes's products were less similar (primarily wire and other long steel products rather than products made from flat-rolled steel like lockers) to metal lockers than were Grupo Carso's products.  Id. at 12-14.

       **D.**      **Department's Final Determination**

In its Final Determination, Commerce found that the subject metal lockers and parts thereof were, or were likely to be, sold in the United States at less than fair value.  Final Determination, 86 Fed. Reg. at 35,737 (P.R. 363).  In calculating surrogate values, Commerce continued to select Turkey as the primary surrogate country.  IDM at 12 (P.R. 348).  Specifically, Commerce determined that "Turkey and Mexico are both at the same level of economic

development as China and qualify as significant producers of comparable merchandise," and that "the only complete, audited financial statements on the record" were those of Grupo Carso and Ayes.  <u>Id.</u>  Commerce once again concluded, however, that Grupo Carso was not a producer of merchandise comparable to metal lockers.  <u>Id.</u> at 13.

Although Commerce acknowledged Grupo Carso produced products like metallic structures, heat exchangers; pressure vessels, distillation towers, air coolers, surface capacitors, high pressure feed water heaters, and large containers – which Petitioners contended were comparable merchandise to metal lockers, <u>see</u> Pet. Case Br. at 4 (P.R. 341; C.R. 296) – Commerce found "the record lacks any evidence regarding the physical characteristics, end uses or the production process for such containers."  <u>IDM</u> at 13 (P.R. 348).  Thus, Commerce "continue{d} to find that Grupo Carso is not a producer of merchandise comparable to metal lockers."  <u>Id.</u>  With respect to Ayes, Commerce repeated its finding from the <u>Preliminary Determination</u>:

> Ayes, however, produces mesh fences, steel mesh, ribbed iron, and certain machines (drawing machine, cutting machines, butt welding machines, wire mesh bending machines, etc.).  As a result, we determined that Ayes produces merchandise comparable to the subject merchandise, and that its audited financial statements constitute the only information on the record suitable for the determination of surrogate financial ratios specific to metal locker production.

<u>Id.</u> at 12 (citing <u>PDM</u> at 13 (P.R. 285); Zhejiang Xingyi Surrogate Ratio Submission (P.R. 269)).[3]  Commerce offered no analysis as to the comparability of Ayes's merchandise to the subject lockers and pointed to no "evidence regarding the physical characteristics, end uses or the production process" that would in any way differentiate the record regarding Ayes's products

---

[3]    Commerce only cited Zhejiang Xingyi's surrogate value and surrogate country comments generally, and did not point to any particular section or page of those comments in support of Commerce's conclusion.  <u>See</u> <u>IDM</u> at 12, n.56 (P.R. 348); <u>PDM</u> at 13, n.102 (P.R. 285).

from those of Grupo Carso which Commerce had rejected.  Commerce then concluded that "Turkey is the only country that has usable financial statements on the record from a comparable producer for the purposes of valuing surrogate financial ratios." Id. at 14.

Commerce acknowledged that Mexican data for certain factors of production were "more contemporaneous than that of corresponding Turkish data," but stated that because Grupo Carso was found not to be a producer of comparable merchandise, "the selection of Mexico does not offer a complete set of information from which to derive SVs and surrogate financial ratios." Id. at 13.  The more contemporaneous Mexican data thus did not "overcome Commerce's preference to value all data from a single source country." Id.  Commerce did not engage in any qualitative analysis of the other surrogate values from the two countries. Therefore, the rejection of Mexico as a surrogate country turned almost entirely on the finding that Grupo Carso did not produce comparable merchandise.[4]

Commerce also continued to use Ayes's financial statements to calculate surrogate financial ratios.  Id. at 14.  Commerce acknowledged its general practice was to exclude certain line items unrelated to a company's general operations – i.e., items such as income reported as an FOP, income related to a separate line of business, income related to the disposal of non-routine assets, and interest income generated from long-term financial assets – as an offset to SG&A expenses.  Id. at 15.  Commerce also acknowledged that where line items "should be excluded as offsets to S&GA and interest expenses, {Commerce} will also remove those line items from profit." Id. at 15-16.

---

[4]   Commerce also stated "the record is incomplete with respect to {surrogate values} from Mexico, but is complete with respect to {surrogate values} from Turkey," based on an argument by Zhejiang Xingyi that petitioners "misclassified the surrogate value for COLD_GDG_56 as {Harmonized Tariff Schedule ("HTS")} 7209.26, rather than 7211.29," making the data from Mexico "unreliable." Id.  This issue is addressed in Section III.A, infra.

However, Commerce did not remove the six line items under Ayes's "Other Real Operating Income," which Commerce had preliminarily excluded as offsets to Ayes's SG&A income, from Ayes's profit.  Instead, Commerce *reclassified* these line items – along with Rental Income, one of the line items under "Income from Investing Activities"– as *included* offsets to SG&A expenses.  Id. at 15.  Commerce's explanation for this change was that, "by definition, these items pertain to the general operations of the company."   Dep't of Commerce Memorandum Re: "Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China: Changes to the Surrogate Financial Ratios for the Final Determination," (June 28, 2021) ("Final SV Mem.") at 2 (P.R. 357).  In a footnote, Commerce elaborated:

> In the Preliminary Determination, we excluded all line items except exchange difference income, explaining that it was our understanding at the time that Ayes' financial statements neither described nor discussed how this income is associated with the general operations of the company.  However, ***we have come to understand that the term, "real operating income," in audited financial statements means that the relevant expense categories apply to the general operations of the company***.

Id. at 2, n.6 (emphasis added).  Commerce did not explain, or cite any record evidence in support of, its new understanding of the definition of "Other Real Operating Income" in Turkish financial statements.  With respect to Ayes's "Income from Investing Activities," Commerce continued to exclude interest income as an offset to SG&A because Commerce was "unable to identify whether the interest income is short-term or long-term in nature," but chose not to adjust Ayes's profit for this line item.  IDM at 16 (P.R. 348).  Commerce also reclassified Securities Value Increase Profits as an increase to profit.  Id.

Commerce further rejected petitioners' argument that Grupo Carso's financial statements were superior to those of Ayes because they are more detailed, holding: "Absent any record

evidence demonstrating that Ayes's financial statements are insufficiently detailed to calculate financial ratios, we reject the petitioners' contention that Grupo Carso's financial statements are more suitable because they are more detailed than those of Ayes." Id. at 16. Commerce concluded: "Accordingly, we will continue to use Ayes' financial statements to calculate surrogate financial ratios for the final determination of this investigation." Id. at 18.

