## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| LIST INDUSTRIES, INC.,<br><br>   Plaintiff,<br><br> v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br> and<br><br>ZHEJIANG XINGYI METAL<br>PRODUCTS CO., LTD. / XINGYI<br>METALWORKING TECHNOLOGY<br>(ZHEIJIANG) CO., LTD.,<br><br>HANGZHOU XLINE MACHINERY &<br>EQUIPMENT,<br><br>WEC MANUFACTURING, LLC.,<br><br>   Defendant-Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Court No. 21-00521 |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, the responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated:_____, 2022
   New York, NY

             _____
                CHIEF JUDGE

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | | |
|---|---|---|
| LIST INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 21-00521 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZHEJIANG XINGYI METAL | ) | |
| PRODUCTS CO., LTD. / XINGYI | ) | |
| METALWORKING TECHNOLOGY | ) | |
| (ZHEIJIANG) CO., LTD., | ) | |
| | ) | |
| HANGZHOU XLINE MACHINERY & | ) | |
| EQUIPMENT, | ) | |
| | ) | |
| WEC MANUFACTURING, LLC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

Of Counsel:

JESUS N. SAENZ
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001

May 27, 2022

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ............................................................................ 2

    I.     The Administrative Determination Under Review ................................................. 2

    II.    Issues Presented For Review ................................................................................. 2

STATEMENT OF FACTS ........................................................................................................ 2

SUMMARY OF ARGUMENT ................................................................................................. 6

ARGUMENT ............................................................................................................................ 7

    I.     Standard Of Review ............................................................................................. 7

    II.    Legal Framework for Surrogate Value Selection ................................................. 8

    III.   Commerce's Determination That Turkish Data Are The Best Available Information To Value The Respondents' Factors Of Production Is Supported By Substantial Evidence ........................................................................................... 9

           A.    Commerce Reasonably Relied On The Ayes Financial Statement Because Ayes Is A Producer Of Comparable Merchandise And The Statement Provided The Best Data For Calculating Financial Ratios ..................... 10

           B.    Commerce Reasonably Adjusted The Ayes Financial Ratios In Accordance With Its Practice.................................................................... 16

    IV.   The Remainder Of List Industries' Challenges To Commerce's Selection Of Turkey as Primary Surrogate Country Do Not Demonstrate Reversible Error .... 22

CONCLUSION ....................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ......................................................... 12, 13, 16

*Bristol Metals L.P. v. United States,*
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................ 25

*Ceramica Regiomontana, S.A. v. United States,*
   810 F.2d 1137 (Fed. Cir. 1987) .......................................................... 8, 15

*Changzhou Trina Solar Energy Co., Ltd. v. United States,*
   255 F. Supp. 3d 1312 (Ct. Int'l Trade Aug. 18, 2017) .................................. 23, 24

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007) .......................................................... 11

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ...................................................................... 7

*FMC Corp. v. United States,*
   87 F. Appx 753 (Fed. Cir. 2004) ........................................................ 25

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ........................................................... 7

*Goldlink Indus. Co. v. United States,*
   431 F. Supp. 1323 (2006) ................................................................ 11

*Heze Huayi Chemical v. United States,*
   No. 17- 0032, Slip Op. 18–57, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ............... 11

*Home Meridian Int'l. Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014) .......................................................... 9

*INS v. Elias-Zacarias,*
   502 U.S. 478–84 (1992) .................................................................. 7

*Jiaxing Bro. Fastener Co. v. United States,*
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .............................................. 9

*Jiaxing Bro. Fastener Co. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016) .......................................................... 9, 24

*Nation Ford Chem. Co. v. United States,*
   166 F.3d 1373 (Fed. Cir. 1999) .......................................................... 9, 10, 11

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) .......................................................... 11

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ............................................... 7

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ............................................... 8

*QVD Food Co., Ltd v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ......................................... 22, 23

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998) ......................................... 8, 15

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ....................................... 24-25

**Statutes**

19 U.S.C. § 1516a ............................................................. 7

19 U.S.C. § 1677b ..................................................... 3, 4, 8, 11

**Regulations**

19 C.F.R. § 351.408 ................................................ 4, 5, 6, 8, 9, 16

**Rules**

Rule 2 ..................................................................... 27

Rule 56.2 ............................................................... 21, 2

**Administrative Determinations**

*Boltless Steel Shelving Units Prepackaged for Sale from China*,
    80 Fed. Reg. 51,779 (Dep't of Commerce Aug. 26, 2015).................... 18

*Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final
Affirmative Determination of Sales at Less Than Fair Value*,
    86 Fed. Reg. 35,737 (Dep't of Commerce July 7, 2021)....................... 2

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Initiation of
Less-Than-Fair Value Investigation*,
    85 Fed. Reg. 47,343 (Dep't of Commerce Aug. 5, 2020)............... 3, 14, 15

*Certain Metal Lockers and Parts Thereof from the People's Republic of China: Preliminary
Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final
Determination and Extension of Provisional Measures*,
    86 Fed. Reg. 9,051 (Dep't of Commerce Feb. 11, 2021) ...................... 3

*Certain New Pneumatic Off-the-Road Tires from China*,
   73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) ...................................................... 20

*Certain New Pneumatic Off-the-Road Tires China*,
   77 Fed. Reg. 14,495 (Dep't of Commerce Mar. 12, 2012) ................................................... 22

*Certain Quartz Surface Products from China*,
   84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019) ................................................... 24

*Certain Tool Chests and Cabinets from China*,
   83 Fed. Reg. 15,365 (Dep't of Commerce Apr. 10, 2018) ................................................... 18

*Citric Acid and Certain Citrate Salts from China*,
   76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011) ................................................... 21

