## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| LIST INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | )  Court No. 21-00521 |
| | ) |
| ZHEJIANG XINGYI METAL | ) |
| PRODUCTS CO., LTD. / XINGYI | ) |
| METALWORKING TECHNOLOGY | ) |
| (ZHEIJIANG) CO., LTD., | ) |
| | ) |
| HANGZHOU XLINE MACHINERY & | ) |
| EQUIPMENT, | ) |
| | ) |
| WEC MANUFACTURING, LLC., | ) |
| | ) |
| Defendant-Intervenors. | ) |

### PLAINTIFF'S REPLY BRIEF IN SUPPORT OF RULE 56.2
### MOTION FOR JUDGMENT ON THE AGENCY RECORD

KATHLEEN W. CANNON
R. ALAN LUBERDA
ELIZABETH C. JOHNSON

KELLEY DRYE & WARREN LLP
3050 K Street N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400

Counsel to Plaintiff List Industries, Inc.

Dated:  July 11, 2022

## **Table of Contents**

**Page**

ARGUMENT ........................................................................................................... 1

I.      DEFENDANT HAS FAILED TO JUSTIFY ITS SELECTION OF AYES IN TURKEY AS A PRODUCER OF COMPARABLE MERCHANDISE ......... 1

      A.     Defendant Points to No Analysis by Commerce Showing that Ayes Produces Comparable Merchandise to Subject Lockers ............................ 1

      B.     Defendant's Attempt to Rehabilitate Its Selection of Ayes by Contrasting Data on Grupo Carso with that of Ayes Does Not Provide Substantial Evidence of Record to Support Commerce's Selection of Ayes ..................................................................................... 5

II.     COMMERCE'S DETERMINATION THAT AYES HAD A SUITABLE FINANCIAL STATEMENT FROM WHICH TO CALCULATE SURROGATE FINANCIAL RATIOS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW ................... 7

      A.     Commerce Should Have Excluded "Other Income from Real Operations" from Ayes's Profit and Found Ayes Unprofitable ................ 8

      B.     Commerce Should Have Excluded "Interest Income" and "Rental Income" from Ayes's SG&A Ratio and Deducted from Profit .............. 12

III.    COMMERCE'S SELECTION OF TURKEY OVER MEXICO AS A SURROGATE COUNTRY WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW ................. 15

CONCLUSION ..................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,
    222 F. Supp. 3d 1255 (Ct. Int'l Trade 2017) ...........................................................4

Canadian Solar Int'l Ltd. v. United States,
    378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019),
    vacated on other grounds, 471 F. Supp. 3d 1379 (Fed. Cir. 2020)...........................8

Carbon Activated Tianjin Co. v. United States,
    503 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ............................................. 9-10, 14

Evonik Rexim (Nanning) Pharm. Co. v. United States,
    253 F. Supp. 3d 1364 (Ct. Int'l Trade 2017) ...........................................................3

Jiaxing Bro. Fastener Co. v. United States,
    961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014) ............................................. 15-16, 17

NEXTEEL Co. v. United States,
    28 F.4th 1226 (Fed. Cir. 2022) ............................................................................4, 7

SEC v. Chenery Corp.,
    332 U.S. 194 (1947)....................................................................................................4

Shanghai Foreign Trade Enters. Co. v. United States,
    318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ............................................... 1-2, 3

**Statutes and Regulations**

19 U.S.C. § 1677b(c)(1)(B) .......................................................................................17

19 U.S.C. § 1677m(d)...................................................................................................7

**Administrative Determinations**

Certain Metal Lockers and Parts Thereof From the People's Republic of China:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    86 Fed. Reg. 35,737 (Dep't Commerce July 7, 2021)
    ("Final Determination") (P.R. 363) ............................................................... *passim*

Issues and Decision Memorandum for the Final Determination in the Less-Than-
     Fair-Value Investigation of Pentafluoroethane (R-125) from the People's
     Republic of China (Dep't Commerce Dec. 30, 2021), ref'd in, 87 Fed. Reg.
     1117 (Jan. 10, 2022) (final determ.) ...............................................................................8, 9, 11

Issues and Decision Memorandum for the Final Determination in the Less-Than-
     Fair-Value Investigation of Forged Steel Fittings from the Republic of Korea
     (Dep't Commerce Oct. 30, 2020) ("Forged Steel Fittings"), ref'd in,
     85 Fed. Reg. 66,302 (Oct. 19, 2020)...........................................................................................8

Issues and Decision Memorandum for the Final Affirmative Determination in the
     Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts
     Thereof from the People's Republic of China (June 28, 2021)
     ("IDM") (P.R. 348) .......................................................................................... *passim*

