Slip Op. 23-83

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LIST INDUSTRIES, INC.,<br><br>                Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>                Defendant,<br><br>    and<br><br>WEC MANUFACTURING, LLC,<br>HANGZHOU XLINE MACHINERY &<br>EQUIPMENT CO., LTD., ZHEJIANG<br>XINGYI METAL PRODUCTS CO., LTD.,<br>XINGYI METALWORKING<br>TECHNOLOGY (ZHEJIANG) CO., LTD.,<br><br>          Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge<br>Court No. 21-00521 |

### OPINION AND ORDER

[U.S. Department of Commerce's final determination in the antidumping duty investigation of certain metal lockers and parts thereof from the People's Republic of China is sustained, in part, and remanded, in part.]

Dated: May 30, 2023

Elizabeth C. Johnson, Kelley Drye & Warren, LLP, of Washington, DC, argued for plaintiff List Industries, Inc. With her on the brief were Kathleen W. Cannon and R. Alan Luberda.

Ioana Cristei, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Jesus N. Saenz, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Camelia C. Mazard and Andre P. Barlow, Doyle, Barlow & Mazard, PLLC, of Washington, DC, for defendant-intervenor WEC Manufacturing, LLC.

Lizbeth R. Levinson, Brittney R. Powell, and Ronald M. Wisla, Fox Rothschild LLP, of Washington, DC, for defendant-intervenor Hangzhou Xline Machinery & Equipment Co., Ltd.

Eugene Degnan and Nicholas Duffey, Morris, Manning & Martin, LLP, of Washington, DC, argued for defendant-intervenors Zhejiang Xingyi Metal Products Co., Ltd. and Xingyi Metalworking Technology (Zhejiang) Co., Ltd.  With them on the brief were Brady W. Mills, Donald B. Cameron, Edward J. Thomas, III, Jordan L. Fleischer, Julie C. Mendoza, Mary S. Hodgins, and R. Will Planert.


Barnett, Chief Judge: This action concerns the final affirmative determination in the antidumping duty investigation by the U.S. Department of Commerce ("Commerce" or "the agency") regarding certain metal lockers and parts thereof from the People's Republic of China ("China").  *See Certain Metal Lockers and Parts Thereof From China*, 86 Fed. Reg. 35,737 (Dep't Commerce July 7, 2021) (final affirmative determination of sales at less than fair value) ("*Final Determination*"), ECF No. 28-4, and accompanying Issues and Decision Mem., A-570-133 (June 28, 2021) ("I&D Mem."), ECF No. 28-5.[1]

Plaintiff List Industries, Inc. ("Plaintiff" or "List") challenges several aspects of the *Final Determination* as unsupported by substantial evidence and not in accordance with law, namely, Commerce's selection of Turkey as the primary surrogate country, Commerce's selection of certain surrogate values, and Commerce's selection and

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 28-2, and a Confidential Administrative Record ("CR"), ECF No. 28-3.  Parties submitted joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF No. 41; Confid. J.A. ("CJA"), ECF No. 40.  The court references the confidential version of the relevant record documents, if applicable, throughout this opinion unless otherwise specified.

calculation of financial ratios.  Pl.'s Br. in Supp. of Rule 56.2 Mot. for J. on the Agency

R. ("Pl.'s Mem."), ECF No. 32-1; Pl.'s Reply Br. in Supp. of Mot. for J. on the Agency R.

("Pl.'s Reply"), ECF No. 39.  Defendant United States ("Defendant" or "the

Government") and Defendant-Intervenors[2] support Commerce's determination.  Def.'s

Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 36; Def.-

Int. Zhejiang Xingyi Metal Prods. Co., Ltd.'s Br. in Resp. to Pl.'s Mot. for J. on the

Agency R. ("Zhejiang's Resp."), ECF No. 37; Def.-Int. Hangzhou Xline Mach. & Equip.

Co., Ltd.'s Opp'n to Pl.'s 56.2 Mot. for J. on the Agency R. ("Hangzhou's Resp."), ECF

No. 38.[3]

　　　　For the following reasons, Commerce's *Final Determination* will be remanded for

reconsideration or further explanation of the treatment of certain income categories in

the calculation of the sales, general, and administrative expenses ("SG&A") and profit

ratios.  Commerce's *Final Determination* will be sustained in all other respects.

## BACKGROUND

　　　　On July 29, 2020, Commerce initiated an investigation into certain metal lockers

and parts thereof ("metal lockers") from China alleged to have been sold in the United

States at less than fair value.  *Certain Metal Lockers and Parts Thereof From the

People's Republic of China*, 85 Fed. Reg. 47,343 (Dep't Commerce Aug. 5, 2020)

---

[2] Defendant-Intervenors consist of WEC Manufacturing, LLC, Hangzhou Xline
Machinery & Equipment Co., Ltd. ("Hangzhou"), Zhejiang Xingyi Metal Products Co.,
Ltd. ("Zhejiang"), and Xingyi Metalworking Technology (Zhejiang) Co., Ltd.
[3] Hangzhou adopted by reference the Government's arguments and made no additional
arguments.  Hangzhou's Resp. at 2.

