A-570-133
Remand
Slip Op. 23-83
POI:  02/11/2021 - 07/31/2022
**Public Document**
E&C/OIII:  LRL

*List Industries, Inc. v. United States*
**Court No. 21-00521, Slip Op. 23-83 (May 30, 2023)**
**Certain Metal Lockers and Parts Thereof from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

I.      **SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

Court) in *List Industries, Inc. v. United States*, Court No. 21-00521 (May 30, 2023) (*Remand*

*Order*).[1]  These final results of redetermination pertain to the final affirmative determination of

the antidumping duty (AD) investigation of certain metal lockers and parts thereof (metal

lockers) from the People's Republic of China (China).[2]  In light of the *Remand Order*, on

remand, Commerce has provided further explanation for our treatment of shipping revenue,

incentive income, interest income and rental income in the determination of the selling, general,

and administrative (SG&A) expense ratio using Ayes Celikhasir VE CT's (Ayes) audited

financial statements.  In addition, we excluded shipping revenue from the determination of the

SG&A, and reduced profit by the interest income.  Consequently, we have recalculated Zhejiang

Xingyi Metal Products Co., Ltd. (Zhejiang Xingyi) and Xingyi Metalworking Technology

(Zhejiang) Co., Ltd.'s (Xingyi Metalworking) (collectively, Zhejiang Xingyi/Xingyi

---

[1] *See List Industries, Inc. v. United States*, Court No. 21-00521, Slip Op. 23-83 (CIT 2023) (*Remand Order*).
[2] *See Certain Metal Lockers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 35737 (July 7, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

Metalworking) weighted-average dumping margin, which has changed from 21.25 percent to 21.38 percent.  The weighted-average dumping margin for Hangzhou Xline Machinery & Equipment Co., Ltd. (Hangzhou Xline) (*i.e.*, 0.00 percent) is unchanged from that in the *Final Determination.*  Moreover, as a result of Commerce's recalculation of the weighted-average dumping margin for Zhejiang Xingyi/Xingyi Metalworking, we have recalculated the exporter/producer combination rates for the respondents that are eligible for a separate rate in this investigation.

## II.      BACKGROUND

In the underlying investigation, Commerce calculated surrogate financial ratios using the financial statements of Ayes.  The CIT remanded four issues to Commerce for further reconsideration or explanation with respect to the calculation of these financial ratios.[3]  The CIT remanded the following issues to Commerce either to reconsider or to further explain:  (1) disparate treatment of shipping in the calculation of Ayes' financial ratios, where shipping expenses were excluded from SG&A, but shipping revenues were included in SG&A, in view of Commerce's stated practice of seeking "consistency in the treatment of both the revenue and expense side of line items on Ayes' financial statements;" (2) inclusion of incentive income as an offset to SG&A for the *Final Determination* (but not the *Preliminary Determination*[4]) without identifying the corresponding expense category or explaining the reason for the change; (3) inclusion of rental income as an offset to SG&A in the *Final Determination* (but not the *Preliminary Determination*) without explaining the reason for the change; (4) treatment of

---

[3] *See Remand Order*.
[4] *See Certain Metal Lockers and Parts Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 86 FR 9051 (February 11, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

interest income in the calculation of the financial ratios, with a precise description of its calculations, including a demonstration that any interest income excluded from the SG&A ratio is also excluded from profit.

We issued draft results pursuant to court remand on July 27, 2023.[5]  On August 3, 2023, Zhejiang Xingyi and Xingyi Metalworking (collectively, Zhejiang Xingyi/Xingyi Metalworking) provided comments on the Draft Results.[6]

### III.   ANALYSIS

#### A.   Discussion of the Issues

As a result of our analysis, and consistent with the Court's instructions, we have provided further explanation for our treatment of shipping revenue, incentive income, interest income, rental income and interest income in the determination of SG&A using Ayes' audited financial statements.  In addition, we excluded shipping revenue from the determination of the SG&A, and reduced profit by the interest income.