## SUMMARY OF ARGUMENT

Commerce's selection of Turkey rather than Mexico as the primary surrogate country in this investigation, and its resulting selection of surrogate values that flowed from that choice, were not supported by substantial evidence or in accordance with law.

First, Commerce's decision to reject the financial statements of Mexican producer Grupo Carso, based on Commerce's determination that Grupo Carso did not produce merchandise comparable to the subject metal lockers, is unsupported by the record. Commerce's decision that Grupo Carso's products, like steel tubing, pressure vessels, high pressure feed water heaters, and large containers were not comparable to metal lockers was conclusory, lacking any analysis of the similarities or differences between the products. This decision was made even less supported by the record by Commerce's second conclusory finding that Ayes's mesh fencing, ribbed iron, and machinery were comparable to metal lockers, again without any discussion or analysis of the similarities or differences in physical characteristics, production processes, or end uses of metal lockers and the products manufactured by Ayes. Commerce failed to articulate a single reason supported by substantial evidence why Ayes's products were comparable to metal lockers and Grupo Carso's were not, and the record does not support such a conclusion. Accordingly, Commerce's rejection of Grupo Carso's financial statements was unsupported by the record. The agency is required to provide a reasoned explanation supported by substantial evidence for its determination, and has not done so here.

Second, Commerce's decision to accept Ayes's financial statements for determining surrogate financial ratios was also contrary to law and unsupported by the record.  As noted, the record does not contain a reasoned explanation supported by substantial evidence that Ayes produced comparable products.  In addition, Commerce should have found that Ayes was unprofitable in 2019, and rejected its financial statements consistent with Commerce's well-established practice not to rely on financial statements of unprofitable companies.  In its Preliminary Determination, Commerce found Ayes to be profitable solely because certain income items that had been excluded from Ayes's SG&A ratio (i.e., line items included as "Other Real Operating Income" and "Income from Investing Activities") had not also been removed from Ayes's profit.  Commerce's standard practice is to remove from profit any income items that are excluded as offsets to SG&A.  Rather than remedying this defect in its Final Determination, however, Commerce reversed course and *included* most of these items as offsets to Ayes's SG&A without any record basis for doing so.  Thus, Commerce's final determination that Ayes was profitable is based on Commerce's improper treatment of "Other Real Operating Income" and "Income from Investing Activities" as offsets to SG&A and its improper failure to remove these items from Ayes's profit.  Commerce's failure to articulate an explanation for its treatment of these line items is unsupported by substantial evidence and otherwise contrary to law.

Third, Commerce's ultimate selection of Turkey over Mexico as the primary surrogate country was unsupported by the record evidence and contrary to law.  Commerce failed to follow its own sequential process for selecting a primary country, foregoing all comparative assessments of the relative data quality between Turkey and Mexico, and instead choosing Turkey as the primary surrogate country based solely on its prior determination that Grupo Carso

did not produce merchandise comparable to subject lockers.  Whatever Commerce's conclusions regarding the Grupo Carso financial statements, however, Commerce was still required to analyze the quality of the various Turkish surrogate values and compare them to the Mexican surrogate values.  Yet Commerce failed to offer *any* analysis of the quality of Turkish surrogate values, even in isolation.  Moreover, the record shows that the Mexican data were superior to the Turkish data.  Many of the Mexican surrogate values were more contemporaneous than Turkish surrogate values, and the Grupo Carso financial statements – which Commerce should have found were usable – were both more detailed than those of Ayes and from a profitable company.  However, Commerce disregarded the superior Mexican data solely because of its (flawed) decision that Grupo Carso did not produce merchandise comparable to metal lockers.  Commerce failed to fulfill its overriding obligation for obtaining the "best data" to calculate a respondent's dumping rate, and thus Commerce's selection of Turkey as the primary surrogate country was not supported by substantial evidence or in accordance with law.

## STANDARD OF REVIEW

Commerce's determination can only be upheld if the Court finds it is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).  "In determining whether substantial evidence supports Commerce's determination, the court must consider 'the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'''  Jacobi Carbons AB v. United States, 222 F. Supp. 3d 1159, 1168 (Ct. Int'l Trade 2017) (quoting Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (in turn quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The standard also requires Commerce to articulate a satisfactory reasoned explanation for its action including a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983);

14

<u>Husteel Co. v. United States</u>, 491 F. Supp. 2d 1283,1291-93 (Ct. Int'l Trade 2007) (finding the agency's determination unsupported by substantial evidence because the agency "did not provide a reasoned explanation supported by a stated connection between the facts found and the choices made . . . ." (citation omitted)).   In other words, "To be supported by substantial evidence, Commerce must explain the basis for its decisions sufficiently to make its decisions reasonably discernable to a reviewing court."   <u>Hyundai Heavy Indus., Co. v. United States</u>, 332 F. Supp. 3d 1331, 1349 (Ct. Int'l Trade 2018) (citing <u>NMB Singapore Ltd. v. United States</u>, 557 F3d. 1316, 1319 (Fed. Cir. 2009) (in turn citing <u>NSK Ltd. v. United States</u>, 481  F.3d 1355, 1359 (Fed. Cir. 2007))).   "{W}hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."   <u>NMB Singapore Ltd.</u>, 557 F.3d at 1319.

Moreover, the Court will hold as unlawful any administrative decision that is arbitrary, capricious or an abuse of discretion.   19 U.S.C. § 1516a(b)(1)(A).   "To effectuate judicial review, Commerce must provide 'a reasoned analysis or explanation for {its} decision' so the court may 'determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.'"   <u>Jacobi Carbons AB v. United States</u>, 365 F. Supp. 3d 1323, 1350 (Ct. Int'l Trade 2019) (quoting <u>Thai I-Mei Frozen Foods Co., Ltd. v. United States</u>, 616 F.3d 1300, 1304 (Fed. Cir. 2010).   It is well established that "{a}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."   <u>SKF USA Inc. v. United States</u>, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (internal quotation marks omitted) (internal citations omitted).

15

## ARGUMENT

### I.   COMMERCE'S FINDINGS THAT GRUPO CARSO DOES NOT PRODUCE COMPARABLE MERCHANDISE WHILE AYES DOES WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WERE CONTRARY TO LAW

Commerce's rejection of Grupo Carso's surrogate financial ratios, which was based entirely on Commerce's determination that Grupo Carso did not produce comparable merchandise to the subject lockers, was not supported by substantial evidence.  See IDM at 12-13 (P.R. 348).  In antidumping investigations of imports from a non-market economy ("NME") country, Commerce calculates normal value on the NME producer's factors of production using a surrogate market economy country or countries that, pursuant to section 773(c)(4) of the Act, Commerce considers to be "at a level of economic development comparable to that of the non-market economy country" and a "significant producer of comparable merchandise."  IDM at 11 (citing 19 U.S.C. § 1677b(c); 19 C.F.R. § 351.408).  The statute requires that the valuation of the factors of production "be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1).