*Forged Steel Fittings From the Republic of Korea*,
   85 Fed. Reg. 66,302 (Dep't of Commerce Oct. 19, 2020) ............................................... 16, 17

*Notice of Final Results of Antidumping Duty Administrative Review: Silicon Metal from Brazil*,
   71 Fed. Reg. 7,517 (Dep't of Commerce Feb. 13, 2006) ............................................... 21, 22

*Stainless Steel Bar From Brazil: Final Results of Antidumping Duty Administrative Review*,
   74 Fed. Reg. 33,995 (Dep't of Commerce July 14, 2009), .................................................... 19

*Wooden Bedroom Furniture From China*,
   75 Fed. Reg. 50,992 (Dep't of Commerce Aug. 18, 2010) ................................................... 21

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

———————————————————————

| | |
|---|---|
| LIST INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Court No. 21-00521 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| ZHEJIANG XINGYI METAL | ) |
| PRODUCTS CO., LTD. / XINGYI | ) |
| METALWORKING TECHNOLOGY | ) |
| (ZHEIJIANG) CO., LTD., | ) |
| | ) |
| HANGZHOU XLINE MACHINERY & | ) |
| EQUIPMENT, | ) |
| | ) |
| WEC MANUFACTURING, LLC., | ) |
| | ) |
| Defendant-Intervenors. | ) |

———————————————————————

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the motion for

judgment upon the agency record filed by plaintiff List Industries, Inc. (List Industries),

challenging the Department of Commerce's final determination in the antidumping duty

investigation of certain metal lockers and parts thereof from the People's Republic of China.

Because Commerce's final determination is supported by substantial evidence and otherwise in

accordance with law, this Court should deny List Industries's motion for judgment on the agency

record and sustain the final determination in its entirety.

1

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

The administrative determination under review is *Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 35,737 (Dep't of Commerce July 7, 2021) (final affirmative determ. of sales at less than fair value) (*Final Determination*), (P.R. 363), and accompanying Issues and Decision Memorandum (IDM), (P.R. 348).[1]  The investigation covers the period from July 1, 2018, to June 30, 2019.  *Id.*

### II.    Issues Presented For Review

1.    Whether Commerce's determination that Ayes Celikhasir VE CT's (Ayes) financial statement was the only data of a producer of comparable merchandise available for calculating surrogate financial ratios is supported by substantial evidence and in accordance with law.

2.    Whether Commerce reasonably adjusted the surrogate financial ratios of Ayes according to its practice.

## STATEMENT OF FACTS

On July 9, 2020, List Industries, DeBourgh Manufacturing Co., Penco, Products, Inc., and Tennsco LLC (collectively, the petitioners) filed an antidumping duty petition concerning imports of metal lockers from China.  On the basis of the petition, Commerce initiated a less-than-fair value investigation of metal lockers from China.  *See Certain Metal Lockers and Parts Thereof from the People's Republic of China: Initiation of Less-Than-Fair Value Investigation*,

---

[1]  "P.R." refers to documents in the public record and "C.R." refers to documents in the confidential record.

2

85 Fed. Reg. 47,343 (Dep't of Commerce Aug. 5, 2020) (P.R. 23) (*Initiation Notice*).

Commerce selected two mandatory respondents as a subset of known exporters from China:

Zhejiang Xingyi Metal Products Co., Ltd. / Xingyi Metalworking Technology (Zhejiang) Co.,

Ltd (collectively, Zhejiang Xingyi), and Hangzhou Xline Machinery & Equipment (Hangzhou

Xline).  Respondent Selection Memo (Aug. 19, 2020) (P.R. 74, C.R. 27); *see also Certain Metal*

*Lockers and Parts Thereof from the People's Republic of China: Preliminary Affirmative*

*Determination of Sales at Less Than Fair Value, Postponement of Final Determination and*

*Extension of Provisional Measures*, 86 Fed. Reg. 9,051 (Dep't of Commerce Feb. 11, 2021)

(*Preliminary Determination*), P.R. 301 and accompanying Preliminary Decision Memorandum

(PDM) at 9-10, P.R. 285 (finding Zhejiang Xingyi Metal Products Co., Ltd. and Xingyi

Metalworking Technology (Zhejiang) Co. as a single entity for purposes of Commerce's

investigation).

      Consistent with 19 U.S.C. § 1677b(c)(4)(A), Commerce notified parties that Brazil,

Malaysia, Mexico, Romania, the Russian Federation, and the Republic of Turkey were countries

at a comparable level of economic development as the People's Republic of China, based on the

current annual issue of the World Development Report.  *See* Surrogate Country and Surrogate

Value Letter (Sept. 16, 2020) (P.R.142).  Commerce invited comments from interested parties

on: (1) this non-exhaustive list of countries; (2) surrogate country selection; and (3) surrogate

value data.  *Id.*  Between September and December, Commerce received surrogate country and

surrogate value comments from List Industries and the two mandatory respondents.  PDM at 4-5;

*see also* Petitioners' Comments on List of Surrogate Countries (Sept. 30, 2020) (P.R. 164),

Zhejiang Xingyi's Comments on Economic Comparability of Surrogate Countries (Sept. 30,

2020) (P.R. 163), Hangzhou Xline's Surrogate Country Comments and Initial Surrogate Value

Submission (Nov. 16, 2020) (P.R. 222-224), Zhejiang Xingyi's Surrogate Value and Surrogate

Country Comments (Nov. 16, 2020) (P.R. 213-221), Petitioners' Surrogate Country and

Surrogate Values Comments (Nov. 17, 2020) (P.R. 227-232), Zhejiang Xingyi's Rebuttal

Surrogate Value and Surrogate Country Comments (Dec. 11, 2020) (P.R. 262-266),  Zhejiang

Xingyi's Surrogate Financial Ratios Submission (Dec. 18, 2020) (P.R. 269), Hangzhou Xline's

Submission of Surrogate Financial Ratios (Jan. 5, 2021) (P.R. 271).