Issues and Decision Memorandum for the Final Affirmative Determination in the
     Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the
     Republic of Turkey (Dep't Commerce Sept. 23, 2021), ref'd in,
     86 Fed. Reg. 52,880 (Sep. 23, 2021) .......................................................................................11

Issues and Decision Memorandum for the Final Results of the 2008-2010
     Antidumping Duty Administrative Review of Citric Acid and Certain Citrate
     Salts from the People's Republic of China (Dep't Commerce Dec. 7, 2011),
     ref'd in, 76 Fed. Reg. 77,772 (Dec. 14, 2011) ................................................................. 12-14

Issues and Decision Memorandum for the Antidumping Duty Investigation of
     Prestressed Concrete Steel Rail Tie Wire from Mexico
     (Dep't Commerce Apr. 28, 2014), ref. in, 79 Fed. Reg. 25,571 (May 5, 2014)
     (final determ.) .........................................................................................................................10

Issues and Decision Memorandum for the Final Determination of the
     Antidumping Duty Investigation of Steel Propane Cylinders from the People's
     Republic of China (Dep't Commerce June 17, 2019), ref'd in,
     84 Fed. Reg. 29,161 (Dep't Commerce June 21, 2019) ...........................................................13

Issues and Decision Memorandum for the Final Results of the Administrative
     Review of the Antidumping Duty Order on Wooden Bedroom Furniture from
     the People's Republic of China (Dep't Commerce Aug. 11, 2010), ref'd in,
     75 Fed. Reg. 50,992 (Aug. 18, 2010)..................................................................................12, 13

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade and the Court's April 26, 2022 Order (ECF No. 35), Plaintiff List Industries, Inc. ("List") files this reply in support of its Motion for Judgment on the Agency Record (ECF No. 32) and Memorandum in Support thereof (ECF No. 32-1) ("List Br."). For the reasons discussed below, neither Defendant the United States' Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (ECF No. 36) ("Def.'s Br."), nor Defendant-Intervenor Zhejiang Xingyi Metal Products Co., Ltd.'s Brief in Response to Plaintiff's Motion for Judgment on the Agency Record (ECF No. 37) ("Zhejiang Xingyi Br."), nor Defendant-Intervenor Hangzhou Xline Machinery & Equipment Co., Ltd.'s Opposition to Plaintiff's 56.2 Motion for Judgment on the Agency Record (ECF No. 38) ("Hangzhou Xline Br.") proffer any compelling support for the United States Department of Commerce's ("Commerce") unsupported and unlawful selection of Turkey, rather than Mexico, as the surrogate country in this investigation.

## ARGUMENT

## I.   DEFENDANT HAS FAILED TO JUSTIFY ITS SELECTION OF AYES IN TURKEY AS A PRODUCER OF COMPARABLE MERCHANDISE

As set forth fully in List's opening brief, Commerce failed to provide any analysis or reasoned explanation for its determination that Ayes Celikhasir VE CT ("Ayes") produces merchandise comparable to the subject lockers. List Br. at 16-19. Nor does the record support such a determination. Id. at 19-21. Defendant's and Defendant-Intervenors' *post hoc* attempts to rehabilitate the deficient record in this case fail.

### A.   Defendant Points to No Analysis by Commerce Showing that Ayes Produces Comparable Merchandise to Subject Lockers

As discussed in Plaintiff's Memorandum, in evaluating the comparability of merchandise produced by a company in the surrogate country, "Commerce's established practice is to apply a

three-part test that examines 'physical characteristics, end uses, and production processes.'" Shanghai Foreign Trade Enters. Co. v. United States, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004) (citation omitted).  In its response, Defendant entirely ignores the fact that Commerce failed to conduct this comparability analysis with respect to Ayes's products.  See generally Def.'s Br. at 13-15.[1]

In fact, neither Defendant nor Defendant-Intervenors identify any record support – nor can they – that Commerce proffered any analysis whatsoever as to the comparability of Ayes's products.  Defendant only repeats Commerce's conclusory reasoning:  a listing of the products produced by Ayes, a listing of the products produced by Grupo Carso, and a summary conclusion: "Ayes produces merchandise comparable to the subject merchandise."  Def.'s Br. at 14 (citing Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China (June 28, 2021) ("IDM") (P.R. 348) at 12, ref'd in, Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 35,737 (Dep't Commerce July 7, 2021) ("Final Determination") (P.R. 363)).  In effect, the sum total of Commerce's analysis amounts to the following: "Grupo Carso produces *A, B* and *C* which are not comparable to subject lockers.  By contrast, Ayes produces *X, Y,* and *Z.*  Accordingly, Ayes produces

---

[1]    Moreover, Defendant acknowledges that Commerce did not conduct the required comparability analysis of Grupo Carso's products, and argues instead that Commerce was unable to conduct this comparability analysis because there was insufficient information regarding Grupo Carso's products on the record.  Def.'s Br. at 12.  While Defendant focuses on the greater amount of record in-formation regarding Ayes's products than Grupo Carso's, the volume of evidence on the record regarding Ayes does not support Commerce's determination because the evidence is irrelevant and was never relied upon by Commerce.  See pp. 5-6, infra.

merchandise comparable to subject lockers."  To call this an "explain{ation} why the products manufactured by Ayes were merchandise comparable to metal lockers," see Def.'s Br. at 14, strains credibility.