(initiation of less-than-fair-value investigation), PR 23, CJA Tab 2.  Commerce invited

interested parties to submit comments on surrogate country selection and to propose

surrogate value data.  Request for Econ. Dev., Surrogate Country and Surrogate Value

Cmts. and Info. (Sept. 16, 2020), PR 142, CJA Tab 4.

List submitted comments supporting the selection of financial statements of a

Mexican company, Grupo Carso S.A.B. de CV ("Grupo Carso"), to value financial ratios

or, alternatively, the statements of a company in Montenegro.  Pet'rs' Cmts. on

Surrogate Country Selection and Submission of Surrogate Values (Nov. 17, 2020)

("Pet'rs' Cmts."), PR 227–30, CJA Tab 10.  Zhejiang, a respondent in the investigation,

proposed the use of the financial statements from the Turkish company Ayes Celikhasir

VE CT ("Ayes").  Rebuttal Surrogate Value and Surrogate Country Cmts. (Dec. 11,

2020), PR 262, CJA Tab 11; Submission of Surrogate Fin. Ratios (Dec. 18, 2020)

("Zhejiang's Fin. Ratios Submission"), PR 269, CJA Tab 12.

On February 11, 2021, Commerce issued its preliminary determination.  *Certain

Metal Lockers and Parts Thereof From the People's Republic of China*, 86 Fed. Reg.

9,051 (Dep't Commerce Feb. 11, 2021) (preliminary affirmative determination of sales at

less than fair value; postponement of final determination and extension of provisional

measures) ("*Preliminary Determination*"), PR 301, CJA Tab 18, and accompanying

Decision Mem. for the Prelim. Determination (Feb. 4, 2021) ("Prelim. Mem."), PR 285,

CJA Tab 16.  For the *Preliminary Determination*, Commerce determined that the only

complete, audited financial statements on the record were those of Grupo Carso and

Ayes.  Prelim. Mem. at 13.  Commerce preliminarily determined that Grupo Carso was

not a producer of comparable merchandise, and that Ayes was such a producer.  *Id.*

Consequently, Commerce selected the financial statements of Ayes for the purpose of

determining the surrogate financial ratios.  *Id.*

When calculating the SG&A ratios using Ayes' financial statements, Commerce

preliminarily excluded certain income categories listed as "other real operating income"

because Ayes' "financial statements neither describe nor discuss how this income is

associated with the general operations of the company."  Prelim. Surrogate Value Mem.

(Feb. 4, 2021) ("Prelim. SV Mem.") at 6, PR 295–96, CJA Tab 17.  Commerce also

excluded "interest income from investing activities" when determining the SG&A and

profit ratios.  *Id.*

For the *Final Determination*, Commerce continued to find that Ayes produced

comparable merchandise and that Grupo Carso did not.  I&D Mem. at 11–12.

Commerce thus found that Ayes' financial statements constituted the best available

information to determine surrogate financial ratios.  *Id.* at 12.  Commerce also revised

its financial ratio calculations for the *Final Determination* by reclassifying several other

income categories and "rental income" as offsets to the SG&A ratios.  *Id.* at 15.

Commerce explained that it "excluded 'interest income' from the financial ratios . . . and

[did] not offset SG&A or adjust[] profit for this line item."  *Id.* at 16.  Commerce further

explained that it selected Turkey as the primary surrogate country because of the

completeness and contemporaneity of the surrogate value data available from that

country, including the financial ratios.  *Id.* at 12.

In this action, List challenges Commerce's (1) determination that Ayes produced comparable merchandise whereas Grupo Carso did not; (2) selection and adjustment of Ayes' financial statements to determine surrogate financial ratios; and (3) selection of Turkey as the primary surrogate country.  *See generally* Pl.'s Mem.  The court heard oral argument on November 3, 2022.  *See* Docket Entry, ECF No. 45.[4]

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[5] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

### I.    Commerce's Surrogate Country and Surrogate Value Selection Process

An antidumping margin is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production[6] used to produce the subject merchandise in a surrogate market economy country as well as

---

[4] Additional background information is provided with the discussion of each issue.

[5] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

amounts for "general expenses and profit plus the cost of containers, coverings, and

other expenses."  *Id*. § 1677b(c)(1).

In selecting these "surrogate values," Commerce must, "to the extent possible,"

use data from a market economy country that is at "a level of economic development

comparable to that of the nonmarket economy country" and is a "significant producer[ ]

of comparable merchandise."  *Id.* § 1677b(c)(4).  To select a surrogate country,

Commerce has adopted a four-step approach:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)-(3), Commerce will select the country
> with the best factors data.

*Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*")*,* 822 F.3d 1289, 1293 (Fed.