#### 1.   *Shipping Revenue*

In the *Preliminary Determination*, Commerce excluded both shipping expenses and shipping revenues from the determination of surrogate financial ratios.[7]  However, in the *Final Determination*, Commerce continued to exclude shipping expenses from the determination of SG&A, but included shipping revenues in SG&A.[8]

---

[5] *See* Draft Results of Remand Redetermination, *List Industries, Inc. v. United States*, Court No. 21-00521, Slip Op. 23-83 (CIT 2023), dated July 27, 2023(*Draft Results*).
[6] *See* Zhejiang Xingyi/Xingyi Metalworking's Letter, "ZXM/XMT Comments Regarding The Draft Remand Redetermination," dated August 3, 2023 (Draft Results Comments).
[7] *See* Memorandum, "Preliminary Surrogate Value Memorandum," dated February 4, 2021 (Preliminary Surrogate Value Memorandum) at 6 and Attachment 3, "Ayes Financial Ratio Analysis."
[8] *See* Memorandum, "Changes to the Surrogate Financial Ratios for the Final Determination," dated June 28, 2021 (Final Surrogate Financial Ratios Memorandum) at 2 and Attachment 3, "Ayes Financial Ratio Analysis."

The CIT remanded the issue to Commerce for reconsideration or further explanation because Commerce's treatment of shipping revenue in the *Final Determination* appeared to be at odds with its stated practice of seeking "consistency in the treatment of both the revenue and expense side of line items on Ayes' financial statements."[9]

**Analysis**

We agree with the Court's analysis that our treatment of shipping revenue in the *Final Determination* is at odds with our stated practice of seeking "consistency in the treatment of both the revenue and expense side of line items on Ayes' financial statements."[10]

Commerce excluded shipping expenses from the determination of the surrogate financial ratios in the final determination because both respondents, Zhejiang Xingyi and Hangzhou Xline appropriately reported shipping expenses in their Section C databases for their U.S. sales.[11] Specifically, Zhejiang Xingyi reported that it incurred domestic inland freight, and domestic brokerage and handling on its U.S. sales.[12] However, Zhejiang Xingyi further explained that it incurred no international freight or marine insurance on its free on board (FOB) sales.[13]

Hangzhou Xline reported for certain sales that it incurred domestic inland freight and domestic brokerage and handling expenses,[14] international freight,[15] and marine insurance.[16]

---

[9] *See Remand Order* at 15 (citing *Final Determination* IDM at 15).

[10] *Id.*

[11] *See* Memorandum, "Analysis Memorandum for the Final Determination:  Zhejiang Xingyi Metal Products Co., Ltd. / Xingyi Metalworking Technology (Zhejiang) Co., Ltd.," dated June 28, 2021 (Zhejiang Xingyi's Final Analysis Memorandum) (citing to the ZXM US Sales database and the XMT US Sales Database. *See also* Memorandum, "Final Analysis Memorandum for Hangzhou Xline Machinery & Equipment Co., Ltd.," dated June 28, 2021 (Hangzhou Xline's Final Analysis Memorandum) (citing to Hangzhou Xline US Sales Database).

[12] *See* Zhejiang Xingyi's Letter, "ZXM's Section C Questionnaire Response," dated October 19, 2020 (Zhejiang Xingyi's CQR), at 15.

[13] *See* Zhejiang Xingyi's Letter, "ZXM Supplemental Sections ACD Questionnaire Response," dated December 14, 2020, at 24.

[14] *See* Hangzhou Xline's Letter, "Submission of Hangzhou Xline's Section C Response," dated October 20, 2020 at 24-25.

[15] *Id.* at 26.

[16] *Id.* at 27.

Commerce deducted the reported shipping expenses from each company's reported gross unit price, as appropriate, in the determination of the net U.S. price used in the margin calculations for each company,[17] thereby accounting for the actual shipping expenses each company incurred. As a consequence, if Commerce were to include the shipping expenses recorded in the surrogate financial statements in the surrogate SG&A ratio, it would double count the shipping expenses reported by each company and, thus, inappropriately overstate SG&A in the calculation of normal value for each company.[18]

Despite the fact that neither company reported shipping revenue,[19] it would be inappropriate to include shipping revenue in the determination of SG&A using Ayes' financial statements, because such treatment would be inconsistent with the treatment of the corresponding shipping expenses, which we have excluded from the SG&A expense ratio. Therefore, for the purposes of these results of the remand redetermination, we are excluding shipping revenue from the calculation of the SG&A ratio using Ayes' surrogate financial statements, as we did in the *Preliminary Determination*.[20]  As a result of this exclusion, the total value of SG&A increases from 11,196,626 to 11,680,961 – a difference of 484,335.  As a consequence, the SG&A ratio increases from 3.4223 percent to 3.5703 percent.