"To determine if a product produced by a company in the surrogate country is comparable, Commerce's established practice is to apply a three-part test that examines 'physical characteristics, end uses, and production processes.'"  Shanghai Foreign Trade Enterprises Co. v. United States, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004).  Application of that test requires Commerce to engage in actual analysis with reasoned explanation for its decision supported by substantial record evidence – something Commerce did not do in this case.  In Shangai Foreign Trade Enterprises, the court remanded Commerce's determination to rely on Reserve Bank of India surrogate financial data and reject surrogate financial data from Indian

brake rotor producers, where Commerce merely repeated parties' arguments that cast iron brake rotors were not comparable to the subject merchandise (cast iron pipe fittings) and failed to conduct its own analysis of the issue.  318 F. Supp. 2d at 1347-48.  The court found Commerce's analysis "present{ed} little more than paraphrases of the contentions of the parties" and "conclusory statements," and "fail{ed} to discuss why" cast iron brake rotors were not comparable to the subject merchandise.  Id.  The court also noted "{n}either the Federal Register notice announcing the Final Determination nor the Issues and Decision Memorandum provides reasons why Commerce, in this case, departed from its practice by omitting an analysis of its application of the three-part test or another such test."  Id. at 1348.  The court concluded:

> If steel fence posts are comparable to steel pipes and pipe fittings, if a food additive is comparable to a toxic dye ingredient, if pencils are comparable to furniture, and if bearings are comparable to steel pipes, then Commerce must explain, in the context of its established practice, how cast iron pipe fittings are not comparable to cast iron brake rotors.

Id. at 1349.

Similarly, in Evonik Rexim (Nanning) Pharmaceutical Co. v. United States, the court remanded the agency's determination where "Commerce attempted to justify" its chosen surrogate financials by explaining that two other potential surrogate companies' financial statements were inadequate, "but failed to cite any record evidence or to provide adequate explanations to demonstrate why" its chosen surrogate financial ratios were more appropriate.  Evonik Rexim (Nanning) Pharmaceutical v. United States, 253 F. Supp. 3d 1364, 1376 (Ct. Int'l Trade 2017).  Instead, "{t}he Department's explanation contained mere conclusory statements regarding the similarity in production processes between" the respondent and the selected surrogate companies (i.e., "{T}he companies have a comparable production process to producers of glycine . . .").  Id.

17

In this case, Commerce likewise failed to provide any analysis or explanation for its determination that Ayes, but not Grupo Carso, produces merchandise comparable to the subject lockers.  Neither Ayes not Grupo Carso produces metal lockers.  Rather, the record shows that Grupo Carso produces a large variety of metal products like lockers such as steel tubing, metallic structures (for bridges, building, and mining branches), heat exchangers, pressure vessels, distillation towers, air coolers, surface capacitors, high pressure feed water heaters, and large containers.  IDM at 9, 12 (P.R. 348).  The petitioners argued that the materials and processes for these products were similar.  Pet. Case Br. at 4 (P.R. 341; C.R. 296).  Ayes produces mesh fencing, steel mesh, ribbed iron, and certain machines (drawing machines, cutting machines, butt welding machines, and wire mesh bending machines).  IDM at 12 (P.R. 348).

Commerce's determination that Grupo Carso's products were not comparable to metal lockers is supported by a single statement that the record "lacks sufficient information to demonstrate that Grupo Carso produces anything with similar physical characteristics or end uses comparable to metal lockers, or that Grupo Carso uses a similar production process to that of the metal lockers under investigation."  Id. at 12-13.  At the same time, Commerce's determination is entirely devoid of *any* explanation or analysis as to the physical characteristics, end uses, and production processes of Ayes's mesh products, or any analysis of why Commerce considered these products "comparable" to metal lockers.  Indeed, the entirety of Commerce's discussion of the comparability of Ayes's merchandise in its Preliminary Determination was as follows:

> Ayes produces mesh fences, steel mesh, ribbed iron, and certain machines (drawing machine, cutting machines butt welding machines, wire mesh bending machines).  ***As a result, because Ayes produces merchandise comparable to the subject merchandise***, its audited financial statements constitute the only information on the record suitable for the determination of surrogate financial ratios."

PDM at 13 (P.R. 285) (emphasis added).   In its Final Determination, Commerce simply reiterated its findings in the Preliminary Determination:  "Ayes, however, produces mesh fences, steel mesh, ribbed iron, and certain machines (drawing machine, cutting machines, butt welding machines, wire mesh bending machines, etc.).  *As a result, we determined that Ayes produces merchandise comparable to the subject merchandise* . . .."   IDM at 12 (P.R. 348) (emphasis added).  Commerce's bald conclusion that Ayes's products are comparable to subject lockers, and its failure to undertake the three-part test examining "physical characteristics, end uses, and production processes," is precisely the sort of conclusory analysis rejected by the court in Shanghai Foreign Trade Enterprises and Evonik Rexim (Nanning) Pharmaceutical, and should be remanded for this reason alone.  See also Hyundai Heavy Indus., Co. v. United States, 393 F. Supp. 3d 1293, 1311 (Ct. Int'l Trade 2019) ("'A finding that simply restates the statutory standard and is unsupported by any discussion linking the applicable standard to the particular facts is inadequate.'") (quoting ABB Inc. v. United States, 355 F. Supp. 3d 1206, 1223 (Ct. Int'l Trade 2018)).

Indeed, the record does not support a finding that Ayes's products are more comparable to the subject metal lockers than Grupo Carso's products.  Although Zhejiang Xingyi submitted information regarding the production process for Ayes's mesh products, this information only shows that Ayes cuts, welds, and finishes wire rods to produce its mesh fences and panels. Zhejiang Xingyi Surrogate Ratio Submission at Exh. 4 (P.R. 269).  The production processes for Ayes's wire rod, cold-drawn bars, and construction iron share no overlap with the production of metal lockers, and no information is on the record regarding Ayes's production process for the machines or wire rod it produces.  See generally id.[5]  Moreover, Ayes's products do not share the

---

[5]   Metal lockers are typically produced by slitting of coils of metal, typically flat-rolled cold-rolled or hot-rolled carbon steel, zinc coated galvanized steel or stainless steel, into various

same physical characteristics or end uses as lockers, and not even Zhejiang Xingyi argued before Commerce that they do. See id. at 2. Notably, wire mesh lockers are expressly *excluded* from the scope of the orders. See Orders, 86 Fed. Reg. at 46,829.