On January 21, 2021, petitioners submitted comments advocating for the selection of

Mexico, or alternatively Montenegro, as the primary surrogate country.  Petitioners' Pre-

Preliminary Determination Comments (Jan. 21, 2021) (P.R. 279).  Petitioners also argued that

the financial statements of Grupo Carso S.A.B. de CV (Grupo Carso), a Mexican conglomerate,

were the best available financial statements on the record of the investigation.  *Id.*  In response,

Zhejiang Xingyi argued that the financial statements of Ayes, a Turkish company, was the best

financial statements on the record.  Zhejiang Xingyi Rebuttal Pre-Preliminary Determination

Comments (Jan. 28, 2022) (P.R. 284, 4081662-01).

On February 11, 2021, Commerce published its preliminary determination.  In the

preliminary determination, Commerce made the determination as to the financial statements

providing the best surrogate value data to value the factors of production.  *See* PDM at 13.

Factors of production include, but are not limited to:  hours of labor required, quantities of raw

materials employed, amounts of energy and other utilities consumed, representative capital costs,

and transportation costs.  19 U.S.C. § 1677b(c)(3); *see also* PDM at 26.  Commerce will value

respondent's capital costs incurred in the production of subject merchandise (*i.e.*, factory

overhead, selling, general and administrative expenses, and profit) by deriving financial ratios in

accordance with 19 C.F.R. § 351.408(c)(4).  *Id.* at 26.

4

Commerce found that parties placed on the record several sources of data for raw materials, packing materials, scrap, labor, utilities, and freight information. *Id*. at 13. Parties also placed on the record information to value surrogate financial ratios from Mexico, Montenegro, Romania, and Turkey. *Id*. Of the surrogate financial data on the record, Commerce found that only the information from Mexico and Turkey included complete audited financial statements. *Id*. These financial statements were Grupo Carso of Mexico and Ayes of Turkey. *Id*. Commerce then examined the audited financial statements of Grupo Carso and Ayes to determine which producer provided the best surrogate value data on the record. *Id*.

Commerce preliminarily determined that Turkey was the only country with complete surrogate value information on the record, and that Ayes's financial statement was the only data of a producer of comparable merchandise available for calculating surrogate financial ratios. *Id*. at 10-13. Although Commerce found that both Mexico and Turkey were at a level of economic development comparable to China and significant producers of comparable merchandise, Commerce selected Turkey as the primary surrogate country, based on data availability and reliability, consistent with *Policy Bulletin* 04.1.[2] *Id*. at 11-13.

In the case and rebuttal briefs, petitioners continued to advocate for Mexico as the primary surrogate country, and the Grupo Carso financial statements for the surrogate financial ratio. *See* Petitioners' Case Br. (May 12, 2021) (P.R. 341, C.R. 296). In rebuttal, Zhejiang Xingyi argued that the Mexican surrogate value data was flawed and Commerce should continue to select Turkey as the surrogate country and rely on the financial statement of Ayes for

---

[2] *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last visited May 20, 2022) (*Policy Bulletin* 04.1).

calculating surrogate financial ratios.  *See* Zhejiang Xingyi's Rebuttal Br. (May 20, 2021) (P.R. 344).

In its final affirmative determination, Commerce continued to rely on Turkey as the primary surrogate country.  IDM at 11.  Commerce found that the Turkish surrogate value data was the best available information on the record, and that the Ayes financial statement was the only source of surrogate value data from a producer of comparable merchandise.  *Id.*  Commerce reasoned that Turkey was the only country with complete and contemporaneous surrogate value data on the record.  *Id.*

## SUMMARY OF ARGUMENT

The Court should sustain the final determination because List Industries has not demonstrated that Commerce's findings are unsupported by substantial evidence or otherwise not in accordance with law.

Importantly, List Industries does not contest Commerce's determination that Turkey is an economically comparable country to China and is a significant producer of comparable merchandise.  The record in fact shows that Commerce's selection of the Turkish surrogate value data for all factors of production is supported by substantial evidence because the Turkish data was publicly available complete surrogate value data, contemporaneous with the period of investigation, product-specific, representative of a broad-market average, and tax and duty exclusive.

Plaintiff argues that Commerce's selection of Ayes's financial statement to calculate surrogate financial ratios is not supported by substantial evidence, and that consequently Commerce's selection of Turkey is not supported.  To the contrary, however, Commerce's selection of Ayes is supported by substantial evidence for several reasons.  Ayes is a producer of

6

comparable merchandise, whereas Grupo Carso is not; a determination left to Commerce's discretion, which Commerce reasonably exercised here, as supported by record evidence. In addition, Commerce reasonably determined that Ayes was a profitable company by revising its final surrogate financial ratio calculations based on the information in Ayes's financial statements, according to Commerce practice. Finally, Commerce did in fact compare the quality of the Turkish and Mexican data, and found that the Turkish data were better overall.

Thus, Commerce's decision to rely on the Ayes financial statements and Turkey as the primary surrogate country is supported by substantial evidence and in accordance with law and the Court should sustain Commerce's final determination.

## ARGUMENT

### I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citations omitted), but "less than the weight of the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* The agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992). Moreover, it is not necessary for Commerce to provide an explicit explanation

7

where its path is reasonably discernible.  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998); *see also Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)).

## II.    Legal Framework for Surrogate Value Selection

In non-market economy proceedings, Commerce determines normal value by valuing the "factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1)(B).  Factors of production include the "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation" expended in producing subject merchandise.  *Id.* § 1677b(c)(3).