Commerce's analysis as to the comparability of Ayes's products is even more conclusory than the agency analyses remanded in Shanghai Foreign Trade Enterprises, 318 F. Supp. 2d at 1348 (remanding Commerce's determination where it "present{ed} little more than paraphrases of the contentions of the parties" and "conclusory statements," and "fail{ed} to discuss why" cast iron brake rotors were not comparable to the subject merchandise) and Evonik Rexim (Nanning) Pharmaceutical Co. v. United States, 253 F. Supp. 3d 1364, 1376 (Ct. Int'l Trade 2017) (remanding Commerce's determination where "{t}he Department's explanation contained mere conclusory statements regarding the similarity in production processes between" the respondent and the selected surrogate companies), discussed in List's opening brief.  See List Br. at 16-17.  Tellingly, neither Defendant nor Defendant-Intervenors even attempt to address these cases in their response briefs.

Instead, Defendant argues that "where the path of an agency's reasoning is reasonably discernible, this Court may nonetheless sustain the agency's action," and claims that additional record evidence regarding Ayes's products and production processes supports Commerce's determination that Ayes's products are comparable to the subject lockers.  Def.'s Br. at 15-16. See also Zhejiang Xingyi Br. at 4.  Citing to Zhejiang Xingyi's Surrogate Financial Ratios Submission,[2] Defendant argues the record contains "end-use information, technical

---

[2]   See Letter from Morris, Manning & Martin, LLP to Dep't of Commerce, Re: "Certain Metal Lockers And Parts Thereof From the People's Republic of China, Case No. A-570-133: (cont'd on next page)

specifications, pictures of the products, product dimensions, production processes, and various steel products," for Ayes's products as well as "detailed information regarding the wire-mesh production process."  Def.'s Br. at 15

Defendant's argument is problematic because Commerce's reasoning is *not* "reasonably discernable" from the record.  In fact, Defendant cannot cite to anywhere in Commerce's IDM in support of its argument, because Commerce *never relied on any record evidence* in support of its determination that Ayes produces products comparable to metal lockers.  See IDM at 12-13 (P.R. 348).  Thus, Defendant's argument is merely an improper attempt to supply a reasoned basis for Commerce's action that the agency itself failed to provide.  SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 222 F. Supp. 3d 1255, 1267 (Ct. Int'l Trade 2017) ("An agency's determination . . . cannot be sustained on the basis of a rationale supplied after the fact—whether by the agency's litigation counsel, by another party, or by the court.") (citations omitted).  Because there is no indication on the record that Commerce relied upon the "end-use information, technical specifications, pictures of the products, product dimensions, {or} production processes," of Ayes's products to support its determination that Ayes produces comparable merchandise, Commerce's determination must be remanded.  See NEXTEEL Co. v. United States, 28 F.4th 1226, 1237 (Fed. Cir. 2022) ("We are not free to substitute our own reasoning for that of the agency and must instead 'review only the bases on which Commerce made its determination.'") (quoting Thai I-Mei Frozen Foods Co. v. United States, 616 F.3d 1300, 1307 (Fed. Cir. 2010)).

---

Submission of Surrogate Financial Ratios" (Dec. 18, 2020) ("Zhejiang Xingyi Surrogate Ratio Submission") (P.R. 269).

**B.** **Defendant's Attempt to Rehabilitate Its Selection of Ayes by Contrasting Data on Grupo Carso with that of Ayes Does Not Provide Substantial Evidence of Record to Support Commerce's Selection of Ayes**

In any event, the information on the record regarding the physical characteristics, end-use, and production process of the merchandise produced by Ayes does *not* support a determination that Ayes produces merchandise comparable to the subject lockers while Grupo Carso does not. As discussed in Plaintiff's opening brief, the products produced by Ayes are coils of wire rod, cold-drawn iron bars and construction iron, steel mesh and mesh fencing, and certain machines. List Br. at 5 (citing Zhejiang Xingyi Surrogate Ratio Submission at Ex. 3 (P.R. 269)). Though there are pictures of these products and information regarding their physical characteristics, end-uses and production process in the record, none are comparable to the physical characteristics, end-uses and production processes of metal lockers. For instance, whereas metal lockers are typically made of flat-rolled metal (see Petition, Vol. I, at 11 (P.R. 2; C.R. 2)), Ayes's products are made of wire rod and bars. Whereas lockers are used for storage (Petition, Vol. I, at 10 (P.R. 2; C.R. 2)), Ayes's fencing is used for "environmental security" and "visual purposes," while its wire rod and cold-drawn bars are used in various construction applications. Zhejiang Xingyi Surrogate Ratio Submission at Ex. 3 (P.R. 269).