Cir. 2016) (alteration in original); *see also* Import Admin., U.S. Dep't of Commerce,

Non–Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1

(2004), http://enforcement.trade.gov/policy/bull04-1.html (last visited May 30, 2023).

Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

(excepting labor).  With respect to "manufacturing overhead, general expenses, and

profit, [Commerce] normally will use non-proprietary information gathered from

producers of identical or comparable merchandise in the surrogate country."  *Id.*

§ 351.408(c)(4).

**II.    Commerce's Determination that Ayes Produces Comparable Merchandise and that Grupo Carso Does Not**

### A.  Legal Framework

Commerce determines if a company in the surrogate country produces comparable merchandise by "apply[ing] a three-part test that examines 'physical characteristics, end uses, and production processes.'"  *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 490, 318 F. Supp. 2d 1339, 1348 (2004) (citation omitted).  For purposes of this determination, "the burden of creating an adequate record lies with the interested parties, not with Commerce."  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

### B.  Parties' Contentions

Plaintiff contends that Commerce departed from its established practice of applying a three-part test that examines "physical characteristics, end uses, and production processes" to determine the comparability of the merchandise.  Pl.'s Mem. at 16.  Additionally, Plaintiff contends that Commerce failed to support with substantial evidence its findings that Ayes produces comparable merchandise, and that Grupo Carso does not.  *Id.* at 18; *see also* Pl.'s Reply at 5.

The Government responds that Commerce applied the three-part test and explained its reasoning, contending that the record supports Commerce's finding that Ayes' merchandise is comparable to the subject metal lockers.  Def.'s Resp. at 14–15.  The Government further argues that the record does not support a finding that Grupo

Carso's merchandise is comparable to the subject metal lockers.  *Id.* at 12.  Zhejiang

advances similar arguments.  *See* Zhejiang's Resp. at 4–5.

### C.  Analysis

On the basis of the record before it, Commerce reasonably determined that

Grupo Carso was not a producer of comparable merchandise, and that Ayes was such

a producer.

Commerce acknowledged that Grupo Carso produces "metallic structures for

bridges, building, and mining branches, heat exchangers, pressure vessels, distillation

towers, air coolers, surface capacitors, high pressure feed water heaters, and large

containers."  I&D Mem. at 12.  However, Commerce explained that "although [List]

claim[s] that Grupo Carso produces comparable products including metal containers,

we note that Grupo Carso's list of products identifies 'large containers,' not metal

containers."  *Id.* at 12 n.61 (citing Pet'rs' SV Cmts., Ex. Mex.-9; Pet'rs' Case Br. at 4

(May 12, 2021), CR 296, PR 341, CJA Tab 19).

With respect to the end uses of Grupo Carso's merchandise, Commerce noted

that "Grupo Carso is a diversified conglomerate with commercial, industrial,

infrastructure, construction, and energy sectors that do not produce comparable

merchandise."  *Id.* at 12 & n.56 (citing Pet'rs' SV Cmts., Ex. Mex.-9).  On the basis of

the limited information before it, Commerce reasoned that "many of these products

represent high-value structural components for the public or private sector, and/or

machinery that includes 'cutting-edge technology.'"  *Id.* at 12 n.61 (citing Pet'rs' SV

Cmts., Ex. Mex.-9).

Finally, with respect to production processes, Commerce concluded that "the record lacks sufficient information to demonstrate . . . that Grupo Carso uses a similar production process to that of the metal lockers under investigation.*" Id.* at 12–13. Commerce again noted that "there is an unspecific indication that Grupo Carso has engaged in the 'manufacture of large containers' but the record lacks any evidence regarding the physical characteristics, end uses or the production process for such containers." *Id.* at 13.

Commerce also evaluated the record evidence and explained the basis for its finding that Ayes was a producer of comparable merchandise. Commerce cited technical specifications, pictures of products, and product dimensions, reflecting the physical characteristics of the merchandise produced by Ayes. *See id.* at 12 & n.57 (citing Prelim. Mem. at 13; Zhejiang's Fin. Ratios Submission). Commerce also explained that "Ayes . . . produces mesh fences, steel mesh, ribbed iron, and certain machines (drawing machine, cutting machines, butt welding machines, wire mesh bending machines, etc.)." *Id.* at 12.

Commerce reviewed and referenced marketing materials reflecting the end uses and production processes of the merchandise produced by Ayes. *See id.* at 12 & n.57 (citing Prelim. Mem. at 13; Zhejiang's Fin. Ratios Submission); *see also* Prelim. Mem. at 13 & n.102 (citing Zhejiang's Fin. Ratios Submission). Among other things, the marketing materials indicated that "Ayes produces metal panel fences, steel mesh products, and cold-drawn bars and coil in a manner similar to the production of metal lockers." Zhejiang's Fin. Ratios Submission at 2. Among the materials considered by

Commerce were a discussion of Ayes' production process for wire mesh and a chart comparing the production processes between Ayes' merchandise and the subject metal lockers. *See id.*, Exs. 4–5.