---

[17] *See* Zhejiang Xingyi's Final Analysis Memorandum at Attachment 2, lines 1682 and 1687; *see also* Hangzhou Xline's Final Analysis Memorandum at Attachment 2, lines 1225-1264.

[18] *See, e.g.*, *Certain Iron Mechanical Transfer Drive Components from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 81 FR 75032 (October 28, 2016), and accompanying IDM at Comment 17; *see also Notice of Final Determination of Sales at Less Than Fair Value; Honey from the People's Republic of China*, 66 FR 50608 (October 4, 2001), and accompanying IDM at Comment 3.

[19] *See* Zhejiang Xingyi's Final Analysis Memorandum and U.S. sales database; *see also* Hangzhou Xline's Final Analysis Memorandum and U.S. sales database.

[20] Additionally, we note that we stated that we intended to exclude both the shipping expenses and shipping revenues in the calculation of the financial ratios for the *Final Determination.  See Final Determination* IDM at Comment 1 ("Consistent with Commerce's practice, we sought consistency in the treatment of both the revenue and expense side of line items on Ayes' financial statements.  For example, we excluded both the shipping expenses and shipping revenues in the *Preliminary Determination*, because these expenses and revenues are reportable as sales-specific expenses.  We continue to exclude both the expenses and revenues associated with shipping merchandise for sale." (citations omitted).)

### 2.    *Incentive Income*

In the *Preliminary Determination*, Commerce excluded incentive income from the calculation of SG&A using Ayes' surrogate financial statements,[21] but included it in SG&A for the *Final Determination*.[22]

The CIT remanded the treatment of incentive income to Commerce for reconsideration or further explanation because it was unable to discern the corresponding expense category or any other reason for Commerce's change in the *Final Determination*.[23]

**Analysis**

As a preliminary matter, we note that any surrogate financial statements used in the determination of SG&A and profit in non-market economy (NME) cases represent public documents obtained by parties to the proceeding for the determination of normal value.  In the case of NME surrogate financial ratio calculations, Commerce cannot go behind the financial statements to determine the appropriateness of including certain items in the financial ratio calculations.  Consequently, we look to information in the surrogate financial statements to determine the possible nature of the activity generating the income to see if a relationship exists between the activity and the general operations of the company.[24]  In these surrogate financial statements, Ayes lists the incentive income as "Other Income from Operating Activities."  While Commerce does have a practice of excluding income from "export" incentive programs, Note 22 to Ayes' financial statements confirms that Ayes received no government incentives or grants during fiscal years 2018 and 2019.

---

[21] *See* Preliminary Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."
[22] *See* Final Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."
[23] *See Remand Order* at 16-17.
[24] *See, e.g.*, *OTR Tires* IDM at Comment 18.B.

In this case, the issue is not whether the surrogate company failed to record a corresponding expense for incentive income, but whether Commerce appropriately classified the line items recorded on Ayes' surrogate financial statements for the purposes of the AD calculations.  As the Court noted, Commerce revised the treatment of six income categories recorded in Ayes' financial statements from the *Preliminary Determination* to the *Final Determination*:  deferred finance income, incentive income, shipping revenues, provisions no longer required, price difference, other income and profits.[25]  The Court noted that for four income categories (deferred finance income, provisions no longer required, price difference, and other income and profit), Ayes' financial statements included a corresponding expense category that Commerce had already included in the SG&A ratio calculation (deferred finance expense, provision for doubtful receivables, price difference, and other expenses and losses).[26]  The Court noted that, contrary to the List Industries' argument, the inclusion of certain "other real operating income" categories as offsets to SG&A does not contradict Commerce's general practice.[27]  It follows then that Commerce's treatment of incentive income in the *Final Determination* is consistent both with the facts of this case, and its practice.

Our calculation worksheet shows that in the *Final Determination*, we deducted all line items recorded in "Other Real Operating Income" on Ayes' financial statements from SG&A, and we added all line items recorded in "Other Real Operating Expenses" on Ayes' financial statements to SG&A.[28]  An examination of the line items included in "Other Real Operating

---

[25] *See Remand Order* at 16.
[26] *Id.*
[27] *Id.* at 17 (explaining in footnote 7:   "'In calculating the {general and administrative} expense ratio, Commerce normally includes certain expenses and revenues that relate to the general operations of the company as a whole and to the accounting period, as opposed to including only those expenses that directly relate to the production of the merchandise.' Issues & Decision Mem. for Forged Steel Fittings from the Republic of Korea, A-580-904 (Oct. 13, 2020) at 18, https://access.trade.gov/Resources/frn/summary/korea-south/2020-23110-1.pdf (last visited May 30, 2023)").
[28] *See* Final Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."