There is no reasoned explanation on the record by Commerce as to why the products manufactured by Ayes were comparable to metal lockers while those produced by Grupo Carso were not comparable. There is no discussion by Commerce of the physical characteristics, uses or production processes of either set of products that would support a decision about the comparability of one or the other. "Commerce's Issues and Decision Memorandum, by itself, does not constitute substantial evidence. In the absence of substantial evidence, this conclusion must be remanded." Hyundai Heavy Indus., 332 F. Supp. 3d at 1349 (citing Bowman Transp., Inc. v. Ark.-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974)). The absence of any such analysis by Commerce makes it impossible for the Court to render a finding either that Grupo Carso did not produce comparable merchandise or that Ayes did.

Commerce's conclusion that Ayes produces comparable merchandise to the subject lockers is accordingly unsupported by record evidence and should be remanded. Further, Commerce's failure to explain its disparate treatment of the products produced by Ayes and Grupo Carso lacks a rational connection between Commerce's conclusion and the evidence in the record. See, e.g., Pakfood Public Co. v. United States, 724 F. Supp. 2d 1327, 1338 (Ct. Int'l Trade 2010) ("'Agencies have a responsibility to administer their statutorily accorded powers

---

widths. See Petition, Vol. I, at 11 (P.R. 2; C.R. 2). The steel is fed into a series of presses and punch machines where it is cut to size into blanks. Id. Blanks are then loaded onto various punch presses, or brake presses or roll formers where they are folded, notched and punched into body panels, doors and shelves. Id. Body parts (i.e., backs, sides, tops, shelves and bottoms are welded together into the locker body. Id. at 11-12. Completed welded bodies, as well as locker doors, parts and accessories, are hung on a paint conveyor and paint is applied in an automated spray process. For completed lockers to be shipped assembled, the top, bottom, back and side panels and shelves are assembled into completed bodies using screws, rivets, nuts and bolts and other fasteners. Id. at 12.

fairly and rationally, which includes not treating similar situations in dissimilar ways.'") (quoting

Nakornthai Strip Mill Pub. Co. v. United States, 587 F. Supp. 2d 1303, 1307 (Ct. Int'l Trade

2008)).

**II.   COMMERCE'S DETERMINATION THAT AYES HAD A SUITABLE FINANCIAL STATEMENT FROM WHICH TO CALCULATE SURROGATE FINANCIAL RATIOS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW**

Commerce's finding that Ayes's financial statement was usable for calculating surrogate

financial ratios was also unsupported by substantial evidence and contrary to law because the

company was not profitable based on Commerce's past practice of calculating financial ratios.  It

is Commerce's longstanding practice not to use the financial ratios from unprofitable companies

as surrogate values.  See Canadian Solar Int'l Ltd. v. United States, 378 F. Supp. 3d 1292, 1315

(Ct. Int'l Trade 2019).   Commerce's treatment of six line items listed in Ayes's financial

statements under "Other Real Operating Income," and two line items listed under "Income from

Investing Activities," to calculate Ayes's profitability (and to conclude that Ayes was profitable)

departed from Commerce's prior practice without sufficient explanation, and were unsupported

by the record.   When calculated properly, Ayes's financial statements show Ayes was

unprofitable in 2019, and its financial statements should not have been used to calculate

surrogate financial ratios.

In its Preliminary Determination, Commerce properly excluded six line items classified

as "Other Real Operating Income" and three line items classified as "Income from Investing

Activities" as offsets to Ayes's SG&A, but failed to also remove these line items from Ayes's

profit.  See Prelim. SV Memo at Attach. 3 (P.R. 295-296).  These excluded income amounts

totaled TL 5,587,695, whereas Ayes's entire pre-tax profit in 2019 was only TL 1,984,287.  In

their case brief to Commerce, petitioners noted that these line items should have also been

removed from Ayes's profit pursuant to Commerce's practice.  Pet. Case Br. at 10-12, n.27 (P.R. 341; C.R. 296) (citing Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the 2009-2010 Administrative Review of the Antidumping Duty Order (Dep't Commerce Mar. 5, 2012) at Comment 7 (hereinafter, "CNPO Tires from China IDM"), referenced in, 77 Fed. Reg. 14,495 (Mar. 12, 2012) (final results)).  Once these line items are removed from Ayes's profit, the financial statement demonstrates Ayes was unprofitable in 2019.  Id.

In its Final Determination, Commerce acknowledged that certain items should be excluded as offsets to SG&A when they are not related to the general operations of the company or when they are related to investing activities.  IDM at 15 (P.R. 348).  Commerce further acknowledged that when line items are excluded from SG&A, they should also be removed from the company's profit.  Id. at 15-16 ("In instances where we can identify, from the face of the financial statement, line items that should be excluded as offsets to S&GA and interest expenses, we will also remove those line items from profit.").  Nonetheless, rather than removing the "Other Real Operating Income" line items from Ayes's profit, Commerce reversed course and included all six items as offsets to Ayes's SG&A.  Id.  Commerce's sole explanation for its about-face on these expenses was:  "{W}e have come to understand that the term, 'real operating income,' in audited financial statements means that the relevant expense categories apply to the general operations of the company."  Final SV Mem. at 2, n.6 (P.R. 357).  Commerce offered no further explanation or citation to support this changed understanding.  Id.

With respect to "Income from Investing Activities," Commerce only removed from Ayes's profit one of the line items it originally had excluded from Ayes's SG&A ratio (i.e., Securities Value Increase Profits).  IDM at 15 (P.R. 348); see also Final SV Mem. at Attach. 3

(P.R. 358).  Commerce continued to exclude Interest Income from the SG&A ratio, but opted not to remove this item from Ayes's profit because Commerce was "unable to identify whether the interest income is short-term or long-term in nature."  IDM at 16 (P.R. 348).  Commerce also reversed course on the final line item under "Income from Investing Activities" (i.e., Rental Income), and included this line item as an offset to Ayes's SG&A.  Id.  No explanation was given for this change.

A discussed below, Commerce's treatment of these line items in calculating Ayes's SG&A ratio was contrary to law.