Commerce values factors of production "based on the best available information regarding the value of such factors in a market economy country or countries considered to be appropriate by the administering authority."  *Id.* § 1677b(c)(1).  The statute does not define the term "best available information," and Commerce has broad discretion in reaching this determination.  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  In practice, Commerce prefers surrogate values that are publicly available, specific to the input being valued, free of taxes and duties, reflective of broad market averages, and contemporaneous with the period under consideration.  *See, e.g.*, *id.*; Non-Market Economy Surrogate Country Selection Process, *Policy Bulletin* 04.1.  Additionally, when valuing manufacturing, overhead, general expenses, and profit, Commerce normally looks to the financial statements of producers of identical or comparable merchandise in the surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).

Commerce has a regulatory preference to use data from a single primary surrogate country where practicable. *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016). Accordingly, Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 132-33 (Ct. Int'l Trade 2014) (citations omitted), *aff'd*, *Jiaxing Bro.*, 822 F.3d 1289.

While the data Commerce relies on must be the best available, "there is no requirement that the data be perfect." *Jiaxing Bro.*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.*

## III. Commerce's Determination That Turkish Data Are The Best Available Information To Value The Respondents' Factors Of Production Is Supported By Substantial Evidence

Commerce found in the final determination that the Turkish data and financial statements provide the best available information with which to value the mandatory respondents' factors of production. *See* IDM at 11-14. In fact, plaintiff does not challenge Commerce's determination that Turkey meets the statutory requirements for selection as a primary surrogate country; instead, it bases its entire argument on the claim that the Grupo Carso financial statements were better than the Ayes ones. Substantial evidence, however, supports Commerce's determination that Ayes produces merchandise comparable to the subject merchandise. The plaintiff's arguments to the contrary do not compel a different result, and therefore Commerce's determination must be sustained.

9

In particular, List asserts that:  (1) Commerce unreasonably rejected Mexico on the basis that the Mexican data was incomplete because of Commerce's conclusion that Grupo Carso is not a producer of comparable merchandise; (2) the Grupo Carso financial statements were superior because they represented a profitable company and were more detailed; and (3) the Mexican surrogate value data were superior to the Turkish data because they were contemporaneous with the period of investigation.  We address each of these arguments in turn to demonstrate that plaintiff's arguments amount to nothing more than disagreement with how Commerce weighed the available record evidence.

### A.      Commerce Reasonably Relied On The Ayes Financial Statement Because Ayes Is A Producer Of Comparable Merchandise And The Statement Provided The Best Data For Calculating Financial Ratios

List Industries challenges Commerce's reliance on the Ayes financial statements on two bases.  First, it argues that Grupo Carso produced more comparable merchandise and Commerce failed to explain why it determined that Ayes's merchandise was more comparable.  Second, it argues that Commerce improperly adjusted the financial ratio calculations making Ayes incorrectly appear to be a profitable company.  Neither argument shows any error in Commerce's determination.

List Industries makes two arguments challenging Commerce's determination that Ayes is a producer of comparable merchandise and that Grupo Carso is not.  First, List Industries contends that Commerce failed to conduct any comparability analysis in either the preliminary or final determination.  *Id.* at 18.  Specifically, List Industries states that Commerce failed to conduct its three-prong test, which compares: (1) physical characteristics, (2) end-use, and (3) production process for determining whether a product is comparable to subject merchandise.  *Id.* at 18.  Second, List Industries argues that Commerce failed to explain "why the products manufactured by Ayes were comparable to metal lockers while those produced by Grupo Carso

10

were not comparable." *Id*. at 20.  Based on Commerce's alleged failure to document its analysis, plaintiff concludes that the record does not support a finding that Ayes's products are more comparable to metal lockers than Grupo Carso's products. *Id*. at 18-19.

Substantial evidence, however, supports Commerce's finding that there is insufficient record evidence to support claims that Grupo Carso does produce products comparable to metal lockers, and that Ayes does produce products comparable to metal lockers.

Whether products are determined to be comparable merchandise is a determination that is left to Commerce.  "The statute does not speak directly to the meaning of 'comparable'; therefore Commerce's interpretation will govern if it is reasonable." *Heze Huayi Chemical v. United States*, No. 17- 0032, Slip Op. 18–57, 2018 WL 2328183, at *4 (Ct. Int'l Trade May 22, 2018) (citation omitted) (discussing 19 U.S.C. § 1677b(c)(4)(B)).  Commerce's Policy Bulletin also states that "'comparable merchandise' is not defined in the statute or the regulations, since it is best determined on a case-by-case basis," and such a comparability analysis "depends on the subject merchandise." *Policy Bulletin* 04.1 at 2.  Under the substantial evidence standard, it is improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it de novo. *Goldlink Indus. Co.*, 431 F. Supp. 2d 1323, 1326.  Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as

11

a whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744
F.2d 1556, 1562 (Fed. Cir. 1984).

Commerce's preliminary analysis of Grupo Carso's financial statements revealed that it
is "a diversified conglomerate with commercial, industrial, infrastructure, construction, and
energy sections," none of which produce comparable merchandise.  PDM at 13 (citing
Petitioners' Surrogate Country and Surrogate Value Comments (Nov. 17, 2020) at Ex. Mexico-9
(P.R. 229)).  Commerce also found that Grupo Carso's "financial statements describe its
products as metallic structures for bridges, buildings and mining branches; heat exchanges;
pressure vessels' distillation towers; air coolers; surface capacitors; high pressure feed water
heaters; and large containers."  *Id.* at 13, n.101.  On these grounds, Commerce concluded that
"because Ayes produces merchandise comparable to the subject merchandise, its audited
financial statements constitute the only information on the record suitable for the determination
of surrogate financial ratios."  *Id.* at 13.