With regard to production processes, Defendant argues there is no information on the record regarding Grupo Carso's production processes because Plaintiff "simply list{s} these products and assert{s} that they share a similar manufacturing process to metal lockers." Def.'s Br. at 13. The same, however, is true for Ayes's products. There is *no* information on the record regarding Ayes's production process for the machinery it produces, and no record evidence that Ayes's mesh products involve rolling, cutting, punching or welding flat-rolled steel. See generally Zhejiang Xingyi Surrogate Ratio Submission at Exs. 3-4 (P.R. 269). Instead,

respondent Zhejiang Xingyi baldly asserts – in the form of a comparison chart – that Ayes' products share manufacturing processes with lockers.  Id. at Ex. 5.  There is nothing to distinguish Zhejiang Xingyi's own assertion of production process comparability regarding Ayes from List's assertion regarding Grupo Carso.

In short, there is nothing in the record justifying a finding that cold-drawn bars and construction wire (produced by Ayes) are comparable to metal lockers, while steel tubing (produced by Grupo Carso) is not.  Nor is there any record evidence to support a finding that Ayes's machinery (e.g., drawing machines and cutting machines), but not Grupo Carso's machinery (e.g., heat exchangers and pressure vessels) are comparable to subject lockers.  Both companies produce metal products.  The record does not show that either company's products share the same end-use as metal lockers, or that either company's production processes involve pressing, cutting, punching and welding flat-rolled steel.

As List argued in its case brief, if Commerce believed that the surrogate values on record for Mexico were deficient, it should have provided List with notice and an opportunity to provide supplemental information – just as Commerce did for respondent Zhejiang Xingyi with respect to surrogate values from Turkey.  See Certain Metal Lockers and Parts Thereof From People's Republic of China: Petitioners' Case Brief (May 12, 2021) (P.R. 341; C.R. 296) at 10, n.24.[3]

---

[3]    In its Final Determination, Commerce offered a conflicting response to this argument.  First, Commerce wrote that it was justified in selecting Turkey over Mexico because, "as a result of the aforementioned finding regarding the Grupo Carso financial statements not reflecting a producer of comparable merchandise – *the selection of Mexico does not offer a complete set of information from which to derive SVs and surrogate financial ratios*."  IDM at 13-14 (P.R. 348) at 13 (emphasis added).  In response to petitioners' argument that Commerce should have afforded petitioners an opportunity to remedy the deficiency, however, Commerce did an about-face and claimed there was no deficiency:  "Commerce's determination that Grupo Carso does not produce comparable merchandise was based on an analysis of *complete, factual*
(cont'd on next page)

Indeed, the statute requires that if Commerce determines a response to a request for information is deficient, Commerce "*shall* promptly inform the person submitting the response of the nature of the deficiency and *shall*, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the {applicable} time limits." 19 U.S.C. § 1677m(d) (emphasis added). Although there was ample time for Commerce to provide List with an opportunity to remedy any deficiency in the Grupo Carso data that Commerce identified (i.e., over two months between petitioners' submission of surrogate country/surrogate value data and Commerce's preliminary determination), Commerce failed to provide petitioners with the opportunity.

A remand is thus warranted for Commerce to undertake an analysis of these factors and to reconsider its selection of Ayes in Turkey, and Grupo Carso in Mexico, as a producers of comparable merchandise.[4]

## II.   COMMERCE'S DETERMINATION THAT AYES HAD A SUITABLE FINANCIAL STATEMENT FROM WHICH TO CALCULATE SURROGATE FINANCIAL RATIOS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS CONTRARY TO LAW

As discussed in Plaintiff's opening brief, Commerce's failure to deduct certain line items classified as "Other Income from Real Operations" (totaling Turkish Lira ("TL") 4,080,820) and "Income from Investing Activities" (totaling TL 129,738) from Ayes's total pre-tax profit, which totaled only TL 1,984,287, erroneously made Ayes's financial statement look profitable, and

---

information on the record, and did not result from a deficient or incomplete SV submission." Id. at 13 (emphasis added).