Plaintiff contends that Commerce "failed to provide any analysis or explanation for its determination that Ayes, but not Grupo Carso, produces merchandise comparable to the subject lockers." Pl.'s Mem. at 17–18. The court acknowledges that the total quantum of Commerce's explanation of how its three-part test applies to both Grupo Carso and Ayes is limited. In this case, however, that limited analysis is a function of the limited information placed on the record by the parties. While Plaintiff objects that Commerce failed to apply its three-part test to Grupo Carso, Plaintiff does not identify any record information regarding Grupo Carso of which Commerce did not take account. Commerce's limited analysis of Grupo Carso is a result of the limited information placed before the agency by Plaintiff.

In these non-market economy antidumping cases, Commerce is tasked with identifying the "best available information" with which to value the respondent's factors of production. That best available information standard, however, is applied with respect to the record developed before the agency; i.e., the information made <u>available</u> for Commerce's determination. *See Qingdao*, 766 F.3d at 1386. Commerce cannot be faulted for failing to consider information with which it was not provided. In fact, Commerce recognized the limitations of the record by stating that

> the petitioners simply reiterate their previous arguments . . . but provide no elaboration on how these products or their production processes are comparable to metal lockers. The record lacks sufficient information to

demonstrate that Grupo Carso produces anything with similar physical characteristics or end uses comparable to metal lockers, or that Grupo Carso uses a similar production process to that of the metal lockers under investigation.

I&D Mem. at 12–13.

While Commerce's analysis of the three-part test with respect to Ayes is also, admittedly, limited, that again is a function of the limited information contained on the record. Nevertheless, Commerce evaluated the limited information before it to reasonably determine that Ayes produced comparable merchandise. Among other things, Ayes produces mesh fences and steel mesh. *See id.* at 12. While wire mesh lockers are excluded from the scope of the order, that exclusion requires that at least three sides, including the door, be made from wire mesh and that the locker exceed certain physical dimensions. *See Final Determination*, 86 Fed. Reg. at 35,740. Otherwise, the scope expressly provides that "subject metal lockers typically are made of flat-rolled metal, metal mesh, and/or expanded meta." *Id*. Commerce's reliance on Ayes' production of mesh fences and steel mesh as support for its finding that Ayes produces comparable merchandise is reasonably discernible from this limited record. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) ("Where the path of an agency's reasoning is reasonably discernible, this Court may nonetheless sustain the agency's action.").

For these reasons, Commerce's determination that Ayes produces merchandise comparable to the subject metal lockers, and that Grupo Carso does not, is supported by substantial evidence.

### III.   Commerce's Selection of Ayes' Financial Statements to Determine Financial Ratios

#### A.  Parties' Contentions

Plaintiff contends that Commerce's determination that Ayes had suitable financial statements from which to calculate surrogate financial ratios was not supported by substantial evidence or in accordance with law.  Pl.'s Mem. at 21; *see also* Pl.'s Reply at 7.  Plaintiff contends that if Commerce acted in accordance with its past practice of calculating financial ratios, Commerce would have found that Ayes was not profitable and, therefore, unsuitable for determining the surrogate financial ratios.  Pl.'s Mem. at 21; *see also* Pl.'s Reply at 7–8.  The Government responds that Commerce applied its practice of treating "other income" as related to the general operations of the company and correctly found that Ayes was profitable.  Def.'s Resp. at 16; *see also* Zhejiang's Resp. at 5–6 (arguing that Commerce adhered to its practice).

#### B.  Analysis

Commerce calculated respondents' SG&A and profit using financial ratios derived from Ayes' financial statements.  *See* I&D Mem. at 14–16.  Commerce calculated the SG&A ratio by taking Ayes' SG&A as a percentage of its raw materials, direct labor, energy, manufacturing overhead, and traded/finished goods.  Changes to the Surrogate Fin. Ratios for the Final Determination (June 28, 2021) ("Fin. Ratios Mem."), Attach. 3, PR 357–58, CJA Tab 22.  Commerce calculated the profit ratio by taking Ayes' profit as a percentage of its raw materials, direct labor, energy, manufacturing overhead, traded/finished goods, SG&A, and interest.  *Id*.

At issue is whether Commerce properly accounted for certain income categories when calculating the financial ratios for Ayes.  Plaintiff asserts that if the income categories it challenges are properly excluded from these calculations, Commerce would have found that Ayes was not profitable and, therefore, selected the financial statements of another company (e.g., Grupo Carso) to calculate the financial ratios. *See* Pl.'s Mem. at 21.  For purposes of this discussion, the court divides the income categories into three groups as discussed below.