Income" and "Other Real Operating Expenses," shows that three income categories (incentive

income, shipping revenues, and provisions no longer required) do not have a corresponding

expense in the category of "Other Real Operating Expenses."[29]  And five expense categories

included in "Other Real Operating Expenses" do not have a corresponding category in "Other

Real Operating Income:  maturity difference expenses, provision for doubtful receivables,

litigation provision, decline in value of inventory, and idle capacity expenses.[30]  Therefore, an

examination of Ayes' financial statements reveals that numerous line items included in either the

"Other Real Operating Expenses" category or the "Other Real Operating Income" category do

not have an entry in the corresponding category.  The important point is not whether the

surrogate company had matching line items for all of its recorded real operating income and/or

real operating expense line-items, but whether Commerce treated all of the reported line items

recorded within each category in a consistent and reasonable fashion.

By including all real operating income and all real operating expenses in the

determination of SG&A for Ayes, *i.e.*, by deducting all real operating income line items

(excluding shipping revenues) and adding all real operating expense line items, Commerce

treated the real operating income and real operating expenses recorded on Ayes' financial

statements in a reasonable, consistent, and predictable fashion, that is also consistent with its

stated practice.[31]

---

[29] *Id.*
[30] *Id.*
[31] *See Forged Steel Fittings from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 66302 (October 19, 2020), and accompanying IDM at 18; *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017), and accompanying IDM at Comment 13.

Thus, for these results of the remand redetermination, we have further considered and explained our treatment of incentive income in the determination of SG&A and have made no changes to our calculations with respect to incentive income.

### 3.    *Rental Income*

In the *Preliminary Determination*, Commerce excluded rental income from the calculation of the SG&A ratio in Ayes' surrogate financial statements,[32] but included it in the SG&A ratio for the *Final Determination*.[33]

The CIT remanded the issue to Commerce for reconsideration or further explanation, because Commerce did not explain its treatment of rental income in the *Final Determination* or provide an explanation of its treatment of income and expenses from investing activities as it did for other real operating income and expenses.[34]  The CIT further stated that "Commerce's explanation of providing consistent treatment between income and expense lines does not explain Commerce's treatment of rental income for the *Final Determination* - both because such an explanation does not apply to income from investing activities and because there is no obvious corresponding expense."[35]

**Analysis**

Commerce included rental income in Ayes' SG&A ratio for the *Final Determination* because, like fixed assets sales profits, it represents a general and administrative expense of the company.  Moreover, "{I}t is {Commerce's} practice to allow offsets to the G&A expense rate for rental income related to the general operations of the company, but to exclude the items if it

---

[32] *See* Preliminary Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."
[33] *See* Final Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."
[34] *See Remand Order* at 18-19.
[35] *Id.* at 19.

relates to a separate line of business (*e.g.*, hotel or apartment building)."[36]  The small amount of

the rental income in these financial statements is not indicative of a separate line of business, nor

is there any other information in the financial statements to suggest it is a separate line of

business for the surrogate company.  Additionally, the financial statements include depreciation

expenses under "expenses from investments" that are likely associated with the rental income.

Moreover, there would be other expenses associated with the rented asset, such as maintenance,

insurance, property taxes, etc., that are embedded in expenses used in the ratio calculations.

Thus, in the *Final Determination*, Commerce properly classified rental income as an offset to

SG&A.

Therefore, for the purposes of these final results of redetermination, Commerce has

explained why it classified rental income as an offset to SG&A in Ayes' surrogate financial

ratios for the *Final Determination*, and we continue to classify rental income as an offset to

SG&A for the purposes of these final results of redetermination.

### 4.    *Interest Income*

Commerce stated that it excluded interest income from the determination of SG&A and

profit in both the *Preliminary Determination* and the *Final Determination*.[37]  However, List

Industries maintains that Commerce failed to subtract the excluded interest income from Ayes'

profit, and Zhejiang Xingyi maintains that Commerce properly included the "interest income" in

the profit calculation.  Commerce explained that it excluded interest income from the profit

calculation.