### A.   Commerce's Treatment of "Other Real Operating Income" Is Not Supported By the Record and is Contrary to Law

Commerce's failure to explain its wholesale reversal in the treatment of all "Other Real Operating Income" line items between its Preliminary Determination and Final Determination was arbitrary and capricious.  "{C}onsistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant."  DAK Ams. LLC v. United States, 456 F. Supp. 3d 1340, 1355 (Ct. Int'l Trade 2020) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); Chisholm v. Def. Logistics Agency, 656 F.2d 42, 47 (3d Cir. 1981)).  Though Commerce's prior determinations are not legally binding, its exercise of discretion is constrained by the need to provide an adequate explanation for any deviation from its past practice and interpretations.  SKF USA Inc., 263 F.3d at 1382 ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.") (quotation omitted).  Similarly, although "'Commerce has the flexibility to change its position' from the Preliminary Results to the Final Results, the agency must 'explain the basis for its change' and that explanation must be 'supported by substantial evidence.'"  Carbon Activated Tianjin Co. v. United States, 503 F. Supp. 3d 1278, 1286-87 (Ct. Int'l Trade 2021) (quoting Asociacion

Colombiana de Exportadores de Flores v. United States, 22 C.I.T. 173, 185, 6 F. Supp. 2d 865, 880 (1998)).

Here, Commerce offered nothing but a conclusory, unsupported statement that it had "come to understand that the term, 'real operating income,' in audited financial statements means that the relevant expense categories apply to the general operations of the company." Final SV Mem. at 2, n.6 (P.R. 357). Based on this statement, Commerce implemented a wholesale adjustment to all six line items listed under "Other Real Operating Income" without any discussion or analysis of the individual line items themselves. Moreover, Commerce cited no record evidence – from Ayes's financial statements or otherwise – or other authority that would support its newfound understanding of these items. Notably, even Zhejiang Xingyi conceded that several of the line items from "Other Real Operating Income" – including Incentive Income and Other Income and Profits – should be excluded as offsets to SG&A. See Rebuttal Brief of Zhejiang Xingyi Metal Products Co., Ltd. (May 20, 2021) at 12-13 ("Zhejiang Xingyi Rebuttal Case Br.") (P.R. 344). Accordingly, "Commerce failed to explain why its preliminary finding" that the six line items under "Other Real Operating Income" should be excluded as offsets to SG&A "was no longer valid or cite substantial evidence for the change." Carbon Activated Tianjin Co., 503 F. Supp. 3d at 1286-87.

In fact, Commerce's treatment of these line items as offsets to SG&A represents an unexplained departure from Commerce's longstanding practice. For instance, Commerce historically has _excluded_ "Provisions no longer required" as offsets to SG&A. See Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Methionine from Japan (Dep't Commerce July 19, 2021) at Comment 2, referenced in 86 Fed. Reg. 38,983 (July 23, 2021) (final determination) (rejecting respondent's

argument that "Provisions No Longer Required" should be included as an offset to SG&A expenses, and holding that this line item "does not represent revenue or reduced operating costs in the year of reversal . . . Rather, {it} represent{s} a correction of an estimate which was made in a prior year.") (quoting Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Stainless Steel Bar from Brazil for the Period of Review February 1, 2007, through January 31, 2008 (Dep't Commerce July 7, 2009) at 8, referenced in 74 Fed. Reg. 33,995 (July 14, 2009) (final results)); Issues and Decision Memorandum for the Final Determination of the Less-Than-Fair-Value Investigation of Certain Polyethylene Terephthalate (PET) Resin from India (Dep't Commerce Mar. 4, 2016) at 13 (Comment 6), referenced in 81 Fed. Reg. 13,327 (Mar. 14, 2016) (final determination) (agreeing with petitioners that "income from reversal of provisions no longer required" should not be included as an offset to SG&A expenses because "we do not consider it appropriate to reduce {respondent's} current period expenses by its correction of an over estimated expense associated with a non-recurring provision from a previous period."). There is nothing in the record to explain why Commerce departed from its prior practice of excluding "Provisions No Longer Required" as offsets to SG&A in this case. Commerce's treatment of this line item as an offset to SG&A here – without so much as a discussion as to what this particular line item entails – is a failure to adequately explain the "deviation from {Commerce's} past practice and interpretations." SKF USA Inc., 263 F.3d at 1382.

Thus, Commerce's decision in its Final Determination to include all six line items under "Other Real Operating Income" as offsets to SG&A, without any discussion of these line items individually, any explanation of Commerce's departure from its prior treatment of these items, or

any explanation of the basis for its new understanding of such financial statement entries is unsupported by record evidence and contrary to law.

**B.** **Commerce's Treatment of "Income from Investing Activities" Is Not Supported By the Record and is Contrary to Law**

Commerce's treatment of Ayes's line items for "Interest Income" and "Rental Income" are similarly unsupported by the record.

First, Commerce's failure to remove "Interest Income" from Ayes's profit, after excluding this income as an offset to Ayes's SG&A, was contrary to Commerce's established practice. "In instances where {Commerce} can identify, from the face of the financial statement, line items that should be excluded as offsets to S&GA and interest expenses, {it} will also remove those line items from profit." IDM at 15-16 (P.R. 348); see also CNPO Tires from China IDM at Comment 7; Issues and Decision Memorandum for the Final Results of the 2008-2010 Antidumping Duty Administrative Review of Citric Acid and Certain Citrate Salts from the People's Republic of China (Dep't Commerce Dec. 7, 2011) ("Citric Acid from China IDM") at 23 (Comment 9), referenced in 76 Fed. Reg. 77,772 (Dec. 14, 2011) (final results) ("Citric Acid from China") ("because we are disallowing the interest income offset to the SG&A and interest expenses, likewise we are adjusting the profit amount from the surrogate financial statements to exclude the interest income"); Issues and Decision Memorandum for the Final Results of the 2006-2007 Administrative Review of Pure Magnesium from the People's Republic of China (Dep't Commerce Dec. 8, 2008) at 27 (Comment 7), referenced in 73 Fed. Reg. 76,336 (Dec. 16, 2008) (final results) ("{W}e exclude {from profit} income that is not related to the general operations of the company.  Investment income is not considered to be related to the general operations of the company"), remanded in part, on other grounds, Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp. 2d 1322 (Ct. Int'l Trade 2010).