Plaintiff argues that Commerce did not provide any analysis or explanation for its
determination that Grupo Carso did not produce comparable merchandise.  Pl. Br. at 18.
Plaintiff is correct that Commerce was unable to perform its typical comparability analysis of
Grupo Carso's products, for the reason that the requisite information simply was not on the
record.  IDM at 11-12.  Nor did plaintiff place any information on the record regarding the
physical characteristics, end-uses, or production processes of Grupo Carso's merchandise.  IDM
at 12; PDM at 13; IDM at Cmt. 1.  In its administrative case brief, List Industries offered no
support for its contention that Grupo Carso produces comparable merchandise.  *Id*. at 12-13.  List
Industries merely repeated its claims that Grupo Carso is a producer of products comparable to
metal lockers.  *See* Petitioners' Case Br.  Now, plaintiff still fails to elaborate how Grupo Carso's

products qualified as comparable merchandise to metal lockers, particularly when these products are even more disparate from metal lockers than those produced by Ayes. *Id.* at 12-13; *see* Pl. Br.; *see also* Petitioners' Case Br.  The products plaintiff lists, "lockers such as steel tubing, metallic structures (for bridges, building, and mining branches), heat exchangers, pressure vessels, distillation towers, air coolers, surface capacitors, high pressure feed water heaters, and large containers," see Pl. Br. at 18, are the same products Commerce noted in the final determination. *See* IDM at 12.  But contrary to plaintiff's argument, simply listing these products and asserting that they share a similar manufacturing process to metal lockers, is insufficient for Commerce to determine whether the merchandise was comparable.

Nonetheless, to the extent it could, Commerce did analyze Grupo Carso's products using the limited record evidence available.  The only information plaintiff placed on the record was a single page listing the products Grupo Carso's Infrastructure and Construction division produces. Petitioners' Surrogate Value Comments at Exhibit Mexico-9 (P.R. 230).  This information merely states that the Infrastructure and Construction division is "involved in the construction of: roads; tunnels; water treatment plants, and infrastructure works in general; petroleum platforms and equipment for the chemical and petroleum industries; drilling of oil wells, geothermal wells, and drilling services; commercial centers, industrial plants, office buildings, and housing; and telecommunications facilities, gas pipelines and aqueducts." *Id.*  Further, Grupo Carso's financial statement provides scant additional information for a comparability analysis. *Id.*  In analyzing Grupo Carso's products, Commerce explained:

> {W}e note that many of these products represent high-value structural components for the public or private sector, and/or machinery that includes "cutting-edge technology" . . . Therefore, although the petitioners claim that Grupo Carso produces comparable products including metal containers, **we note that**

13

> **Grupo Carso's list of products identifies "large containers," not metal containers**.

IDM at 12, n.61 (emphasis added).  Thus, although "there is an unspecific indication that Grupo Carso has engaged in the 'manufacture of large containers,'" Commerce concluded that the record "lacks any evidence regarding the physical characteristics, end uses or the production process for such containers."  IDM at 13; *see also* Petitioners' Surrogate Value Comments at Ex. Mexico-9.  List Industries has not suggested otherwise.  Accordingly, Commerce was unable to determine whether these "large containers" were in any way comparable to the metal lockers under review.  Thus, Commerce determined that "{t}he record lacks sufficient information to demonstrate that Grupo Carso produces anything with similar physical characteristics or ends uses comparable to metal lockers, or that Grupo Carso uses similar production process to that of the metal lockers under investigation."  IDM at 12-13.

Second, Commerce did in fact explain why the products manufactured by Ayes were merchandise comparable to metal lockers.  *See* Pl. Br. at 19.  Specifically, the scope of the investigation defined metal lockers as composed, in part, of "flat-rolled metal, metal mesh and/or expanded metal, which includes but is not limited to alloy or non-alloy steel."  *Initiation Notice*, 85 Fed. Reg. at 47,343.  The product list information, copied from Ayes' website, on the record shows that Ayes produces mesh fences, steel mesh, ribbed iron, and certain machines including drawing machine, cutting machines, butt welding machines, wire mesh and bending machines. IDM at 12; *see also* Zhejiang Xingyi's Surrogate Financial Ratios Submission (Dec. 18, 2020) at Exs. 3-5.  Grupo Carso, however, produces metallic structures for bridges, buildings and mining branches; heat exchanges; pressure vessels' distillation towers; air coolers; surface capacitors; high pressure feed water heaters; and large containers.  IDM at 12.  Thus, Commerce concluded that "Ayes produces merchandise comparable to the subject merchandise."  IDM at 12.

While the plaintiff might prefer additional explanation from Commerce, where the path of an agency's reasoning is reasonably discernible, this Court may nonetheless sustain the agency's action. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998); *see also Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)). Here, Commerce's path was reasonably discernible.

List Industries also argues that wire mesh lockers are specifically excluded from the scope of the orders, but this statement is incorrect. Pl. Br. at 20. Only wire mesh lockers where at least three sides including the door are made from wire mesh and the measurements exceed certain numbers are excluded from the scope, but other wire mesh lockers are included. *Initiation Notice,* 85 Fed. Reg. at 47,343. Thus, plaintiff's arguments claiming that Ayes does not produce comparable merchandise are unavailing.

Further supporting Commerce's conclusion is the fact that the record contains information regarding the physical characteristics, end-use, and production process of the merchandise produced by Ayes. Zhejiang Xingyi Surrogate Financial Ratios Submission (Dec. 18, 2020) at Exs. 3-5. For example, the Ayes products list includes end-use information, technical specifications, pictures of the products, product dimensions, production processes, and various steel products. *Id*. at Ex. 3. Additionally, the record contains detailed information regarding the wire-mesh production process, and also includes and compares the various production steps of metal lockers to that of wire mess. *Id*. at Exs. 4-5. Plaintiff provided no evidence to rebut the record data demonstrating that Ayes was a producer of comparable merchandise, but merely asserts that Grupo Carso's products are more comparable. Plaintiff has

identified no reason to disturb Commerce's determination, which  was reasonable and supported by substantial evidence.  *See Atl. Sugar, Ltd.*, 744 F.2d 1556, 1562.