[4]    To the extent there is insufficient evidence on the record to conclude that either Ayes or Grupo Carso produce comparable merchandise, the Court should remand the determination to Commerce to re-open the record for additional evidence. Cf. NEXTEEL Co., 28 F.4th at 1238 ("Remand is appropriate because 'the record may well be enlarged….'") (quoting Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1380–82 (Fed. Cir. 2003)).

therefore useable for purposes of calculating surrogate values.  List Br. at 21-29.  When the financial ratio is calculated correctly, Ayes is unprofitable.  Commerce does not use the financial statements of unprofitable companies to calculate surrogate financial ratios.  Canadian Solar Int'l Ltd. v. United States, 378 F. Supp. 3d 1292, 1315 (Ct. Int'l Trade 2019), vacated on other grounds, 471 F. Supp. 3d 1379 (Fed. Cir. 2020).  Moreover, **Commerce's "practice {is} to disregard financial statements that are only profitable due to 'other income**.'"  Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Pentafluoroethane (R-125) from the People's Republic of China (Dep't Commerce Dec. 30, 2021) ("Pentafluoroethane from China IDM") at 51 (cmt. 6) (emphasis added), ref'd in, 87 Fed. Reg. 1117 (Jan. 10, 2022); id. at 50 (citing Issues and Decision Memorandum for the Final Results of the 2007-2008 Antidumping Duty Administrative Review: Glycine from the People's Republic of China (Dep't Commerce Aug. 6, 2009) at cmt. 1, ref'd in, 74 Fed. Reg. 41,121 (Aug. 14, 2009)).

### A. Commerce Should Have Excluded "Other Income from Real Operations" from Ayes's Profit and Found Ayes Unprofitable

Defendant argues "Commerce has developed a practice of treating other income as related to the general operations of the company," and that therefore Commerce properly included all line items listed under "Other Income from Real Operations" in Ayes's SG&A ratio. Def.'s Br. at 16 (citing Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Forged Steel Fittings from the Republic of Korea (Dep't Commerce Oct. 30, 2020) ("Forged Steel Fittings") at 18, ref'd in, 85 Fed. Reg. 66,302 (Oct. 19, 2020).  Forged Steel Fittings, however, is not a case where – as here – the entirety of a surrogate company's profits are due to "other income."  In Commerce's final determination in

Pentafluoroethane from China – issued only a few months after its Final Determination here – Commerce rejected the financial statement of proposed surrogate company HaloPolymer where the company would only be profitable for the 2020 fiscal year if "other income" was included. Pentafluoroethane from China IDM at 50 (cmt. 6). Commerce noted it was "unable to determine whether 'other income' is related to normal operations involving production and sales of comparable or identical merchandise," but in any event, the respondent "**provided no justification for why we should ignore our practice to disregard financial statements that are only profitable due to 'other income.'**" Id. (emphasis added). So too here – Ayes's 2019 financial statements show it is profitable only if "Other Income from Real Operations" are included, and Commerce should have accordingly disregarded them.

 Moreover, as Defendant admits – "Ayes' financial statements neither describe nor discuss how {the line items listed under "Other Income from Real Operations"} is associated with the general operations of the company," and therefore "Commerce could not discern whether 'other real operating income' items qualified as SG&A expenses" in the Preliminary Determination. Def.'s Br. at 17 (quoting Preliminary Surrogate Value Memorandum (Feb. 4, 2021) ("Prelim SV Mem.") at 6 (P.R. 295)). In its Final Determination however, Commerce abruptly reversed course and included these line items in Ayes's SG&A ratio without any explanation other than: "{W}e have come to understand that the term, 'real operating income,' in audited financial statements means that the relevant expense categories apply to the general operations of the company." Memorandum Re: Less-Than-Fair-Value Investigation of Certain Metal Lockers and Parts Thereof from the People's Republic of China: Changes to the Surrogate Financial Ratios for the Final Determination (Dep't Commerce June 28, 2021) ("Final SV Mem.") at 2, n.6 (P.R. 35). Commerce failed to cite to a single page of the record, or any authority, in support of its

new "understanding."  For this reason alone, Commerce's treatment of the "Other Income from

Real Operations" line items in Ayes's financial statements should be remanded.  See Carbon

Activated Tianjin Co. v. United States, 503 F. Supp. 3d 1278, 1287 (Ct. Int'l Trade 2021)

(remanding Commerce's surrogate country selection where "Commerce failed to explain why its

preliminary finding . . .  was no longer valid or cite substantial evidence for the change")

(quotation omitted).