### 1. Commerce Properly Accounted for Certain Other Real Operating Income Categories

For the *Preliminary Determination*, Commerce "excluded other real operating income" categories from its SG&A ratio calculation.  Prelim. SV Mem. at 6.  Specifically, Commerce excluded deferred finance income, incentive income, shipping revenues, provisions no longer required, price difference, and other income and profits from the SG&A ratio calculation.  *Id.*, Attach. 3.  In its comments to Commerce on the *Preliminary Determination*, Plaintiff argued that while Commerce properly excluded these income categories from SG&A, the agency failed to adjust the profit calculation accordingly. *See* Pet'rs' Case Br. at 11–12.  For the *Final Determination*, Commerce revised its SG&A calculation and included these "other real operating income" categories in the calculation of SG&A.  I&D Mem. at 15.  Before the court, Plaintiff contends that Commerce failed to adequately explain the change in treatment of these "other real operating income" categories between the *Preliminary Determination* and *Final Determination* and that the explanation Commerce provided was conclusory and

unsupported by the record.  Pl.'s Mem. at 24; *see also* Pl.'s Reply at 9–10.  Plaintiff

maintains that these income categories should have been excluded from both the

SG&A and profit ratio calculations, as it maintained before Commerce.  Pl.'s Mem. at

24–26; Pl.'s Reply at 10–12.

      Commerce provided an explanation, supported by substantial evidence, for its

change between the *Preliminary Determination* and *Final Determination* with respect to

some, but not all, of the income categories at issue.  For the *Final Determination*,

Commerce revised its final surrogate financial ratios calculations to include all six of the

"other real operating income" categories identified above and explained that it came "to

understand that the term, 'real operating income,' in audited financial statements means

that the relevant expense categories apply to the general operations of the company."

Fin. Ratios Mem. at 2, n.6.  Moreover, Commerce described its practice of seeking

"consistency in the treatment of both the revenue and expense side of line items on

Ayes' financial statements."  I&D Mem. at 15.

      While Commerce's description of its practice as seeking consistency in the

treatment of revenues and expenses explains some of the changes it made, it fails to

justify all of these changes.  Furthermore, the examples that Commerce provides of its

consistency introduces another issue.

      First, in describing its practice of consistent treatment, Commerce provided two

examples drawn from the "other real operating income" categories.  In one case,

Commerce stated that it includes both exchange gains and losses in the calculation of

financial income and expenses.  Commerce similarly said that it "excluded both the

shipping expenses and shipping revenues in the *Preliminary Determination*" and "continue[d] to exclude both the expenses and revenues associated with shipping merchandise for sale." *Id.* While Commerce accurately described its treatment of exchange gains and losses, the supporting documents for Commerce's *Final Determination* indicate that shipping *expenses* were excluded, but shipping *revenues* were included in SG&A. *See* Fin. Ratios Mem., Attach. 3. Because Commerce's actual treatment of shipping revenue appears to be at odds with its stated treatment of that revenue, the court must remand this issue for reconsideration or further explanation.

Commerce's revised treatment of four other income categories is addressed by its explanation of providing consistent treatment. For each of these four income categories (deferred finance income, provisions no longer required, price difference, and other income and profit), Ayes' financial statements included an analog expense category that Commerce had already included in the SG&A ratio calculation (deferred finance expense, provision for doubtful receivables, price difference, and other expenses and losses). *See id.* Commerce's expressed interest in "consistency in the treatment of both the revenue and expense side of line items on Ayes' financial statements" is adequate to explain Commerce's treatment of these income categories for the *Final Determination*.

There is one remaining category of "other real operating income" that Commerce excluded from the SG&A ratio calculation for the *Preliminary Determination* but included for the *Final Determination*: incentive income. While Commerce listed incentive income along with other income categories with corresponding expense categories, the court is

unable to discern the corresponding expense category or any other explanation for

Commerce's change for the *Final Determination*.  To that end, the court must remand

this issue for reconsideration or further explanation.

The court further notes that, contrary to Plaintiff's argument, the inclusion of

certain "other real operating income" categories as offsets to SG&A does not contradict

Commerce's general practice.[7]  As Commerce explained, its normal practice calls for

the agency to treat the revenue and expense sides of line items consistently.  I&D Mem.

at 15.[8]

Plaintiff relies on selected determinations in which Commerce excluded certain

"other real operating income" categories from offsetting SG&A.  *See* Pl.'s Mem. at 24–

25.  In those determinations, Commerce made fact-specific determinations that are not

inconsistent with or otherwise detract from its general practice.[9]  Instead, these

---

[7] "In calculating the [general and administrative] expense ratio, Commerce normally includes certain expenses and revenues that relate to the general operations of the company as a whole and to the accounting period, as opposed to including only those expenses that directly relate to the production of the merchandise."  Issues & Decision Mem. for Forged Steel Fittings from the Republic of Korea, A-580-904 (Oct. 13, 2020) at 18, https://access.trade.gov/Resources/frn/summary/korea-south/2020-23110-1.pdf (last visited May 30, 2023)).