---

[36] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 37284 (July 1, 2014), and accompanying IDM at Comment 2.
[37] *See* Preliminary Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis;" *see also* Final Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."

The CIT remanded the issue to Commerce for reconsideration or further explanation because the parties disagree on whether Commerce did, in fact, remove the excluded interest income from profit.[38]

**Analysis**

An examination of the Ayes Financial Ratio Analysis worksheets for the *Preliminary Determination* and *Final Determination* reveal that Commerce classified the interest income recorded in Ayes' financial statements under the category "Income from Investing Activities" in the "Excluded" column on the surrogate ratio calculation worksheet.[39]  However, while this classification resulted in the interest income being "excluded" from the SG&A column and calculation, it failed to reduce the net profit column and calculation for this excluded income. Because the starting point for the surrogate profit calculation was the net profit from Ayes' financial statements, all pre-tax income and expenses, including the interest income at question, are part of that net profit.  Therefore, merely classifying the interest income under the "Excluded" column on the worksheet did not exclude the income from net profit.  Where Commerce identifies line items that should be excluded as offsets to SG&A expenses, our practice is to also remove those line items from profit.[40]  Here, we disallowed the interest income from investing activities from SG&A expenses; therefore, we must also adjust (reduce) the net profit from Ayes' financial statements to exclude this interest income from the profit calculation.

---

[38] *See Remand Order* at 20.

[39] *See* Preliminary Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis;" *see also* Final Surrogate Value Memorandum at Attachment 3, "Ayes Financial Ratio Analysis."

[40] *See, e.g., Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 FR 14495 (March 12, 2012), and accompanying IDM at Comment 7; *Citric Acid and Certain Citrate Salts from the People's Republic of China: Preliminary Results of the First Administrative Review of the Antidumping Duty Order; and Partial Rescission of Administrative Review*, 76 FR 34048 (June 10, 2011), and accompanying IDM at Comment 9.

As a result of this change to our calculation, Ayes' profit ratio changes from 0.5731 percent to 0.5375 percent, a downward change of 0.0349 percent.

### B.    Effects on Weighted-Average Dumping Margins

As a result of these changes, Zhejiang Xingyi's weighted-average dumping margin increased from 21.25 percent to 21.38 percent.   The weighted-average dumping margin for Hangzhou Xline (*i.e.*, 0.00 percent) is unchanged from the *Final Determination.*  Moreover, as a result of the change to the weighted-average dumping margin for Zhejiang Xingyi/Xingyi Metalworking, we have recalculated the exporter/producer combination rates for the respondents that are eligible for a separate rate in this investigation.  *See* Attachment.

## IV.    <u>INTERESTED PARTY COMMENTS</u>

Despite stating that they concurred and endorsed Commerce's Draft Results insofar as it complies with the Court's instructions, Zhejiang Xingyi/Xingyi Metalworking explained that they did not agree with the calculation changes with respect to shipping revenue or interest income.  As Zhejiang Xingyi/Xingyi Metalworking concede, however, these changes have virtually no effect on the margin calculation.  Regardless, Zhejiang Xingyi/Xingyi Metalworking urged Commerce to continue to make these same determinations in its final results of redetermination.

Because no interested party provided substantive comments on our Draft Results nor identified necessary changes to the calculations, and all comments received agreed that the Draft Results should remain unchanged for the final, we made no changes to our calculations for these final results of redetermination.

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the Court's instructions, on remand, we have provided further explanation for our treatment of shipping revenue, incentive income, and rental income in the determination of SG&A using Ayes' audited financial statements.  We have excluded shipping revenue from the determination of the SG&A ratio for an overall increase to the SG&A ratio of 0.1480 percent (from 3.4223 percent to 3.5703 percent).  We have also reduced profit by the interest income for an overall change to the profit ratio of -0.0349 percent (from 0.05731 percent to 0.05375 percent).  Consequently, we have recalculated the weighted-average dumping margin for Zhejiang Xingyi/Xingyi Metalworking, which is now 21.38 percent (an increase of 0.13 percent).  The weighted-average dumping margin for Hangzhou Xline is unchanged from that in the *Final Determination* (*i.e.*, 0.00 percent).  Moreover, as a result of Commerce's recalculation of the weighted-average dumping margin for Zhejiang Xingyi/Xingyi Metalworking, we have recalculated the exporter/producer combination rates for the respondents that are eligible for a separate rate in this investigation.  Because certain weighted-average dumping margins are different from those in the *Final Determination*, we intend to issue a *Timken* notice with the amended final determination should the Court sustain these final results of redetermination.