In this case, Commerce properly determined that Interest Income should be excluded as an offset to SG&A, but then improperly refused to remove this line item from Ayes's profit because Commerce could not "identify whether the interest income is short-term or long-term in nature." IDM at 15-16 (P.R. 348).  It is incumbent on the *respondent*, however – *not* Commerce – to show that the interest income is short-term in nature.  See Pakfood Public Co., 724 F. Supp. 2d at 1357 ("Commerce will not allow an offset where a *respondent* cannot demonstrate that the interest income in question is short-term in nature.") (emphasis added).  In Citric Acid from China, for instance, Commerce excluded interest income as an SG&A offset, and removed the amount from the surrogate financial statement's profit, where the record provided no information as to the short- or long-term nature of the interest income.  In that case, Commerce stated:

> After reviewing the surrogate financial statement, we find that there is no record evidence that the interest income is short-term interest revenue earned on working capital.  **The interest income line item in the surrogate financial statement lists interest income without any supporting notes which would give additional information.  The Department cannot assume that this interest income is short-term because there is no additional description in the surrogate financial statements on interest income** and it is the Department's practice to not look behind surrogate financial statements.  Since the Department does not have access to the supporting records for this surrogate financial statement, we cannot determine that this interest income is short-term.

Citric Acid from China IDM at 23 (Comment 9) (emphasis added).  Commerce went on to say that because it was disallowing an offset to SG&A for interest income, "it is reasonable to also exclude the interest income from the calculation of profit."  Id.  Commerce's decision here not to remove investment income from Ayes's profit contradicts its established practice without an adequate explanation.

Second, Commerce failed to offer any explanation at all for its decision to treat Rental Income as an offset to SG&A in the Final Determination, after finding it should be excluded

from the SG&A ratio in the <u>Preliminary Determination</u>.  In its surrogate value memorandum, Commerce simply stated:  "We reclassified certain line items in income from investing activities. We reclassified securities value increase in profits as an increase to profit, and, we treated rental income as an offset to SG&A."  <u>Final SV Mem</u>. at 2 (P.R. 357).  No further explanation was provided.  This describes what Commerce did but not why it did it or on what evidence it was relying to make that decision. In its <u>Final Determination</u>, Commerce grouped Rental Income in with the six line items listed under "Other Real Operating Income," and stated it had offset Ayes's SG&A with all of these line items because "it is Commerce's practice to treat other income as related to the general operations of the company and, therefore, include other income as an offset to SG&A expenses." <u>IDM</u> at 15 (P.R. 357).  Rental Income, however, was listed on Ayes's financial statement as *investment* income rather than "other income."  Zhejiang Xingyi Surrogate Ratio Submission at Exh. 2 (P.R. 269).[6]  Commerce failed to provide any explanation for its departure from the <u>Preliminary Determination</u>, in which it determined Rental Income should be excluded from the SG&A ratio, that is tethered to the record.

*     *     *

Commerce's failure to explain its departure from past practice (<u>i.e.</u>, both in the <u>Preliminary Determination</u> and in prior cases) in treating the "Other Real Operating Income" and "Income from Investing Activities" line items as *excluded* from SG&A and *removed* from pre-tax profits renders Commerce's calculations unsupported by substantial evidence and contrary to law.  Critically, when these line items – totaling over TL 5.5 million – are properly removed from Ayes's pre-tax profit of only TL 1.9 million, Ayes becomes *unprofitable*.  <u>See</u> <u>Final SV</u>

---

[6]   In its Rebuttal Case Brief, Zhejiang Xingyi also appeared to concede that Rental Income should not be included as an offset to SG&A.  <u>See</u> Zhejiang Xingyi Rebuttal Case Br. at 12-13 (P.R. 344).

Mem. at Attach. 3 (P.R. 358).  Commerce thus should have rejected Ayes's financial statements

as statements of an unprofitable company.  Canadian Solar Int'l Ltd., 378 F. Supp. 3d at 1315.

**III.    COMMERCE'S    SELECTION    OF    TURKEY    OVER    MEXICO    AS    A
SURROGATE    COUNTRY    WAS    NOT    SUPPORTED    BY    SUBSTANTIAL
EVIDENCE AND WAS CONTRARY TO LAW**

Commerce's determination that Turkish surrogate value data was superior to the

surrogate value data from Mexico, and its subsequent selection of Turkey over Mexico as the

primary surrogate country in its investigation, was not supported by substantial evidence and not

in accordance with law. Commerce has adopted a four-step process for selecting a primary

surrogate country:

> (1) the Office of Policy ("OP") assembles a list {("the OP List")}
> of potential surrogate countries that are at a comparable level of
> economic development to the {non-market economy} country; (2)
> Commerce identifies countries from the list with producers of
> comparable merchandise; (3) Commerce determines whether any
> of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if
> more than one country satisfies steps (1)-(3), Commerce will select
> the country with the best factors data.

Carbon Activated Tianjin Co., 503 F. Supp. 3d at 1283 (quoting Jiaxing Bro. Fastener Co. v.

United States, 822 F.3d 1289, 1293 (Fed. Cir. 2016)).  In other words, "when several countries

are both at a level of economic development comparable to the nonmarket economy country and

significant producers of comparable merchandise, Commerce evaluates the reliability and

completeness of the data in the similarly-situated surrogate countries and generally selects the

one with the best data as the primary surrogate country."  Jiaxing Bro. Fastener Co., 822 F.3d at

1294.  Importantly, Commerce cannot decline to undertake a comparative evaluation of the

completeness and reliability of two countries' data simply because it determines one country is

not a significant producer of comparable merchandise.  See Carbon Activated Tianjin Co., 503 F.

Supp. 3d at 1288.

A.    **Commerce Failed to Compare the Quality of Turkish and Mexican Surrogate Value Data**

In this case, Commerce found both Mexico and Turkey were "at the same level of economic development as China and qualify as significant producers of comparable merchandise," and that "the only complete, audited financial statements on the record are those of Grupo Carso and Ayes." IDM at 12 (P.R. 348).  Commerce rejected Mexico as the primary surrogate country, however, based on its finding that "the selection of Mexico does not offer a complete set of information from which to derive SVs and surrogate financial ratios." Id.  This finding is predicated on Commerce's erroneous conclusion that Grupo Carso is not a producer of comparable merchandise. See Section I, supra.

Commerce also cites an argument, raised for the first time by respondent Zhejiang Xingyi in its rebuttal surrogate value comments, that petitioners misclassified the HTS code for certain inputs, and then then concludes that petitioners' failure to provide the corrected HTS numbers and surrogate values for Mexico (which would have been after the record closed) means that "the record is incomplete with respect to SVs from Mexico, but is complete with respect to SVs from Turkey." IDM at 13 (P.R. 348).  Id.  However, the slight difference in classifications for a particular input is not dispositive as to the suitability of one surrogate country over another. Commerce could have either extracted the corrected data itself using its own resources (i.e., its subscription to the Global Trade Atlas service used to derive import values) or allowed parties to submit corrections or clarifications. See 19 C.F.R. § 351.301(c)(4) (Commerce "may place factual information on the record of the proceeding at any time"); see also Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China (Dep't Commerce Sept. 30, 2015) at 25, referenced in 80 Fed. Reg. 61,166 (Oct. 9, 2015) (prelim. results)

(Commerce placed on the record a financial statement and information to value international movement expenses), unchanged in 81 Fed. Reg. 23,272 (Dep't Commerce Apr. 20, 2016) (final results); Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Critical Circumstances, in Part, 75 Fed. Reg. 57,449, 57,450 (Sept. 21, 2010) (final determination) (noting Commerce placed additional data on the record of the investigation and notified interested parties that it would be reconsidering its valuation of the labor wage rate in its investigation).