B.     **Commerce Reasonably Adjusted The Ayes Financial Ratios In Accordance With Its Practice**

List Industries argues that the Ayes financial statement was unusable because Commerce failed to exclude certain "other real operating income," "interest income," and "rental income" line items from Ayes's profit, which made Ayes appear profitable.  *Id*. at 21-29.  Plaintiff also claims that a reliance on unprofitable financial statements is contrary to Commerce's practice. *Id*. at 21.  As we explain below, Commerce reasonably determined that the Ayes financial statement was the best available information for calculating surrogate financial ratios.

To calculate an accurate dumping margin, Commerce values a respondent's capital costs incurred in the production of subject merchandise by deriving financial ratios in accordance with 19 C.F.R. § 351.408(c)(4).  These capital costs include expenses such as factory overhead, selling, general and administrative expenses, and profit.  *Id.*  To determine these capital costs and thus calculate surrogate financial ratios, Commerce relies on complete financial statements.

With regards to other real operating income, List Industries argues that Commerce erroneously and without explanation included these line items as offsets to Ayes's selling, general and administrative (SG&A) ratios.  Pl. Br. at 22.  To the contrary, however, Commerce reasonably included these line items and explained why it did so.

Congress did not define an SG&A expense or provide guidance on how Commerce should calculate such an expense.  Instead, Commerce has developed a practice of treating other income as related to the general operations of the company.  *See Forged Steel Fittings From the Republic of Korea*, 85 Fed. Reg. 66,302 (Dep't of Commerce Oct. 19, 2020), and accompanying IDM at 18.  Accordingly, Commerce includes other income as an offset to such SG&A expenses.

16

*Id.*; IDM at 15.  Moreover, "{i}n calculating the {SG&A} expense ratio, Commerce normally includes certain expenses and revenues that relate to the general operations of the company as a whole and to the accounting period."  *Forged Steel Fittings From the Republic of Korea* IDM at 18.

In its preliminary determination, Commerce excluded certain "other real operating income" items from its preliminary surrogate financial ratio calculations.  Preliminary Surrogate Value Memo at 6.  These "other operating income" items included deferred finance income, shipping revenues, provisions no longer required, exchange difference income, price difference, other income and profits, and rental income.  Preliminary Surrogate Value Memo at Att. 3; *see also* Final Surrogate Value Memo at 2.  Commerce explained that it excluded these "other real operating income" items because "Ayes' financial statements neither describe nor discuss how this income is associated with the general operations of the company."  Preliminary Surrogate Value Memo at 6.  Accordingly, Commerce could not discern whether "other real operating income" items qualified as SG&A expenses, and thus excluded those items from the surrogate financial ratio calculations.  Preliminary Surrogate Value Memo at 6.

In the final determination, however, Commerce revised its final surrogate financial ratio calculations with respect to the "other real operating income" items.  IDM at 15; Final Surrogate Value Memo at 2 and Att. 3.  Commerce found that these "other real operating income" items pertained to the general operations of the company.  Final Surrogate Value Memo at 2; *see also* IDM at 15.  Commerce explained that "we have come to understand that the term, 'real operating income,' in audited financial statements means that the relevant expense categories apply to the general operations of the company."  Final Surrogate Value Memo at 2, n.6.  Thus, in accordance with its practice to "treat other income as related to the general operations of the company and,

therefore, include other income as an offset to SG&A expenses," Commerce revised its final

surrogate financial ratio calculations.  IDM at 15; *see also Certain Tool Chests and Cabinets

from China*, 83 Fed. Reg. 15,365 (Dep't of Commerce Apr. 10, 2018), and accompanying IDM

at Cmt. 14; and *Boltless Steel Shelving Units Prepackaged for Sale from China*, 80 Fed. Reg.

51,779 (Dep't of Commerce Aug. 26, 2015), and accompanying IDM at Cmt. 8a.  Thus,

Commerce explained that the change was due to its understanding of the term "real operating

income."  Final Surrogate Value Memo at 2.

Because Commerce classified other real operating expenses as SG&A items, Commerce

reclassified the corresponding incomes as SG&A items as well.  Here, the corresponding

incomes were:  deferred finance expense, foreign exchange difference expenses, interest

expenses, price difference expenses, and provision for doubtful receivables as related to SG&A

expenses.  Thus, Commerce reclassified and treated the corresponding deferred finance income,

exchange difference income, interest income, price difference incomes, provisions no longer

required, other income and profits, and rental income items as offsets to the corresponding

expenses related to SG&A.  Final Surrogate Value Memo at 2 and Att. 3.

Plaintiff claims Commerce's change between the preliminary and final determinations

was arbitrary and capricious because Commerce offered "nothing but a conclusory, unsupported

statement," for the change to the treatment of the "other real operating income" items.  Pl. Br. at

23-24.  As support, plaintiff lists examples of administrative decisions where Commerce

excluded the "provision no longer required" expense item as an offset to financial ratio

calculations.  *Id*. at 24-25.  Yet, plaintiff provides no examples of prior Commerce cases for the

remaining expense items.