　　　In any event, there are certain line items under "Other Income from Real Operations" –

namely, "Provisions no longer required" and "Deferred finance income" – which Commerce has

expressly found are unrelated to the general operations of a company and should therefore be

excluded from the SG&A ratio and deducted from profit.[5]  As established in Plaintiff's opening

brief, Commerce's practice is to exclude "Provisions no longer required" as an offset to the

SG&A ratio because it relates to offsets from a period prior to the period of investigation or

review.  List Br. at 24-25 (citing cases).  Defendant acknowledges that Commerce repeatedly has

excluded "Provisions no longer required" from the surrogate financial ratio, but proffers these

cases represent "an exception to Commerce's normal practice."  Def.'s Br. at 19.  Defendant fails

to cite a single case, however, in which Commerce *included* "Provisions no longer required" in

the SG&A ratio.  It is clear from the cases that Commerce regularly treats "Provisions no longer

---

[5]    Defendant-Intervenor Zhejiang Xingyi argues Commerce "does not cherry-pick financial
statement line items and conduct wholesale revisions to a company's realized expenses or
profits," Zhejiang Xingyi Br. at 5, but Commerce does evaluate line items that should be
excluded from the SG&A ratio and deduct from profit accordingly – even if those line items are
otherwise classified as "other income."   See Issues and Decision Memorandum for the
Antidumping Duty Investigation of Prestressed Concrete Steel Rail Tie Wire from Mexico
(Dep't Commerce Apr. 28, 2014) at cmt. 6, ref. in, 79 Fed. Reg. 25,571 (May 5, 2014) (final
determ.) (disallowing SG&A expense offset for line item called "Deferred Revenue from
Cayman" categorized as "Other revenue.").

required" as an exception to otherwise-included "other income," and accordingly Commerce should have excluded it as an offset to Ayes's SG&A ratio here, as well.

Similarly, "Deferred finance income" should have been excluded as an offset to the finance ratio.  In the Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the Republic of Turkey (Dep't Commerce Sept. 23, 2021) ("Certain Aluminum Foil Turkey IDM"), ref'd in, 86 Fed. Reg. 52,880 (Sep. 23, 2021), for instance, Commerce found that a similar line item, "unearned credit finance income," could not be included as an offset to the SG&A ratio.  The "unearned" finance income represented the portion of the respondent's selling prices related to interest (i.e., extended payment terms), and Commerce stated it "has a longstanding practice of disallowing an offset to a respondent's financial expenses for interest income attributable to trade receivables because they are related to sales transactions and prices."  Certain Aluminum Foil Turkey IDM at 52 (cmt. 14).  Just as in that case, Ayes's "deferred finance income" here – i.e., interest income on extended payment terms – should have also been excluded from Ayes's SG&A because it relates to sales, not costs of production.  Commerce then should have deducted this line item, which represents more than *half* of Ayes's total pre-tax profit in 2019, from Ayes's profit.

Even if Commerce only deducted "Provisions no longer required" (Turkish Lira ("TL") 1,322,260) and "Deferred finance income" (TL 1,085,079) from Ayes's profit while leaving all other line items under "Other Income from Real Operations," Ayes would still be unprofitable.  Ayes's entire pre-tax profit was just TL 1,984,287.  Prelim SV Mem. at Attachment 3 (P.R. 295).  Because Ayes is only profitable with the addition of this "other" income unrelated to its normal operations involving production and sales of comparable or identical merchandise, Commerce

11

should have disregarded Ayes's financial statement.   Pentafluoroethane from China IDM at 50 (cmt. 6).

      **B.**      **Commerce Should Have Excluded "Interest Income" and "Rental Income" from Ayes's SG&A Ratio and Deducted from Profit**

As discussed in Plaintiff's opening brief, Ayes's "Interest income," listed under "Income from Investing Activities" in Ayes's financial statements, was properly excluded from Ayes's financial ratios, but Commerce improperly failed to deduct these items from Ayes's profit.   List Br. at 26-27.   Defendant agrees that Commerce properly excluded "Interest income" from Ayes's financial ratios.   Def.'s Br. at 21-22.   Defendant argues, however, that Commerce did not need to deduct these items from Ayes's profit because "Commerce's practice does not dictate an adjustment to profit in its financial ratio calculations when Commerce cannot discern whether 'interest income' was long-term or short-term."   Def.'s Br. at 21 (citing Issues and Decision Memorandum for the Final Results of the 2008-2010 Antidumping Duty Administrative Review of Citric Acid and Certain Citrate Salts from the People's Republic of China (Dep't Commerce Dec. 7, 2011) ("Citric Acid from China IDM") at 23, ref'd in, 76 Fed. Reg. 77,772 (Dec. 14, 2011); Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China (Dep't Commerce Aug. 11, 2010) at cmt. 30, ref'd in, 75 Fed. Reg. 50,992 (Aug. 18, 2010)).