[8] In providing this explanation, Commerce cited to Issues & Decision Mem. for Certain Tool Chests and Cabinets from China, A-570-056 (Apr. 2, 2018) at 44, https://access. trade.gov/Resources/frn/summary/prc/2018-07315-1.pdf (last visited May 30, 2023); and Issues & Decision Mem. for Boltless Steel Shelving Units Prepackaged for Sale from China, A-570-018 (Aug. 14, 2015) at 33–34, https://access.trade.gov/Resources/ frn/summary/prc/2015-20794-1.pdf (last visited May 30, 2023).  *See* I&D Mem. at 15 & n.74.

[9] For example, Commerce has disallowed an offset for an income category when the record indicated the income related to a prior period.  *See* Issues & Decision Mem. for Methionine from Japan, A-588-879 (Jul. 19, 2021) at 9–10, https://access.trade.gov/

exclusions represent exceptions to Commerce's practice of treating other income as an offset to SG&A such as when the record demonstrates that it relates to a prior period or to non-subject merchandise. *See* I&D Mem. at 15 (explaining the exceptions to Commerce's practice). Absent a demonstration by Plaintiff of such similarities, the cited determinations do not support a general exclusion of these income categories from the SG&A ratio. *See id*.

> **2. Commerce's Inclusion of Rental Income Must Be Remanded for Reconsideration or Further Explanation**

Ayes' financial statements include an income category of "rental income" under the heading "Income from Investing Activities." Zhejiang's Fin. Ratios Submission, Ex. 2. For the *Preliminary Determination*, Commerce excluded rental income from the SG&A ratio calculation. Prelim. SV Mem., Attach. 3. However, for the *Final Determination*, Commerce included "rental income" as an offset to SG&A. I&D Mem. at 15. Plaintiff contends that Commerce failed to explain the change in treatment of "rental

---

Resources/frn/summary/japan/2021-15755-1.pdf (last visited May 30, 2023); Issues & Decision Mem. for PET Resin from India, A-533-861 (Mar. 4, 2016) at 13, https://access.trade.gov/Resources/frn/summary/india/2016-05710-1.pdf (last visited May 30, 2023). Commerce also has disallowed specific income categories when the record indicates the income is unrelated to the company's general operations. For example, Commerce excluded an income category that was directly related to non-subject merchandise sales. *See* Issues & Decision Mem. for Prestressed Concrete Steel Rail Tie Wire from Mexico, A-201-843 (Apr. 28, 2014) at 10–11, https://access. trade.gov/Resources/frn/summary/mexico/2014-10241-1.pdf (last visited May 30, 2023); Issues & Decision Mem. for Certain Aluminum Foil from Turkey, A-489-844 (Sept. 16, 2021) at 52, https://access.trade.gov/Resources/frn/summary/turkey/2021-20534-1.pdf (last visited May 30, 2023).

income" between the *Preliminary Determination* and *Final Determination*.  Pl.'s Mem. at

28; *see also* Pl.'s Reply at 14.

Commerce has not explained its treatment of rental income in the *Final*

*Determination*.  While Commerce included a reference to "rental income" within its

explanation of how it treated "other real operating income" categories, rental income

was not such a category and, instead, was listed as "income from investing activities."

*See* Fin. Ratios Mem., Attach. 3.  Commerce's explanation of providing consistent

treatment between income and expense lines does not explain Commerce's treatment

of rental income for the *Final Determination*—both because such an explanation does

not apply to income from investing activities and because there is no obvious

corresponding expense.[10]  *See id.*

In the absence of any explanation for Commerce's treatment of rental income,

this issue is remanded for Commerce to reconsider or further explain its treatment of

this income category in the SG&A and profit ratio calculations.

### 3. Commerce's Treatment of Interest Income in Calculating Ayes' Profit Must Be Remanded for Reconsideration or Explanation

Ayes' financial statements also include an income category of "interest income"

under the heading "Income from Investing Activities."  Zhejiang's Fin. Ratios

Submission, Ex. 2.  The parties agree that Commerce excluded "interest income" as an

---

[10] While it is possible that the "depreciation expenses" reported in the "expenses from investment activities" are the corresponding expense, the fact that Commerce treats those expenses as factory overhead suggests otherwise.  *See* Fin. Ratios Mem., Attach. 3.

offset to SG&A expenses in the financial ratio calculations.  *See* Pl.'s Mem. at 22–23;

Def.'s Resp. at 18.  Plaintiff, however, maintains that Commerce failed to remove

"interest income" from Ayes' profit.  Pl.'s Mem. at 26; *see also* Pl.'s Reply 13–14.  The

Government responds that Commerce excluded this "interest income" both as an offset

to Ayes' SG&A and from Ayes' profit.  Def.'s Resp. at 20–21.  To that end, it appears

that the parties disagree on what Commerce did with respect to interest income in

calculating Ayes' profit.