8/23/2023

X _Elouaradia_ (signature)

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

**ATTACHMENT**

Consistent with the *Final Determination*, Commerce calculated exporter/producer

combination rates for the respondents that are eligible for a separate rate in this investigation.[41]

Policy Bulletin 05.1 describes this practice.[42]

As a result of these changes, the estimated weighted-average dumping margins for all

companies are as follows:

| Exporter | Producer | Estimated Weighted – Average Dumping Margin | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent) |
|---|---|---|---|
| Hangzhou Xline Machinery & Equipment Co., Ltd. | Hangzhou Jusheng Metal Products Co., Ltd. | 0.00 | 0.00 |
| Zhejiang Xingyi Metal Products Co., Ltd. / Xingyi Metalworking Technology (Zhejiang) Co., Ltd. | Zhejiang Xingyi Metal Products Co., Ltd. / Xingyi Metalworking Technology (Zhejiang) Co., Ltd. | 21.38 | 10.84 |
| Geelong Sales (Macao Commercial Offshore) Limited (a.k.a. Geelong Sales (MCO) Limited, Geelong Sales (Macao Commercial) Limited, and Geelong Sales (MC) Limited) | Zhongshan Geelong Manufacturing Co. Ltd. | 21.38 | 10.84 |
| Hangzhou Evernew Machinery & Equipment Company Limited | Zhejiang Yinghong Metalworks Co., Ltd. | 21.38 | 10.84 |

---

[41] *See Final Determination*, 86 FR at 35738 and 35739.
[42] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 5, 2005) (Policy Bulletin 05.1), available on Commerce's website at https://access.trade.gov/Resources/policy/bull05-1.pdf.

| Exporter | Producer | Estimated Weighted – Average Dumping Margin | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent) |
|---|---|---|---|
| Hangzhou Zhuoxu Trading Co., Ltd. | Shanghai Asi Building Materials Co., Ltd. | 21.38 | 10.84 |
| Hangzhou Zhuoxu Trading Co., Ltd. | Luoyang Mingxiu Office Furniture Co., Ltd. | 21.38 | 10.84 |
| Hangzhou Zhuoxu Trading Co., Ltd. | Luoyang Wandefu Import and Export Trading Co. Ltd. | 21.38 | 10.84 |
| Hangzhou Zhuoxu Trading Co., Ltd. | Zhejiang Xingyi Metal Products Co., Ltd. | 21.38 | 10.84 |
| Jiaxing Haihong Mechanical and Electrical Technology Co. Ltd. | Zhejiang Steelrix Office Furniture Co., Ltd. | 21.38 | 10.84 |
| Kunshan Dongchu Precision Machinery Co., Ltd. | Kunshan Dongchu Precision Machinery Co., Ltd. | 21.38 | 10.84 |
| Luoyang Hynow Import and Export Co., | Luoyang Jiudu Golden Cabinet Co., Ltd. | 21.38 | 10.84 |
| Luoyang Shidiu Import and Export Co., Ltd. | Luoyang Yuabo Office Machinery Co., Ltd. | 21.38 | 10.84 |
| Luoyang Steelart Office Furniture Co., Ltd. | Luoyang Yongwei Office Furniture Co., Ltd. | 21.38 | 10.84 |
| Luoyang Steelart Office Furniture Co., Ltd. | Luoyang Zhuofan Steel Product Factory | 21.38 | 10.84 |
| Luoyang Steelart Office Furniture Co., Ltd. | Luoyang Flyer Office Furniture Co., Ltd. | 21.38 | 10.84 |
| Pinghu Chenda Storage Office Co., Ltd. | Pinghu Chenda Storage Office Co., Ltd. | 21.38 | 10.84 |

| Exporter | Producer | Estimated Weighted – Average Dumping Margin | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent) |
|---|---|---|---|
| Tianjin Jia Mei Metal Furniture Ltd. | Tianjin Jia Mei Metal Furniture Ltd. | 21.38 | 10.84 |
| China-Wide Entity | | 322.25 | 311.71 |