In this case, Commerce did neither.  Moreover, Commerce's summary conclusion that the HTS codes rendered the record "incomplete with respect to SVs from Mexico" is undermined by the very next paragraph of the IDM, in which Commerce defended its decision not to seek additional SV data from petitioners:

> We further disagree that the petitioners received unequal treatment with respect to their SV submissions . . . Petitioners' SV Submission was not deficient but, rather, **provided the information necessary to value all applicable FOPs in Mexico**, including surrogate financial ratios using Grupo Carso's financial statements.  Commerce's determination that Grupo Carso does not produce comparable merchandise was based on an analysis of **complete, factual information on the record**, **and did not result from a deficient or incomplete SV submission**.

IDM at 13-14 (P.R. 348) (emphasis added).  Thus, Commerce itself has acknowledged that the Mexican surrogate value submission was complete and any mistaken HTS codes would therefore not render the Mexican surrogate value data incomplete.

In any event, Commerce failed to follow its own sequential surrogate country selection process by neglecting to compare the relative data quality between Mexico and Turkey – both of which were significant producers of comparable merchandise – based solely on Commerce's (erroneous) decision that Grupo Carso was not a producer of comparable merchandise.  In

Carbon Activated Tianjin Co., the court remanded Commerce's selection of Malaysia as the primary surrogate country over Romania, after Commerce concluded that the Romanian surrogate company's financial statement "did not support a finding that Romania was a significant producer of comparable merchandise." 503 F. Supp. 3d at 1284 (citation omitted). After making this determination, Commerce had "declined to compare the quality and availability of Malaysian and Romanian data for the purpose of primary surrogate country selection, finding the issue to be 'moot.'" Id. at 1284-85. In other words, "Commerce selected Malaysia after concluding that Malaysia was a significant producer of identical merchandise and Romania was not a significant producer of comparable merchandise." Id. at 1288. Rejecting the agency's reasoning, the court held: "Commerce subsequently considered Malaysian data quality in isolation and without reference to the comparable quality of Romanian data because Commerce found that Romania did not meet the significant producer requirement of section 1677b(c)(4)(B) . . . {T}he court cannot sustain Commerce's determination on this basis." Id.

Here, Commerce did not merely consider Turkish "data quality in isolation and without reference to the comparable quality of" Mexican data, Commerce failed to analyze the quality of the Turkish data at all. Indeed, Commerce's determination summarily states: "Therefore, given the completeness and contemporaneity of the SV data available on the record for Turkey, including contemporaneous financial statements from a producer of comparable merchandise, we found that Turkey best meets our selection criteria for a surrogate country." IDM at 12 (P.R. 348); id. at 14 ("Thus, we continue to select Turkey as the primary surrogate country for this investigation, because the Turkish {Global Trade Atlas, or "GTA"} data are accurate and appropriate to value all material inputs, and because Turkey is the only country that has usable financial statements on the record from a comparable producer for the purposes of valuing

32

surrogate financial ratios."). Commerce's determination is entirely void of any discussion of the quality of the Turkish data for any of the surrogate values Commerce used to calculate normal value. For this reason alone, Commerce's selection of Turkey as the primary surrogate country is unsupported by substantial evidence and contrary to law.

Because Commerce failed to conduct any qualitative assessment of Turkish surrogate value data, Commerce's Final Determination is also lacking any comparative assessment of Turkish and Mexican data in making its primary surrogate country determination. Regardless of whether Commerce believed Grupo Carso was a producer of comparable merchandise to subject metal lockers, Commerce was still required to compare all surrogate value data between Turkey and Mexico to determine which presented the "'the best available information regarding the values of such factors.'" See Jacobi Carbons AB, 222 F. Supp. 3d at 1169 (quoting 19 U.S.C. § 1677b(c)(1)(B)); see also Carbon Activated Tianjin Co., 503 F. Supp. 3d at 1288. Commerce's conclusion that "Turkey is the only country that has usable financial statements on the record," (IDM at 14 (P.R. 348)) does not exempt the agency from a qualitative assessment of the data for all factors of production. Jiaxing Bro. Fastener Co. v. United States, 961 F. Supp. 2d 1323, 1333 (Ct. Int'l Trade 2014) ("the statutory standard is not whether surrogate data is merely 'usable', but whether it is the 'best available'"). Further, Commerce's preference for using surrogate values from a single surrogate country did not relieve Commerce of this obligation. Id. at 1335 (remanding Commerce's primary surrogate country selection and instructing Commerce to consider, on remand, the following question: "Does Commerce's preference to source all surrogate values from the same surrogate country somehow outweigh the apparent superior quality and availability of the Philippine {} financial surrogate data?").

Accordingly, Commerce's failure to compare the data quality between Mexico and Turkey was a failure to fulfill its statutory obligation to value factors of production using "the best available information."  19 U.S.C. § 1677b(c)(1)(B).

**B.      The Record Shows Mexican Surrogate Value Data is Superior to Turkish Data**

Finally, if Commerce had properly compared the surrogate value data from Mexico and Turkey, it would have found Mexican surrogate values to be superior to Turkish surrogate values.

First, Commerce effectively ignored that the data provided by the respondents for Turkey included *non-contemporaneous* information for several input values.  "Commerce believes that, when available in a reliable form representative of the factor of production in question, valuation information *contemporaneous with a period of investigation or review generally constitutes the best information*."  Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States, 30 C.I.T. 1173, 1177 (2006) (emphasis added), aff'd, 228 Fed. Appx. 1001 (Fed. Cir. July 16, 2007) (per curiam).  Here, the surrogate values submitted for Turkish labor (2018), electricity (2019), natural gas (2019) and water (2019) were all non-contemporaneous with the period of investigation, while data provided for Mexico was for 2020 (or the period of investigation in the case of labor, electricity and natural gas), and included rates that were updated as recently as January 2020 for water.  Compare Zhejiang Xingyi SV/SC Cmts. at Exhs. 4, 5, 6 (P.R. 213) and Zhejiang Xingyi Rebuttal SV/SC Cmts. at Exhs. 3, 4 (P.R. 262) with Pet. SV/SC Cmts. at Exhs. Mexico-4, 5A, 5B, 5D (P.R. 228).  Commerce, however, only briefly acknowledged that the Mexican data was more contemporaneous before dismissing the relevance of this fact because Commerce had already determined Grupo Carso did not produce comparable merchandise:  "Thus, while we acknowledge that the Mexican data for certain FOPs may be

34

more contemporaneous than that of corresponding Turkish data, this does not in this instance overcome Commerce's preference to value all data from a single source country." IDM at 13 (P.R. 348).