More importantly, however, in the administrative cases plaintiff cites, Commerce in fact followed its practice, which is "to include expenses and revenues that relate to the general operations of the company as a whole." *Stainless Steel Bar From Brazil: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 33,995 (Dep't of Commerce July 14, 2009), and accompanying IDM at 8.  Indeed, Commerce relied on this practice in the final determination.  Commerce explained that the *exception* to the practice of Commerce treating other income as an offset to SG&A expenses is, "when the reported information and the information in the surrogate financial statements indicates otherwise; if, for example, the income has been reported as an {factor of production}, the income relates to a separate line of business, or the income relates to the disposal of non-routine assets."  IDM at 15.  In other cases, Commerce has occasionally treated expense items like the "provision no longer required" expense item here as an offset to financial ratio calculations.  But in those cases, Commerce always did so as an exception to Commerce's normal practice.  The cases List Industries cites in fact involve the *exception* to Commerce's practice.  Pl. Br. at 24-25; *see, e.g.*, IDM for the *Antidumping Duty Administrative Review of Stainless Steel Bar from Brazil for the Period of Review February 1, 2007, through January 31, 2008* (*Stainless Steel Bar from Brazil*) (Dep't of Commerce July 7, 2009) at 8, referenced in 74 Fed. Reg. 33,995 (July 14, 2009) (final results) ("Because VMSA's reversal of the prior-period provision does not relate to costs incurred in the current period, we have excluded it from the {selling, general and administrative} calculation."); IDM for the *Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Methionine from Japan* (*Methionine from Japan*) (Dep't Commerce July 19, 2021) at 10, referenced in 86 Fed. Reg. 38,983 (July 23, 2021) (final determination) ("However, in this investigation, we find that the offset in question was a reduction of costs in the current period

related to a non-recurring cost provision that was set up in a prior period, which Commerce does not allow.").

Accordingly, Commerce's policy is not a wholesale prohibition of offsetting any expense item titled "provision no longer required." Rather, Commerce's policy is to "include expenses and revenues that relate to the general operations of the company as a whole." *Stainless Bar from Brazil* IDM at 8; *see Methionine from Japan* IDM at 9 ("Commerce has explained that it includes certain expenses as a {SG&A} expenses {*sic*} when the amounts are associated with the general operations of the company as a whole."); *see also* Final Surrogate Value Memo at 2 ("{W}e treated real operating income as offsets to selling, general and administrative expenses {selling, general and administrative} expenses, because, by definition, these items pertain to the general operations of the company").

Plaintiff also argues that Commerce's failure to remove "interest income" from Ayes's profit after excluding this income as an offset to Ayes's SG&A, was contrary to Commerce's established practice. Pl. Br. at 26. However, plaintiff's argument misconstrues Commerce's final determination and misconstrues Commerce's practice.

In the preliminary determination, Commerce excluded interest income from Ayes's investing activities in the financial ratio analysis. Commerce explained this calculation is consistent with its practice "to exclude income from long-term financial assets because such income is related to investing activities and is not associated with the general operations of the company." Preliminary Surrogate Value Memo at 6 (Feb. 8, 2021); *see also Certain New Pneumatic Off-the-Road Tires from China,* 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008), and accompanying Issues and Decision Memorandum at Comment 18.D; *see also Notice*

*of Final Results of Antidumping Duty Administrative Review: Silicon Metal from Brazil*, 71 Fed.

Reg. 7,517 (Dep't of Commerce Feb. 13, 2006), and accompanying IDM at Comment 4.

In the final determination, Commerce continued to exclude interest income from

investing activities.  Commerce explained that, according to its practice, interest income

generated from long-term financial assets are not associated with the general operations of a

company, but instead are related to investing activities.  IDM 15-16.  Importantly, Commerce's

practice does not dictate an adjustment to profit in its financial ratio calculations when

Commerce cannot discern whether "interest income" was long-term or short-term.  *Citric Acid*

*and Certain Citrate Salts from China*, 76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011),

and accompanying IDM at 23 (citing *Wooden Bedroom Furniture From China*, 75 Fed. Reg.

50,992 (Dep't of Commerce Aug. 18, 2010) and accompanying IDM at Cmt. 30); *see also*

*Wooden Bedroom Furniture from China* IDM at Cmt. 30.  Instead, Commerce has stated that

"{i}n instances where we *can* identify, from the face of the financial statement, line items that

should be excluded as offsets to selling, general and administrative, and interest expenses, we

will also remove those line items from profit." IDM at 15-16 {emphasis added}; *see also*

*Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review:*

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China* (Dep't

Commerce Sept. 30, 2015) at 25, referenced in 80 Fed. Reg. 61,166 (Oct. 9, 2015) (prelim.

results) and accompanying IDM at 13.

Here, Commerce explained that it was unable to identify whether the interest income was

short-term or long-term.  IDM at 15.  Therefore, Commerce "cannot assume that this interest

income is short-term because there is no additional description in the surrogate financial

statements on interest income and it is the Department's practice to not look behind surrogate

financial statements." *Citric Acid from China* IDM at 23; *see also Certain New Pneumatic Off-the-Road Tires China*, 77 Fed. Reg. 14,495 (Dep't of Commerce Mar. 12, 2012), and accompanying IDM at Cmt. 7; *Silicon Metal from Brazil*, 71 Fed. Reg. 7,517 (Feb. 13, 2006) and accompanying IDM at Cmt. 4. Thus, in accordance with its practice, Commerce disallowed the long-term interest offset to selling, general and administrative expenses and interest expenses in its financial ratio calculations. IDM at 15-16.

## IV.   The Remainder Of List Industries' Challenges To Commerce's Selection Of Turkey as Primary Surrogate Country Do Not Demonstrate Reversible Error

Plaintiff also contends that Commerce failed to compare the quality of the Turkish and Mexican surrogate value data. Pl. Br. at 30. As support for this argument, plaintiff claims that Commerce incorrectly found that the record did not offer a complete set of surrogate value data for Mexico, and that the Turkish surrogate value data was non-contemporaneous for several input values. *Id*. at 30, 34. These claims are not supported by record evidence.