Defendant's reliance on Citric Acid from China is puzzling, as that case stands for precisely the opposite proposition.   As Plaintiff discussed at length in its opening brief (see List Br. at 17), in Citric Acid from China, Commerce disallowed the interest income offset to the SG&A and interest expenses **and** adjusted the profit amount from the surrogate financial

statements to exclude the interest income because the respondent had not met its burden of showing the income was short-term.   See Citric Acid from China IDM at 23 (cmt. 9). Specifically, Commerce found no record evidence that the interest income in that case was "short-term interest revenue earned on working capital," and so it determined the interest income must be excluded from the SG&A ratio.   Id.   Commerce went on to say, in full:

> In addition, ***because we are disallowing the interest income offset to the SG&A and interest expenses, likewise we are adjusting the profit amount from the surrogate financial statements to exclude the interest income***. In instances where we can identify, from the face of the financial statement, line items that should be excluded as offsets to S&GA and interest expenses, we will also remove those line items from profit. ***Here we disallowed the interest income*** because it is not considered to be generated from current assets and current working capital accounts; ***therefore, it is reasonable to also exclude the interest income from the calculation of profit***.

Id. (emphasis added).[6]   See also Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Steel Propane Cylinders from the People's Republic of China (Dep't Commerce June 17, 2019) at cm1. 1, ref'd in, 84 Fed. Reg. 29,161 (June 21, 2019) ("As the petitioners point out, KKB Engineering's unconsolidated financial statements include dividend income, which we need to remove *without counting toward profit*.") (emphasis added).

In other words, where Commerce cannot determine whether interest income is short-term or long-term income from working capital on the record, it assumes it is long-term and accordingly excludes it from the surrogate financial ratios.   Once excluded from the SG&A ratios, Commerce deducts the amount from the company's profit.   Here, Defendant has conceded

---

[6]   Defendant's reliance on Wooden Bedroom Furniture From China similarly falls flat. Wooden Bedroom Furniture does not even discuss long-term/short-term interest income; instead, in that case, Commerce found there was no indication the surrogate company had received any interest income at all.   See Wooden Bedroom Furniture From China IDM at 92 (cmt. 30).

Ayes's "Interest income" was properly excluded as an offset to its SG&A expenses.  Def.'s Br. at 21.  Once excluded, Commerce needed to "exclude the interest income from the calculation of profit."  Citric Acid from China IDM at 23; IDM at 15-16 (P.R. 348) ("In instances where {Commerce} can identify, from the face of the financial statement, line items that should be excluded as offsets to S&GA and interest expenses, {it} will also remove those line items from profit.").  Commerce's failure to do so here is both unreasonable and contrary to established practice.

Like "Interest income," Ayes's "Rental income," which was also listed under "Income from Investing Activities" in Ayes's financial statements, should have been excluded as an offset to Ayes's SG&A expenses and deducted from profit.  See List Br. at 27-28.  Defendant has offered no argument or justification for Commerce's baseless decision to re-classify "Rental income" as "Other income," where Ayes's financial statements classify this as "Income from Investing Activities."  See Def.'s Br. at 17-18.  This "investment" income should have been excluded from Ayes's SG&A ratio absent any information on the record that it was "short-term interest revenue earned on working capital," Citric Acid from China IDM at 23 (cmt. 9), and Commerce's unexplained reversal of its treatment of this income between the Preliminary and Final Determinations renders the agency action unlawful.  See Carbon Activated Tianjin, 503 F. Supp. 3d at 1287.

\*       \*       \*

Ultimately, Commerce's unexplained and unsupported treatment of various income items that should have been *deducted* from Ayes's profit artificially made Ayes look profitable.  If anything was a "results-driven undertaking," it was Commerce's approach to Ayes here, and not – as Defendant-Intervenor Zhejiang Xingyi alleges (see Zhejiang Xingyi Br. at 6) – Commerce's

standard practice of excluding these items from a surrogate company's SG&A ratio and deducting them from profit. Commerce should have found Ayes's 2019 financial statement to represent an unprofitable company, unsuitable for calculating surrogate financial ratios in this investigation. Accordingly, Commerce's <u>Final Determination</u> should be remanded.

**III.   <u>COMMERCE'S   SELECTION   OF   TURKEY   OVER   MEXICO   AS   A   SURROGATE   COUNTRY   WAS   NOT   SUPPORTED   BY   SUBSTANTIAL   EVIDENCE AND WAS CONTRARY TO LAW</u>**

Finally, the record shows that Commerce's selection of Turkey over Mexico as the surrogate country in the underlying investigation was unsupported by the record and contrary to law. As discussed in Plaintiff's opening brief, Commerce's surrogate country selection was contrary to law for Commerce's abject failure to conduct any qualitative assessment of Turkish surrogate value data or any comparative assessment of Turkish and Mexican data. List Br. at 31-33. If Commerce had conducted such an assessment, the record would not have supported a finding that Turkish data was the "best available" when compared to Mexican data because (1) the surrogate values submitted for Turkish labor (2018), electricity (2019), natural gas (2019) and water (2019) were non-contemporaneous with the period of investigation, whereas the Mexican values for the same inputs were contemporaneous; (2) the financial statements of Grupo Carso, a company that does produce merchandise comparable to metal lockers, were superior to the statements of Ayes, which should have been rejected as unprofitable. <u>Id.</u> at 34-36.