On November 10, 2022, the court issued a letter seeking to confirm its

understanding of Commerce's treatment of interest income for the *Final Determination*

and inviting comment from the parties.  Letter Order at 1, ECF No. 47.[11]  Rather than

providing clarity with respect to Commerce's treatment of interest income, the parties'

responses confirmed their disagreement over the basic facts of what Commerce did.[12]

---

[11] The court noted that Commerce placed the "interest income" line item in the "Excluded" column in the Ayes Financial Ratio Analysis.  Letter Order at 1 & n.1 (citing Fin. Ratios Mem., Attach. 3).  Thus, the court asked the parties to address whether this indicated that Commerce did not include the "interest income" amount either as an offset to SG&A or in the total profit.  *Id*. at 2.

[12] In response to the court's Letter, Plaintiff argues that Commerce erred because it did not subtract the "investment income" line item from profit.  Pl.'s Resp. to the Ct.'s Nov. 10, 2022 Order at 2, ECF No. 48 (citing Fin. Ratios Mem. at 2).  The Government contends that to subtract the "interest income" from the profit would be to offset profit with interest income, and it contends that the confusion is caused by the use of the terms "offset" and "exclude."  Def.'s Resp. to Pl.'s Submission to the Ct.'s Nov. 10, 2022 Order at 2–3, ECF No. 49 (citing Fin. Ratios Mem., Attach. 3).  It may be that, whether Commerce has succeeded in "excluding" the interest income from Ayes' profit calculation depends on whether that income was included in the starting profit figure from which Commerce was working.  If the starting profit included interest income, Commerce did not explain how "excluding" that income from profit did not require subtracting that figure from profit (regardless of whether that operation is referred to as

The role of the court is to review Commerce's determinations and determine whether they are in accordance with law and supported by substantial evidence.  The court is unable to perform this review function when it is unable to identify what determination Commerce made.  Accordingly, this issue is remanded to Commerce for reconsideration or further explanation of its treatment of "interest income" in the calculation of financial ratios.  Commerce must be precise in its selection of terminology and, to the extent that it continues to maintain that it is excluding interest income from profit without making a deduction or offset, demonstrate that its profit calculation does not include the interest income.

### 4.  Plaintiff's Arguments that Ayes is Unprofitable Fail

Plaintiff contends that Ayes' profitability results from the other income categories, challenged above, and that when Commerce properly adjusts for those income categories, Ayes will be unprofitable and, therefore, inappropriate as a basis for the surrogate profit ratio.  Pl.'s Reply at 8–9.  Plaintiff argues that Commerce disregards financial statements that are only profitable due to "other income."  *Id.* at 9.

As discussed above, Plaintiff's challenges to Commerce's treatment of four of the eight income categories fails.  While Commerce must reconsider or further explain its treatment of the remaining four income categories, even if Commerce decides that all

---

"subtracting" or "offsetting").  While Plaintiff and Defendant disagree over whether Commerce properly excluded the interest income from the profit, Zhejiang took a third position, arguing that Commerce properly <u>included</u> the "interest income" in the profit calculation.  Def.-Int.'s Zhejiang Xingyi Metal Prods. Co., Ltd.'s Resp. to the Ct.'s Post Arg. Qus. at 2, ECF No. 50.

four categories must be deducted from Ayes' profit, the record indicates that Ayes will

remain profitable.[13]  Consequently, Plaintiff's challenge to the use of Ayes' financial

statements due to a lack of profit fails because the premise on which it is made has not

been established.

###    IV.    Commerce's Selection of Turkey as the Primary Surrogate Country

####            A.  Legal Framework

As discussed above, Commerce generally values all factors of production in a

single surrogate country, referred to as the "primary surrogate country."  *See* 19 C.F.R.

§ 351.408(c)(2) (excepting labor); *Jiaxing II*, 822 F.3d at 1294 & n.3.  The court has

acknowledged this practice as a way "to minimize distortion."  *Tri Union Frozen Prods.,*

*Inc. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1387, 1400 (2017); *see also*

*Carbon Activated Tianjin Co. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1310,

1318 (2021) (discussing Commerce's preference to value all factors of production in a

single surrogate country).  The court also discussed above Commerce's four-step

approach to selecting the primary surrogate country and that it is selected based on the

reliability and completeness of the data in the similarly-situated surrogate country.

Commerce will "only resort to a secondary surrogate country if data from the primary

surrogate country are unavailable or unreliable."  *Jiaxing Brother Fastener Co. v. United*

---

[13] The court is remanding Commerce's treatment of incentive income (Turkish Lira
("TL") 303,749), shipping revenues (TL 484,335), rental income (TL 11,750) and interest
income (TL 117,988).  Even if Plaintiff's arguments are successful on remand with
respect to all four categories, the total adjustment would be TL 917,822, which is less
than Ayes' profit, as already adjusted by Commerce, in the amount of TL 1,939,209.
*See* Fin. Ratios Mem., Attach. 3.