Second, if Commerce had not improperly rejected Grupo Carso's financial statements, it would have found that these statements were superior to those of Ayes.   As discussed above, the financial statements of Ayes represent a company that is unprofitable, or, at the very least, only profitable because of high-value income items not related to production operations. See Section II, supra.  The financial statements of Grupo Carso, meanwhile, reflect a positive, pre-tax profit. Even if Commerce was not required to reject Ayes's financial statements, Commerce's decision to rely on surrogate value financial statements of a company that is only profitable because of high-value income items not related to production operations does not represent the "best available data" for valuing surrogate financial ratios for production of the merchandise under consideration – particularly where Grupo Carso's financial statements represented complete financial statements of a profitable company on the record.

Moreover, the financial statements of Ayes are far less detailed than are the financial statements of Grupo Carso, which further supports finding Grupo Carso's financial statements to be the best available data for valuing surrogate financial ratios.  Commerce itself has stated that "when available on the record {Commerce prefers} to use financial statements that contain the full level of details." Diamond Sawblades Mfrs. Coal. v. United States, 219 F. Supp. 3d 1368, 1381 (Ct. Int'l Trade 2017); cf. Qingdao Qihang Tyre Co. v. United States, 308 F. Supp. 3d 1329, 1354 (Ct. Int'l Trade 2018) (noting Commerce found a certain financial statement "not usable" because "it did 'not adequately break out energy costs'") (citation omitted).   Here, Ayes's presentation listed virtually no details of the amounts underlying the materials, labor and

energy ("MLE") costs, with the vast majority of the MLE costs classified simply as "Cost of Products Sold."  See Zhejiang Xingyi Surrogate Ratio Submission at Exhs. 1-2 (P.R. 269). Grupo Carso, on the other hand, clearly distinguished the typical NME components, including "Wages and salaries," "Employee benefits," "Raw materials," "Electricity," and "Statutory employee profit sharing."  See Pet. SV Cmts. at Exh. Mexico-9 (P.R. 228).  Grupo Carso's cost of sales also details numerous additional costs normally included in factory overhead, including manufacturing depreciation, amortization, maintenance, security services, and leasing costs. None of these costs were detailed by Ayes, which alleged an overhead ratio of less than one percent.  Compare id. with Zhejiang Xingyi Surrogate Ratio Submission at Exh. 1 (P.R. 269).

In its Final Determination, Commerce failed to appropriately address this discrepancy in detail between the two financial statements.  Instead, Commerce claimed "{t}here is no requirement that the financial statements be the most detailed financial statements on the record," and refused to consider whether the significant detail of Grupo Carso's financial statements made these statements the "best available data" for Commerce's surrogate value analysis.  IDM at 16 (P.R. 348).  Commerce's failure to consider the record evidence that Turkish surrogate value data were less suitable than those of Grupo Carso renders Commerce's selection of Turkey as the primary surrogate country unsupported by substantial evidence and not in accordance with law.

Commerce has an obligation to determine the most accurate margin possible.  Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.").  Given that Commerce failed to do any qualitative comparison of the surrogate values on the record from Turkey and Mexico, its process was

arbitrary and capricious and not in accordance with law, and its conclusions cannot be upheld as being supported by substantial evidence or as ensuring that Commerce calculated a margin that is as accurate as possible.  Nor are Commerce's conclusions supported by substantial evidence, because the record demonstrates that the Mexican surrogate value data is superior to Turkish data with respect to multiple factors of production.  Accordingly, the Court should remand the final determination.[7]

*     *     *

The entirety of Commerce's surrogate country and surrogate values determination hinged on its flawed determination that Grupo Carso, the Mexican surrogate company, did not produce merchandise comparable to the subject metal lockers at issue in its investigation.  Commerce used that sole, erroneous conclusion to treat the remainder of its surrogate country and surrogate value determinations as a foregone conclusion.  Commerce failed to consider the comparative value of data between Turkey and Mexico and failed to consider whether certain surrogate values from Mexico constituted the best available data for purposes of calculating the most accurate AD rate for the companies subject to Commerce's <u>Orders</u>.  These failings render Commerce's primary surrogate country selection, and surrogate value determinations, contrary to law.

<u>**CONCLUSION**</u>

For all the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's 56.2 Motion for Judgment on the Agency Record and:

(1) hold that Commerce's <u>Final Determination</u> is unsupported by substantial evidence and are not otherwise in accordance with law with respect to the rejection of surrogate financial

---

[7]    Because Commerce's primary surrogate country selection was contrary to law, the Court should also remand Commerce's surrogate value selections.  <u>See</u> <u>Jacobi Carbons AB</u>, 365 F. Supp. 3d at 1327-28 ("Because Commerce relied on its preference to use data from the primary surrogate country as a basis for selecting the challenged surrogate values . . . the court also remands Commerce's surrogate value selections.").

ratios from Mexico, the acceptance of surrogate financial ratios from Turkey, and the selection of Turkey as the primary surrogate country and selection of only Turkish surrogate values;

(2) remand the <u>Final Determination</u> to Commerce with instructions to reconsider and correct the errors presented in this memorandum; and

(3) provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ Kathleen W. Cannon
Kathleen W. Cannon
R. Alan Luberda
Elizabeth C. Johnson
KELLEY DRYE & WARREN LLP
3050 K Street N.W., Suite 400
Washington, D.C. 20007
Tel: (202) 342-8400
Fax: (202) 342-8451
kcannon@kelleydrye.com
aluberda@kelleydrye.com
ejohnson@kelleydrye.com

Dated:  February 22, 2022

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's December 21, 2021 Order (ECF No. 31) setting the word limitation to Plaintiff List Industries, Inc.'s Rule 56.2 Brief to 14,000 words, counsel to Plaintiff certifies that this Brief contains 11,434 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ Kathleen W. Cannon
KATHLEEN W. CANNON
R. ALAN LUBERDA
ELIZABETH C. JOHNSON
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Plaintiff List Industries, Inc.

Dated:  February 22, 2022