First, List Industries takes issue with Commerce's determination that it misclassified the Harmonized Tariff Schedule (HTS) code for certain inputs, which rendered the record incomplete with regards to surrogate values from Mexico. Pl. Br. at 30-31. In the *Final Determination*, Commerce found that the "petitioners neither refuted these {harmonized tariff schedule} numbers nor provided corresponding {surrogate values} from Mexico." IDM at 13. Because "the burden of creating an adequate record lies with {interested parties} and not with Commerce," *QVD Food Co., Ltd v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011), List Industries had an obligation to correct the record, and thus Commerce reasonably found that the Mexican surrogate value data was incomplete. IDM at 13.

Plaintiff, however, claims that Commerce's finding that the Mexican data were incomplete was based entirely on the missing or misclassified HTS numbers. Pl. Br. at 30. This

is not true.  Rather, Commerce noted that the missing surrogate value data only *further* supported

its decision to continue to use Turkey as the primary surrogate country.  IDM at 13.  Indeed,

Commerce explicitly states that "as a result of the aforementioned finding regarding the Grupo

Carso not reflecting a producer of comparable merchandise—the selection of Mexico does not

offer a complete set of information from which to derive {surrogate values} and surrogate

financial statements."  *Id*.  Nowhere does Commerce state that its sole rationale for relying on the

Turkish surrogate value data as the best information on the record was due to the incorrect HTS

numbers; rather, Commerce found that the Turkish data contained a completed, audited financial

statement for a company that produced comparable merchandise, unlike the Mexican surrogate

data.

Additionally, plaintiff claims that Commerce relied on non-contemporaneous Turkish

surrogate data and that the Mexican surrogate value data was more contemporaneous than the

Turkish data for labor, electricity, natural gas, and water.  Pl. Br. at 34.  Commerce did in fact

consider the fact that the Mexican surrogate value information for certain data were more

contemporaneous than the Turkish data, but determined that contemporaneity in this instance

would not "overcome Commerce's preference to value all data from a single source country."

IDM at 13.  Moreover, to mitigate any non-contemporaneity concerns with the Turkish data,

Commerce adjusted the data to reflect the period of investigation.  *Id*.  Commerce routinely

performs such adjustment in the form of inflating or deflating data to alleviate any non-

contemporaneity concerns.  *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 255 F.

Supp. 3d 1312, 1321-24 (Ct. Int'l Trade Aug. 18, 2017) (noting that Commerce adjusts data to be

contemporaneous where there is not contemporaneous data on the record).  Commerce stressed

that "no such adjustment is available to mitigate specificity concerns from the use of financial

ratios derived from financial information of a producer of non-comparable merchandise." IDM at 13. Thus, the adjustment process was available here, where Commerce determined that Ayes's merchandise was comparable to the subject merchandise, in contrast with Grupo Carso's merchandise.

Finally, plaintiff claims that Grupo Carso's financial statements are more detailed than Ayes's statements and therefore more accurate. Pl. Br. at 35-36. Specifically, plaintiff points to the fact that the Grupo Carso statements segregated information on "Wages and salaries," "Employee benefits," "Raw materials," "Electricity," and "Statutory employee profit sharing" in the as opposed to the Ayes statements. *Id.* at 36. Notably, plaintiff fails to set forth any reason why such level of detail would be necessary, or any record evidence demonstrating that Ayes's financial statements are unusable for calculating surrogate financial ratios. *See also* IDM at 16. Additionally, plaintiff identifies no authority stating that Commerce prefers to use a more detailed financial statement from a company producing non-comparable merchandise, over a financial statement of a company producing comparable merchandise. As explained above, "Commerce's practice is to select financial statements that are "completely translated, publicly available, contemporaneous with the {period of investigation}, show a profit before taxes, do not contain countervailable subsidies, are sufficiently detailed to calculate financial ratios, and are from the primary surrogate country." IDM at 16; *see also Certain Quartz Surface Products from China*, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019), and accompanying IDM at 81-82. Commerce's practice does not require it to use the *most* detailed financial statement, only one that is *sufficiently* detailed.

Therefore, Commerce reasonably determined that because Ayes was a producer of comparable merchandise whereas Grupo Carso was not, and because the Turkish data and

24

financial statements were better overall, it would continue to use Turkey as the primary surrogate country. A review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1301 (citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)). When Commerce provides a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than plaintiff's alternatives, the Court will refrain from "substitut{ing} its own evidentiary evaluation for Commerce's and its own judgment for the agency's in considering and weighing the relative importance of various criteria applied." *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010). Here, Commerce rationally exercised its discretion to choose the best country overall. *See FMC Corp. v. United States*, 27 CIT 240, 251 (Ct. Int'l Trade 2003) (holding that Commerce can exercise discretion in choosing between reasonable alternatives), *aff'd FMC Corp. v. United States*, 87 F. Appx 753 (Fed. Cir. 2004).

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the administrative record and sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                                    /s/ Ioana Cristei
JESUS N. SAENZ                                 IOANA CRISTEI
Attorney                                       Trial Attorney
Office of the Chief Counsel                    U.S. Dept. of Justice
    for Trade Enforcement and Compliance    Civil Division
U.S. Department of Commerce                    Commercial Litigation Branch
Washington, D.C.                               P.O. Box 480
                                               Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone: (202) 305-0001
                                               E-mail: Ioana.Cristei@usdoj.gov

May 27, 2022                                   Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's motion in this matter complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the motion was prepared, the confidential version of the brief contains a total of 7,012 words.

/s/ Ioana Cristei

May 27, 2022