In its response, Defendant entirely fails to address – and thus does not dispute – that Commerce was required to undertake qualitative analysis of all Turkish and Mexican surrogate values even if it determined Grupo Carso was not a producer of comparable merchandise. <u>See</u> Def.'s Br. at 22-25; <u>see also</u> List Br. at 33 (citing <u>Jiaxing Bro. Fastener Co. v. United States</u>, 961 F. Supp. 2d 1323, 1333 (Ct. Int'l Trade 2014)). But Defendant does not even suggest that

Commerce fulfilled this obligation.   Instead, Defendant argues: "Commerce reasonably determined that because Ayes was a producer of comparable merchandise whereas Grupo Carso was not, and *because the Turkish data and financial statements were better overall*, it would continue to use Turkey as the primary surrogate country." Def.'s Br. at 24-25 (emphasis added).

To the contrary, there is nothing in Commerce's <u>IDM</u> that indicates Commerce evaluated the Turkish surrogate data and found it "better" than the data from Mexico.  Instead, Commerce summarily dismissed the superiority of the more-contemporaneous Mexican data based on its finding Grupo Carso did not produce comparable merchandise and refused to consider whether the significant detail of Grupo Carso's financial statements made these statements the "best available data" for Commerce's surrogate value analysis.  <u>See</u> <u>IDM</u> at 13, 16 (P.R. 348).  The entirety of Commerce's analysis was the following: "{G}iven the completeness and contemporaneity of the SV data available on the record for Turkey, including contemporaneous financial statements from a producer of comparable merchandise, we found that Turkey best meets our selection criteria for a surrogate country."  <u>IDM</u> at 12 (P.R. 348); <u>id.</u> at 14 ("Thus, we continue to select Turkey as the primary surrogate country for this investigation, because the Turkish GTA data are accurate and appropriate to value all material inputs, and because Turkey is the only country that has usable financial statements on the record from a comparable producer for the purposes of valuing surrogate financial ratios.").

In fact, Defendant's defense of Commerce's failure to consider the more-detailed Grupo Carso financial statements makes clear that Commerce avoided its duty:  "Notably, plaintiff fails to set forth any reason why such level of detail would be necessary, or any record evidence demonstrating *that Ayes's financial statements are unusable* for calculating surrogate financial ratios."  Def.'s Br. at 24 (emphasis added).  As noted in List's opening brief, however, "the

statutory standard is not whether surrogate data is merely '*usable*', but whether it is the 'best available.'" <u>Jiaxing Bro. Fastener Co.</u>, 961 F. Supp. 2d at 1333 (quotation omitted).  Based solely on Commerce's incorrect determination that Grupo Carso's financial statements were unusable, and its incorrect determination that Ayes's unprofitable statements were usable, Commerce forewent any qualitative analysis of the surrogate data factors and simply selected a surrogate country based on one purportedly "usable" financial statement.  In doing so, Commerce failed to comply with its statutory obligation to value factors of production using "the best available information."  19 U.S.C. § 1677b(c)(1)(B).

\* \* \*

<u>**CONCLUSION**</u>

For all the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record and:

(1) hold that Commerce's <u>Final Determination</u> is unsupported by substantial evidence and is not otherwise in accordance with law with respect to the rejection of surrogate financial ratios from Mexico, the acceptance of surrogate financial ratios from Turkey, and the selection of Turkey as the primary surrogate country and selection of only Turkish surrogate values;

(2) remand the <u>Final Determination</u> to Commerce with instructions to reconsider and correct the errors presented in this memorandum; and

(3) provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ Kathleen W. Cannon
Kathleen W. Cannon
R. Alan Luberda
Elizabeth C. Johnson
KELLEY DRYE & WARREN LLP
3050 K Street N.W., Suite 400
Washington, D.C. 20007
Tel: (202) 342-8400
Fax: (202) 342-8451
kcannon@kelleydrye.com
aluberda@kelleydrye.com
ejohnson@kelleydrye.com

Dated: July 11, 2022

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's December 21, 2021 Order (ECF No. 31) setting the word limitation to Plaintiff List Industries, Inc.'s Reply Brief to 7,000 words, counsel to Plaintiff certifies that this Reply Brief contains 5,209 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ Kathleen W. Cannon
KATHLEEN W. CANNON
R. ALAN LUBERDA
ELIZABETH C. JOHNSON
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Plaintiff List Industries, Inc.

Dated:  July 11, 2022