*States*, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citations omitted),

*aff'd*, *Jiaxing II*, 822 F.3d 1289.

### B. Parties' Contentions

Plaintiff contends that Commerce's selection of Turkey over Mexico as the

primary surrogate country was not supported by substantial evidence or in accordance

with law.  Pl.'s Mem. at 29; *see also* Pl.'s Reply at 15.  Plaintiff contends that Commerce

failed to compare the relative data quality between Mexico and Turkey because the

agency determined that Grupo Carso was not a producer of comparable merchandise.

Pl.'s Mem. at 30–31; *see also* Pl.'s Reply at 15.  Additionally, Plaintiff contends that the

Mexican data were superior because Turkey's surrogate values were not

contemporaneous, Ayes' financial statements were less detailed than Grupo Carso's,

and Ayes was not profitable.  Pl.'s Mem. at 34–36; *see also* Pl.'s Reply at 15.  The

Government contends that Commerce found that the Turkish data included "a

complete[], audited financial statement for a company that produced comparable

merchandise, unlike the Mexican surrogate data."  Def.'s Resp. at 23.  The Government

further contends that Commerce addressed Plaintiff's arguments against selecting

Turkey as the surrogate country, explaining that the Turkish values were

contemporaneous, and Ayes' financial statements showed a profit and contained

sufficient detail.  *Id.* at 23–24.

### C. Analysis

Plaintiff's argument that Commerce erred in selecting Turkey as the surrogate

country is based on several factual assertions, two of which the court has already

rejected: Commerce reasonably found that Ayes produces comparable merchandise whereas Grupo Carso does not; and while Commerce must revisit its treatment of certain income categories when calculating the financial ratios, the value of those categories is not significant enough to result in finding Ayes to be unprofitable in any case.  Having rejected those claims, as Commerce did below, the court considers whether Plaintiff's remaining arguments are a sufficient basis to question Commerce's selection of Turkey.

Plaintiff's contention that Commerce did not examine the relative data quality between the Mexican and Turkish data is not supported by the record.  To the contrary, Commerce acknowledged that "the Mexican data for certain [factors of production] may be more contemporaneous than that of corresponding Turkish data," and explained that "the record is incomplete with respect to [surrogate values] from Mexico, but is complete with respect to [surrogate values] from Turkey."  I&D Mem. at 13.  Commerce further explained that it was able to adjust certain non-contemporaneous surrogate values to reflect the period of investigation, allowing it to value all factors of production, including the financial ratios, in its selected surrogate country.  *See id.*

Plaintiff also argues that Grupo Carso's financial statements should have been used because they are more detailed than Ayes' financial statements.  Pl.'s Mem. at 35. Commerce's practice is to select financial statements that are "sufficiently detailed to calculate financial ratios, and are from the primary surrogate country."  Issues & Decision Mem. for Certain Quartz Surface Products from China, A-570-084 (May 14, 2019) at 81–82, https://access.trade.gov/Resources/frn/summary/prc/2019-10800-1.pdf

(last visited May 30, 2023).  Regardless of the detail in Grupo Carso's financial

statements, Plaintiff has not identified any inadequacy with the level of detail in Ayes'

financial statements.

Commerce also found that Mexico's surrogate data was incomplete because

Plaintiff misclassified certain inputs under the Harmonized Tariff Schedule ("HTS"). I&D

Mem. at 13.  Plaintiff disputes this assertion, pointing to Commerce's statement that the

agency's determination on data quality was "based on an analysis of complete, factual

information on the record, and did not result from a deficient or incomplete SV

submission."  Pl.'s Mem. at 31 (citing I&D Mem. at 13–14).  Regardless, Commerce also

noted that the missing or misclassified HTS numbers "further support[ed]" its selection

of Turkey as the surrogate country.  I&D Mem. at 13.  Thus, Commerce treated the

misclassification as a contributor to its selection of Turkey over Mexico, but not

determinative of that selection.  Even if it were treated as a neutral factor, it would not

serve to counter the lack of an appropriate financial statement from a producer of

comparable merchandise in Mexico and Commerce's preference to value all factors in

the primary surrogate country.

For these reasons, Commerce's selection of Turkey as the primary surrogate

country is supported by substantial evidence and in accordance with the law.

## Conclusion and Order

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Determination* is remanded to Commerce so

that it may reconsider, or further explain, its treatment of Ayes' "incentive income,"

"shipping revenues," "rental income," and "interest income" when calculating the

surrogate financial ratios; it is further

     **ORDERED** that Commerce shall file its remand redetermination on or before

August 24, 2023; it is further

     **ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); it is further

     **ORDERED** that any comments or responsive comments must not exceed 3,000

words; and it is further

     **ORDERED** that Commerce's *Final Determination* in all other respects is

sustained.

/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: May 30, 2023
     New York, New York